# In the United States Court of Federal Claims

No. 24-2155
(Filed Under Seal: May 9, 2025)
Reissued: May 28, 2025*

```
* * * * * * * * * * * * * * * * * *
                                  *
KROPP HOLDINGS, INC.,             *
                                  *
              Plaintiff,          *
                                  *
       v.                         *
                                  *
THE UNITED STATES,                *
                                  *
              Defendant,          *
                                  *
       and                        *
                                  *
ASSOCIATED ENERGY GROUP, LLC,     *
                                  *
              Defendant-Intervenor. *
                                  *
* * * * * * * * * * * * * * * * * *
```

    *Craig A. Holman*, with whom were *Kara L. Daniels*, *Thomas A. Pettit*, *Roee Talmor*, and *Nicole W. Williamson*, Arnold & Porter Kaye Scholer, LLP, all of Washington, D.C., for Plaintiff.

    *John H. Roberson*, Senior Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, with whom were *Douglas K. Mickle*, Acting Deputy Director, *Patricia M. McCarthy*, Director, *Yaakov M. Roth*, Acting Assistance Attorney General, all of Washington, D.C., for Defendant, and *Steven Sosko*, Senior Counsel, Defense Logistics Agency, of Fort Belvoir, VA, of counsel.

    *Todd J. Canni*, with whom were *Ariella M. Cassell* of Los Angeles, CA, and *Kevin Barnett*, *Stephen Ruscus*, *Kevin N. Dorn*, and *Kaitlyn E. Toth*, Baker & Hostetler LLP, all of Washington, D.C., for Defendant-Intervenor.

---

    * Pursuant to the protective order entered in this case, this opinion was filed initially under seal. The parties provided proposed redactions of confidential or proprietary information, which are redacted in this version of the opinion. In addition, the Court made minor typographical and stylistic corrections to this version of the opinion.

**OPINION AND ORDER**

**SOMERS**, Judge.

Whoever came up with the idiom "can't win for losing" obviously did not have the protestor, Kropp Holdings, Inc. ("KHI"), in mind, but they certainly could have. KHI has made several trips to the Government Accountability Office ("GAO") to protest the award of the contract at issue here to Defendant-Intervenor Associated Energy Group, LLC ("AEG") and has now brought the instant protest in this Court. During this time, KHI has discovered that AEG submitted a proposal that was ten pages beyond the page limits set forth in the solicitation. Yet, the agency awarded AEG the contract despite AEG's exceeding of the page limits. So KHI protested this violation to GAO. What did the agency do? The agency took corrective action and extended the page limits by ten pages and re-awarded the contract to AEG. So KHI again protested to GAO because the corrective action did not address the fact that the agency had conducted discussions with AEG based on the proposal with the extra pages without reopening discussions with KHI. Next, the agency realized that AEG submitted a non-compliant proposal because AEG failed to include a required "no cost" certification. What did the agency do? The agency unlawfully conducted discussions with AEG only, which permitted AEG to correct its disqualifying mistake and allowed the agency to award the contract to AEG once again. Finally, once it received the complete administrative record in this Court, four years after the deadline for initial proposal submission, KHI discovered that AEG had submitted its proposal after the deadline for proposal submission. What is more, evidence in the record indicates that the agency was aware that AEG's proposal did not come in on time. What did the agency do? It did not apply the "late is late" rule. Rather, the agency awarded AEG the contract despite its late submission. In other words, despite all these disqualifiers and other procurement errors that will be discussed below, AEG was awarded the contract at issue here. And KHI could not win for losing.

At issue in this protest is the Defense Logistics Agency's award of a contract to administer an aviation fuel payment system known as the "AIR Card" program. The agency awarded the contract to AEG over KHI, the incumbent on the contract and protestor here. KHI filed this bid protest alleging eight grounds for why the Court should overturn the award of the contract to AEG. Of those eight grounds, four are successful. First, AEG untimely submitted its proposal; the agency's acceptance of the late proposal and subsequent award of the contract to AEG constituted prejudicial error. Second, the agency prejudicially erred by conducting misleading discussions with KHI and unequally treating the offerors' proposals. Third, the agency irrationally attributed AEG's corporate experience and past performance to a completely walled-off division created by AEG to compete for the contract and relied on those flawed attributions to award the contract. Such reliance is prejudicial error. Fourth, these above errors directly impacted the agency's best value determination, making that determination prejudicially in error. Accordingly, as discussed in detail below, KHI's motion for judgment on the administrative record ("MJAR") is granted, the cross-motions filed by the government and AEG are denied, the award of the contract to AEG is held unlawful and set aside, and KHI is granted injunctive relief.

## BACKGROUND

**A.    Facts**

The Defense Logistics Agency Energy ("DLA" or "agency") is a major subordinate command of the Defense Logistics Agency located in Fort Belvoir, Virginia.  DLA is responsible for acquiring energy-related resources and services for the U.S. Department of Defense ("DoD").  ECF No. 78 at 2.  As part of its responsibilities, DLA runs the Aviation Into-plane Reimbursement ("AIR") Card program.  Tab 1 at Administrative Record ("AR") 1.  The AIR Card program allows the military departments, defense agencies, and participating civilian agencies to procure aviation fuel, fuel-related supplies, and ground services from commercial merchants worldwide.  *Id.*  Prior to this procurement, KHI held a contract with DLA to provide the transactional services needed to support the AIR Card program.  Tab 14 at AR 680.

On June 22, 2021, DLA posted a Request for Proposals ("RFP") for solicitation number SPE608-21-R-0203 as a follow-on to KHI's expiring contract, seeking transaction processing services for the AIR Card program.  *See* Tab 10 at AR 205; *see also* ECF No. 64 at 3.  The RFP sought a contractor to manage the Air Card program, which "provides the ability to procure aviation fuel and ancillary ground services at commercial airports globally" through a contractor-provided payment solution.  Tab 201 at AR 6291.  After DLA originally issued the RFP on June 22, 2021, it amended the RFP sixteen times.  *See id.* at AR 6288.  Amendment 14 to the original RFP contains the final proposal instructions, Tab 174 at AR 5422–40, and Amendment 16 includes the final Performance Work Statement ("PWS"), Tab 201 at AR 6290–6358.

The RFP ultimately required offerors to submit their proposals in four volumes, each containing different information: Volume 1: Offeror Data; Volume 2: Technical Approach, Management Approach, Past Performance; Volume 3: Electronic Access System ("EAS"), Merchant Acceptance with Level III Data Plan; and Volume 4: Price Proposal.  Tab 174 at AR 5424–31.  In these four volumes offerors were required to provide information that would be scored pursuant to six factors, comprising eleven subfactors, three of which are relevant here.  Within Volume 2, Subfactor 1(d) required offerors to provide information regarding their corporate experience, which DLA would rate and take into consideration when awarding the contract.  *See id.* at AR 5427.  According to the RFP, DLA weighted Subfactor 1(d) the same as Subfactor 1(b), but less than the other subfactors under Factor 1.  *Id.* at AR 5434.  Also within Volume 2, Factor 5, titled "Past Performance," required offerors to provide DLA with references to confirm the offerors' transactional history and provided that DLA would review any past performance ratings offerors may have received in the Contractor Performance Assessment Reporting System.  *Id.* at AR 5428–29.  According to the RFP, DLA weighted Factor 5 the same as Factor 2 but less than Factors 1, 3, and 4.  *Id.* at AR 5434.  Within Volume 3, Factor 3, titled AIR Card EAS, required offerors to submit their offers to create a mobile application and digital interface to support various transactions within the AIR Card program.  *See id.* at AR 5430.  The RFP stated that Factor 3 would be equally weighted with Factors 1 and 4 and that these three factors would be weighted more than all other factors.  *Id.* at AR 5434.  In addition to these three requirements, relevant to this protest is a Preliminary Evaluation Factor that required offerors to certify that their proposals were at no cost to the government.  *Id.*  Failure to include this

3

certification was grounds for deeming a proposal "unacceptable" and removing the offeror from the competition. *Id.*

In response to the RFP, three offerors, including KHI and AEG, submitted proposals. KHI submitted its proposal on August 18, 2021. Tab 14 at AR 631. AEG submitted its proposal on August 19, 2021. *See* Tab 15 at AR 853. After concluding that KHI and AEG were the only acceptable offerors, DLA awarded AEG the contract on June 3, 2022. *See* Tab 91 at AR 2739–42.

## B.    Procedural History

This procurement has an extensive procedural history. On July 5, 2022, KHI filed a post-award protest with GAO. Tab 103 at AR 3117. On July 25, 2022, the contracting officer initiated corrective action, Tab 108 at AR 3686–87, DLA filed notice of that corrective action with GAO one day later, Tab 105 at AR 3680, and GAO dismissed KHI's protest on July 29, 2022, Tab 107 at AR 3682.

Several months later, on December 22, 2022, DLA engaged in additional discussions with AEG and KHI. Tab 123 at AR 3804; Tab 124 at AR 3806. Following these discussions, in January and February 2023, KHI filed two pre-award protests at GAO. Tab 139 at AR 4313; Tab 154 at AR 4594. These protests resulted in DLA filing a notice of corrective action, and GAO subsequently dismissing KHI's protests once more. Tab 173 at AR 5300–01.

On May 8, 2024, the source selection authority ("SSA") completed a Source Selection Decision Document ("SSDD"), concluding that AEG's offer represented the best value to the government, and the agency again awarded the contract to AEG. Tab 218 at AR 7780. On May 22, 2024, KHI filed another post-award protest at GAO, challenging the award of the contract to AEG. Tab 225 at AR 8038.

On August 28, 2024, GAO issued a decision sustaining KHI's protest, finding that the agency erred by accepting AEG's proposal despite the fact that AEG failed to list one of its subcontractors in response to RFP Subfactor 1(a) and because of that, the record did not demonstrate that the agency had reasonably considered this issue. *See Kropp Holdings, Inc.*, B-420857.8, 2024 WL 4330024, at *11–14 (Comp. Gen. Aug. 28, 2024). In response to GAO's decision, on September 18, 2024, DLA convened a new Technical Evaluation Board ("TEB") to reevaluate AEG's final revised proposal. Tab 252 at AR 9524. On October 24, 2024, the TEB signed a report stating that the agency would assess AEG a weakness for failing to identify the subcontractor with which it would execute the contract. *Id.* at AR 9524, 9527–28. On October 25, 2024, the SSA concurred with the TEB's conclusions and awarded the contract to AEG once again. Tab 253 at AR 9556.

On December 31, 2024, KHI filed the instant bid protest in this Court. ECF No. 1. The parties filed cross-MJARs, ECF No. 47; ECF No. 64; ECF No. 65, and AEG also filed a motion to dismiss certain of KHI's claims, ECF No. 65. On March 26, 2025, the Court held oral argument on the parties' cross-motions. This case is now ripe for adjudication.

## DISCUSSION

### A.    Standard of Review

The Tucker Act, as amended by the Administrative Dispute Resolution Act, provides the Court of Federal Claims with "jurisdiction to render judgment on an action by an interested party objecting to . . . the award of a contract or any alleged violation of statute or regulation in connection with a procurement . . . ." 28 U.S.C. § 1491(b)(1).  In such actions, the Court is to "review the agency's decision pursuant to the standards set forth in section 706 of title 5." *Id.* § 1491(b)(4).  To succeed in a bid protest, a protestor must make two showings. *Bannum, Inc. v. United States*, 404 F.3d 1346, 1351 (Fed. Cir. 2005).  First, a protestor must demonstrate error, meaning that the agency violated the standards set forth in section 706 of the Administrative Procedures Act ("APA").  *Id.*; *see also* 5 U.S.C. § 706(2)(A) (requiring the reviewing court to "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law").  Second, a protestor must prove that such error was prejudicial.  *Bannum, Inc.*, 404 F.3d at 1351.

To show that an agency's actions were in error, a protestor must demonstrate that the agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or [the decision] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *Ala. Aircraft Indus., Inc.-Birmingham v. United States*, 586 F.3d 1372, 1375 (Fed. Cir. 2009) (alteration in original) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).  Put differently, a procurement decision may be set aside if the protestor proves that "(1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure."  *Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1358 (Fed. Cir. 2009) (quoting *PGBA, LLC v. United States*, 389 F.3d 1219, 1225 n.4 (Fed. Cir. 2004)).  In addition, to demonstrate entitlement to relief, a protestor must establish not only that the agency violated the APA standard, but also that such violation prejudiced the protestor.  *Data Gen. Corp. v. Johnson*, 78 F.3d 1556, 1562 (Fed. Cir. 1996) ("[T]o prevail in a protest the protester must show not only a significant error in the procurement process, but also that the error prejudiced it."); *see also Sys. Studies & Simulation, Inc. v. United States*, 22 F.4th 994, 996–97 (Fed. Cir. 2021) ("In particular, the challenger of agency action generally bears the burden of showing that an error was harmful—that is, that it was prejudicial.").

Bid protests are generally decided on cross-motions for judgment on the administrative record, pursuant to Rule 52.1 of the Rules of the U.S. Court of Federal Claims ("RCFC").  RCFC 52.1 requires that the Court "make factual findings from the record evidence as if it were conducting a trial on the record."  *Bannum, Inc.*, 404 F.3d at 1354.  Unlike a motion for summary judgment, a genuine dispute of material fact does not preclude a judgment on the administrative record.  *See id.* at 1355–56.  Rather, in reviewing cross-MJARs, "the court asks whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record."  *Jordan Pond Co., LLC v. United States*, 115 Fed. Cl. 623, 630 (2014).

**B.      Analysis**

KHI makes eight principal arguments in support of its protest of DLA's award of the AIR Card contract to AEG.  *See* ECF No. 47-1.  First, KHI argues that the agency erred by accepting AEG's late initial proposal.  *Id.* at 14–17.  Second, KHI asserts that the agency deviated from the Federal Acquisition Regulation ("FAR") by holding post-Final Proposal Revision ("FPR") discussions only with AEG, which allowed AEG to make its proposal awardable.  *Id.* at 17–21.  Third, KHI contends that the agency failed to properly address AEG's OCIs because, in its view, a statute bars an awardee of this contract from having any OCIs and because the agency's acceptance of AEG's proposed OCI mitigation plan was irrational.  *Id.* at 21–31.  Fourth, KHI maintains that the agency misled KHI regarding acceptable approaches to the EAS.  *Id.* at 31–35.  Fifth, KHI claims that the agency's reevaluation was improper because the agency failed to maintain consistency within the TEB and did not resolve the identification-of-subcontractor issue identified by GAO.  *Id.* at 35–42.  Sixth, KHI asserts that the agency irrationally attributed the corporate experience and past performance of AEG to its walled-off division, PPS; therefore, AEG's scores under those subfactors are not reasonable.  *Id.* at 42–44.  Seventh, KHI argues that AEG's proposal was nonresponsive because it violated the RFP's prohibition on creating new "business lines."  *Id.* at 44–45.  Finally, KHI contends, based on the previous seven alleged errors, that the agency's best value determination was irrational.  *Id.* at 45–46.

The Court addresses these arguments in the order presented before turning to discussions of a sanction the Court assessed against the government and KHI's request for injunctive relief.

**1.    DLA Erred by Accepting AEG's Untimely Proposal.**

"All errors are not equal.  There are inherent competitive advantages to submitting a proposal after all other parties are required to do so . . . .  To avoid this potential for abuse, submission deadlines are strictly enforced across the board.  When the rules and procedures of a bid process are applied equally to all parties, but one party submits a proposal past the deadline for doing so, the untimely submission becomes a stranger to the process, and is disqualified from the procurement.  A late proposal is tantamount to no proposal at all.  Such a party has no 'substantial chance' of award, and no more standing to sue than the proverbial man on the street."  *Labatt Food Serv., Inc. v. United States*, 577 F.3d 1375, 1381 (Fed. Cir. 2009).  Put more succinctly, "late is late" and late submissions are not awardable.

KHI argues that AEG did not timely submit its initial proposal; therefore, DLA's acceptance of AEG's late submission violated the FAR and prejudiced KHI.  ECF No. 47-1 at 2–3.  In response, both the government and AEG maintain that AEG timely submitted its proposal.  ECF No. 78 at 24; ECF No. 65-1 at 20.  In the alternative, AEG, but not the government, asserts that even if AEG did not timely submit its proposal, the circumstances surrounding AEG's submission fit within an exception to the FAR's "late is late" rule.  ECF No. 65-1 at 21–25.  The Court first addresses whether AEG's initial proposal was timely before discussing AEG's FAR exception argument.  The Court will then turn to whether DLA's acceptance of AEG's offer prejudiced KHI.

**a. AEG's proposal was late.**

The Court begins its discussion by recounting the unambiguous terms of the RFP. The original RFP in this case established a submission deadline of August 6, 2021, at 3:00 p.m., Tab 10 at AR 206, before a later amendment changed that deadline to August 19, 2021, at 10:00 a.m., Tab 11 at AR 614. The RFP warned prospective offerors of the consequences of late offers and potential issues that may arise when submitting an offer:

> Offers must be received by August 6, 2021, 3:00 p.m.[1] Eastern Daylight Time, Ft. Belvoir, VA LOCAL TIME. Any offer received after 3:00 PM will be considered "Late" and may be determined to be unacceptable. (See FAR 52.212-1). A 3:00 PM Eastern Time closing time for the signed solicitation (and any subsequent amendments) AND proposal submission form is intentionally set to avoid any potential receipt issues due to electronic transmission delays such as fire walls. *Each offer is encouraged to submit proposals as early as possible to the closing time to ensure a timely proposal and to allow system transmission time.*

Tab 10 at AR 208 (emphasis added). The RFP gave clear submission instructions, stating that "Electronic Proposals shall be submitted . . . via email to: Energyfuelcards@dla.mil." *Id.* at AR 210. Additionally, the RFP explicitly noted how the agency would determine submission timeliness: "*TIMELINESS OF AN OFFER WILL BE BASED UPON THE RECEIPT TIME STAMP ON THE SUBMISSION INBOX.*" *Id.* at AR 208 (emphasis in original). Other sections warned of potential hang-ups with electronic submissions and reiterated the agency's encouragement of early submissions to avoid any delays. *See id.* at AR 329 ("The DLA Energy e-mail filter will scan the incoming e-mail and attachments for viruses and key words. [Certain abbreviations] for terms . . . are found in the filter's adult content library and may result in the e-mail delivery being delayed. Offerors are encouraged to verify receipt of e-mail offers by contacting the Contracting Officer prior to the solicitation closing time.").

With the clear terms of the RFP's submission deadline established, the Court turns to the facts surrounding AEG's proposal submission. At the outset, PDFs of the emails transmitting AEG's proposal to DLA included in the administrative record have time stamps for the email transmission of each of AEG's submitted volumes. Inclusion of these PDFs in the administrative record, showing the time stamp on the emails AEG sent to DLA to transmit its proposal, alerted KHI nearly four years after the proposal submission deadline that AEG's initial proposal did not appear to be timely. ECF No. 47-1 at 16. As noted in KHI's motion, two PDFs show time stamps after the submission deadline: a time stamp of 10:07:10 a.m. for AEG's Volume 1 submission, Tab 15 at AR 853; and a time stamp of 10:02:30 a.m. for AEG's Volume 2 submission, *id.* at AR 1039. Given that the RFP established a deadline of "10:00 AM," Tab 11 at AR 614, AEG's proposal is late on the face of the administrative record.

However, after reviewing KHI's MJAR, the government argued that the PDFs in the administrative record did not reflect the correct time stamps for when AEG submitted the

---

[1] As previously discussed, this deadline was amended to August 19, 2025, at 10:00 a.m. Tab 11 at AR 614.

proposal volumes in question, and it moved to complete the administrative record with screenshots of the transmittal emails from Microsoft Outlook and with two declarations to attempt to show that AEG's submission was timely.  *See* ECF No. 50.  KHI opposed the government's motion to complete the administrative record but, alternatively, requested that if the Court were to grant the motion, the email metadata also be included in the administrative record.  ECF No. 56 at 19.  The Court granted the government's motion to complete the administrative record but required the government to include, in addition to its proffered screenshots, a screenshot of the time stamps of the emails in the inbox of the Energyfuelcards@dla.mil email address and the metadata for the emails in question.  *See* ECF No. 58; ECF No. 60; ECF No. 62.  After multiple unresponsive screenshots—showing either time stamps on the emails themselves or an inbox with no time stamps included—the government provided the requested screenshot.  ECF No. 61-1.  The screenshot of the inbox reflected a time stamp of receipt at 10:07 a.m. for AEG's Volume 1 and a time stamp of receipt at 10:02 a.m. for AEG's Volume 2.  *Id.*; Tab 260 at AR 9592.  This screenshot further confirms that AEG's proposal was submitted late.  And to quote an argument the government probably wishes it did not make, "screenshots cannot be changed by all the metadata (or depositions) in the world."  ECF No. 57 at 2.  The metadata, however, also confirms that the emails that had the first and second volumes of AEG's proposal attached to them were first visible in the relevant inbox at 10:07 a.m. and 10:02 a.m., respectively.  Tab 260 at AR 9593 (metadata showing a "received" time stamp of 10:06:57 a.m. EST on August 19, 2021, for AEG's Volume 1 submission); *id.* at AR 9595 (showing a "received" time stamp of 10:02:02 a.m. EST on August 19, 2021, for AEG's Volume 2 submission); ECF No. 50-1 ¶ 4 ("When the three AEG emails were converted from a .msg file to .pdf using the 'Save as Adobe PDF' function, Adobe used the metadata time for when the email had passed through all DLA servers and was viewable by the recipient.").

    Despite the time stamps reflected on the PDFs in the administrative record, despite the inbox time stamp on the screenshot added to the administrative record, and despite the fact that the government itself proffered a declaration confirming that the metadata shows that the emails in question were not visible in the submission inbox until after the deadline for receipt of proposals, the government argues—without any evidentiary support—that the contracting officer did not have the "received" header visible in her Microsoft Outlook inbox and, for that reason, looked to the time stamp on the email itself to determine timeliness.  *See* ECF No. 78 at 26–27.

    To support its argument, the government cites to the contracting officer's declaration, in which she stated that she "determined AEG's initial proposal was submitted timely based on the time stamped [sic] that showed on the emails received in Outlook, which showed all the 4 required volumes were received on or before 10:00 a.m. EDT on August 19, 2021."  ECF No. 50-2 ¶ 3.  While the Court obviously has the government's argument stating the contracting officer's rationale before it, what it does not have is actual declaration testimony from the contracting officer, or any other witness for that matter, regarding whether the contracting officer mistook the time stamp on the emails themselves to be the time stamp "on the submission inbox" per the terms of the RFP or whether she had the "received" header visible in her inbox.  The contracting officer only testified that she looked to the "time stamped [sic] that showed in the emails received in Outlook" to determine timeliness.  *Id.*

Thus, the first part of the government's argument appears to be built on two post hoc justifications supplied by government counsel, rather than the actual reasoning of the contracting officer. First, nowhere in the administrative record or in her declaration does the contracting officer state that she thought the time stamp on the emails was the inbox time stamp. Rather, she simply states which time stamp she did use (the email time stamp) without any justification for why she did so. *Id.* The justification is instead supplied by government counsel. Second, the contracting officer also did not declare that the "received" header was not visible in her inbox. Rather, the contracting officer simply states that she looked to the emails themselves to determine timeliness. *Id.* There is no mention whatsoever of the "received" header in her declaration.[2] Regardless of the merits of the argument that using the email time stamp is a reasonable interpretation of the RFP's requirement of using the inbox time stamp to determine submission timeliness (it is not, as explained below), there is absolutely no support in the administrative record or in the contracting officer's declaration for this rationale. Instead, the government's argument is a completely unsupported post hoc rationalization supplied by a Department of Justice attorney to try to explain away the contracting officer's reliance on the wrong times tamps (according to the RFP) to determine timeliness. The government submitted *three* declarations in support of the argument for the timeliness of AEG's proposal submission. Yet not one of the three declarations addresses whether the contracting officer had the "received" header visible in her inbox, nor do any of the declarations specifically address whether the contracting officer relied on the email time stamps because she thought that was the inbox time stamp or because she made a simple but material error.

Nonetheless, the proverbial nail in the coffin for the government's argument comes directly from the administrative record itself. Included in the administrative record is a telling PDF containing an email sent by the contracting officer to AEG at 10:02 a.m. on the due date asking, "[a]re we expecting Volumes 1 & 2?" Tab 15 at AR 1182. This email seems to confirm that the contracting officer knew at the time she sent this email both that the 10:00 a.m. deadline had passed and that AEG's Volumes 1 and 2 were, at the very least, not visible in her inbox. One of the government's proffered declarations further confirms this conclusion. ECF No. 50-1. A legal administrative specialist for e-discovery within DLA testified that "Adobe use[s] the metadata time for when the email ha[s] passed through all DLA servers and [is] *viewable by the recipient*." *Id.* ¶ 4 (emphasis added).[3] Therefore, according to the government's own

_____

[2] At best, the government argues based on the supposition that because over four years after proposal submission the government was able to produce a screenshot of the inbox that did not display the "received" header, there was no "received" header in the inbox four years ago when proposals were originally submitted. But the present-day screenshot offers little to no indication of whether the contracting officer had the "received" header visible in her inbox four years ago, at the time of proposal submission. The fact that the government filed three declarations in support of its timeliness argument but could not get one declarant, including the contracting officer, to swear that the "received" header was not visible at the time of proposal submissions significantly undercuts the government's argument regarding the appearance of the received header.

[3] Although the government witness's testimony is not part of the administrative record, the Court may properly refer to such evidence in coming to a decision. "[A]llowing for

declaration, at least one, if not both, of AEG's missing proposal volumes were not visible to the contracting officer when she sent her 10:02 a.m. email asking why she had not received Volumes 1 and 2 of AEG's proposal. *See* Tab 15 at AR 1182 (displaying a time stamp of 10:02 a.m. on the contracting officer's email).

Regardless of whether the contracting officer had the "received" header visible in her inbox, the contracting officer's reliance on the time stamps on the emails themselves to determine timeliness, instead of the inbox time stamp, was not reasonable; rather, it was contrary to the express terms of the RFP. Even if the contracting officer mistook the email time stamp for the "receipt time stamp on the submission inbox," her mistake would still be unreasonable and contrary to law. Tab 10 at AR 208 (capitalization altered). "It is hornbook law that agencies must evaluate proposals and make awards *based on the criteria stated in the solicitation*." *Banknote Corp. of Am., Inc. v. United States*, 56 Fed. Cl. 377, 386 (2003), *aff'd*, 365 F.3d 1345 (Fed. Cir. 2004) (emphasis added). Once an agency places requirements in the solicitation, the agency must "either follow them or amend the [solicitation] to eliminate them." *CW Gov't Travel, Inc. v. United States*, 154 Fed. Cl. 721, 732 (2021) (citing 48 C.F.R. § 15.206(a), (d)). It is axiomatic that an agency must "evaluate proposals and assess their qualities solely based on the factors and subfactors specified in the solicitation. If the agency changes any evaluation criterion after issuing the solicitation, it must amend the solicitation and notify the offerors of the changed requirement." *Elec. Data Sys., LLC v. United States*, 93 Fed. Cl. 416, 430 (2010) (citations omitted); *see also Alfa Laval Separation, Inc. v. United States*, 175 Fed. 3d 1365, 1367–68 (Fed. Cir. 1999) ("'[R]egardless of the panel's view of the appropriateness of the standard [set out in the RFP], the [agency] is strictly bound by its terms,' and in waiving a portion of the standard[,] . . . the [agency] violated a clearly applicable procurement statute and regulation." (second alteration in original) (quoting *Alfa Laval Separation, Inc. v. United States*, 40 Fed. Cl. 215, 230 (1998), *rev'd* 175 F.3d 1365 (Fed. Cir. 1999)).

In short, a violation of the terms of a solicitation can constitute a violation of law under the APA standard applied in bid protests. *See Bannum, Inc.*, 404 F.3d at 1351 ("The lower court ruled that [the agency]'s failure to comply with FAR 42.1503(b), *and the terms of the RFP*, were violations of law under § 706(2)(A) . . . . [W]e find no error in these rulings." (emphasis added)). Accordingly, when challenging an agency's adherence to the terms of a solicitation, "a protester must show that: (i) the procuring agency used a significantly different basis in evaluating the proposals than was disclosed; and (ii) the protester was prejudiced as a result— that it had a substantial chance to receive the contract award but for that error." *G4S Secure Integration LLC v. United States*, 161 Fed. Cl. 387, 410 (2022) (quoting *Banknote Corp. of Am.*, 56 Fed. Cl. at 387).

---

deposition testimony of the contracting officer or other governmental official in a bid protest, where appropriate, 'may enable the court to satisfy its statutory duty to give due regard to the need for expeditious resolution of the action.'" *Pitney Bowes Gov't Sols., Inc v. United States*, 93 Fed. Cl. 327, 332 (2010) (quoting *Asia Pac. Airlines v. United States*, 68 Fed. Cl. 8, 18–19 (2005)). In addition, the deposition testimony the Court uses in this opinion was filed by the government, but the Court uses it to support arguments made by KHI. The government can hardly complain that its own deponents do not support its position here.

Here, the RFP clearly states that the "submission inbox" time stamp controls for purposes of assessing timeliness of offers. Tab 10 at AR 208 (capitalization altered). It is commonly understood that an email "inbox" is the folder that contains received emails and is not the email messages themselves. There is broad consensus on the definition of an inbox in the email context. *See In-box*, OXFORD AMERICAN DICTIONARY (2d ed. 2005) (defining "in-box" as "the window in which an individual user's received e-mail messages and similar electronic communications are displayed"); *In-box*, WEBSTER'S NEW WORLD COLLEGE DICTIONARY (5th ed. 2016) (defining "in-box" as "a folder, as in email software, in which received or unread messages are automatically stored"); *Inbox*, CAMBRIDGE DICTIONARY[4] (defining "inbox" as "a place on a computer where email messages arrive[;] a place on a computer where emails that are sent to you are kept"); *In-box*, MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY (11th ed. 2020) (defining "in-box" as "a computer folder devoted to incoming e-mail"); *Inbox*, PCMAG[5] (defining "inbox" as a "repository in an email application that accepts incoming messages"). Accordingly, given this common understanding of what an inbox is, to mistake an inbox time stamp for a time stamp on an email itself is not reasonable.

A physical, in-person analogue is illustrative of this point. If, instead of allowing email submissions, the RFP only allowed physical, in-person submissions, any deviation from the RFP in determining timeliness would be beyond question. For example, assume the RFP stated that offers must be submitted to Room 1A of Fort Belvoir and that submission timeliness would be determined by the "clock on the north wall of Room 1A." If, at the time of AEG's submission, the clock on the north wall of Room 1A read 10:07 a.m., AEG's submission would be untimely. If the contracting officer looked to that clock, she would have no choice but to deem AEG's submission late. However, if the contracting officer instead looked to her wristwatch, which read 10:00 a.m. despite the wall clock displaying 10:07 a.m., to determine that AEG's submission was timely, her decision to determine timeliness based on the time on her wristwatch would certainly be unreasonable and contrary to the hypothetical RFP, which clearly states that timeliness would be controlled by the "clock on the north wall of Room 1A."

Here, the fact that the RFP contemplates electronic submissions does not change this conclusion. Just as the hypothetical RFP mandated that timeliness be determined by the "clock on the north wall of Room 1A," the actual RFP here mandated that timeliness be determined by the "receipt time stamp on the submission inbox." Tab 10 at AR 208 (capitalization altered). The contracting officer's determination of timeliness through any other means than those designated by the RFP—whether by looking to her wristwatch in the hypothetical, or by allegedly looking to the time stamp on emails themselves, as the government argues here— would violate the RFP. Such timeliness determinations would constitute "a significantly different basis in evaluating the proposals than was disclosed [in the RFP]." *G4S Secure Integration*, 161 Fed. Cl. at 410 (quoting *Banknote Corp. of Am.*, 56 Fed. Cl. at 387). Accordingly, that timeliness determination would not be "based on the criteria stated in the solicitation" and would, therefore, be contrary to law. *See Banknote Corp. of Am.*, 56 Fed. Cl. at 386.

---

[4] https://dictionary.cambridge.org/dictionary/english/inbox (last visited May 2, 2025).
[5] https://www.pcmag.com/encyclopedia/term/inbox (last visited May 2, 2025).

In the alternative, the government argues that, despite the contracting officer's reliance on the email time stamp rather than the inbox time stamp, AEG's proposal was timely submitted because it was received by the first government server before the deadline set by the RFP. ECF No. 78 at 7–8. KHI counters that the RFP designated the "submission inbox," not the "first contact with a DoD system," as the location designated for receipt of offers. ECF No. 68 at 6. KHI is correct.

The express terms of the RFP established the inbox time stamp as determinative of the timeliness of submissions. Tab 10 at AR 208. Nowhere in the RFP does the language contemplate server time stamps as instructive for determining timeliness. Even if a server time stamp could determine timeliness here (it cannot), the government's own declaration is fatal to its argument: "[w]hen using Microsoft Outlook, the time stamped in a recipient's *inbox* as received is based on the time the email was received by the first DLA Server." ECF No. 50-1 ¶ 3 (emphasis added). Therefore, the inbox time stamp reflects the time "the first DLA server" received the email, according to the government's declarant. As noted above, the screenshot of the contracting officer's email inbox showed time stamps of 10:07 a.m. for AEG's Volume 1 and 10:02 a.m. for AEG's Volume 2. Tab 260 at AR 9592; ECF No. 65-1 at 2. These screenshots confirm that the emails did not reach the "first DLA server" until after the 10:00 a.m. deadline and are fatal to the government's argument.

Nonetheless, the government provided another declaration, this time from the chief technology officer for the Defense Information Systems Agency ("DISA"), to establish that, at the very least, a *Defense Department* server received AEG's submissions before the deadline. *See* ECF No. 78-1. However, just as the above-discussed declaration fell short of proving the government's point, this declaration also does not save the day for the government's argument. The chief technology officer testified that "the first contact [of AEG's submission] with DOD systems was the TLS handshake between the Microsoft commercial Office 365 servers (where it appears the sender is hosted) and DOD's Enterprise Email Message Security Gateway (EEMSG) systems which hosts the Mail Exchange (MX) record on behalf of DLA." *Id.* at 2. Specifically, he "observed initial contact (TLS handshake) with EEMSG at the following times: . . . 'Air Card Volume 1': 8/19/2021 [9]:59:50[,] 'Air Card Volume 2': 8/19/2021 [9]:58:31." *Id.* (times adjusted from UTC to EDT).

Once again, that this is all the government's own declarant would provide is telling, and the declarant's silence as to any explanation of what happened after the initial TLS handshake is deafening. He states that AEG's submissions contacted the first *Defense Department servers* at 9:58:31 a.m. and 9:59:50 a.m. but is silent as to when AEG's submissions first contacted *DLA's servers*. Therefore, even if server time stamps were relevant, the government has proffered evidence only as to when AEG's submissions contacted DISA's servers and has submitted no evidence as to when AEG's submissions may have made first contact with DLA's servers. Without evidence as to when AEG's submissions first contacted DLA's servers, the Court cannot conclude that DLA's servers received AEG's submissions before the deadline. However, regardless of any server time stamps proffered by the government, if DLA wanted server time stamps to control timeliness of offers, DLA should have included such language in the RFP. Instead, the RFP mandated that the "receipt time stamp on the submission inbox" controls for determining timeliness of offers. Tab 10 at AR 208 (capitalization altered). Under the RFP's

timeliness criteria, AEG's proposal was late.  The agency may not engage in post hoc amendment of the terms of the RFP to justify its acceptance of AEG's late submissions.

To recap, the RFP establishes 10:00 a.m. as the submission deadline and states that "timeliness of an offer will be based upon the receipt time stamp on the submission inbox."  *Id.* (capitalization altered).  The receipt time stamps on the Energyfuelcards@dla.mil submission inbox show that AEG's Volumes 1 and 2 were received after 10:00 a.m.  Because DLA did not timely receive AEG's proposal, AEG's proposal is late and thus "tantamount to no proposal at all."  *Labatt*, 577 F.3d at 1381.

### b.  No exception to the FAR's "late is late" rule applies here.

In the alternative, AEG, but not the government,[6] argues that DLA did not err in accepting AEG's late proposal because the "government control" exception to the "late is late" rule, found in FAR 52.212-1, applies.  ECF No. 65-1 at 21.  KHI argues that the government control exception is inapplicable to this procurement because the exception does not apply to electronic submissions, and here, offerors were required to electronically submitted their proposals.  *See* ECF No. 68 at 9–11.

Under FAR 52.212-1(f)(2)(i), "[a]ny offer, modification, revision, or withdrawal of an offer received at the Government office designated in the solicitation after the exact time specified for receipt of offers is 'late' and will not be considered" unless certain criteria are met.  Those criteria are that the offer, modification, revision, or withdrawal of the offer was "received before the award was made," "the Contracting Officer determines that accepting the late offer would not unduly delay the acquisition," and one of the following circumstances exists:

     (A) If it was transmitted through an electronic commerce method authorized by the solicitation, it was received at the initial point of entry to the Government infrastructure not later than 5:00 p.m. one working day prior to the date specified for receipt of offers; or

     (B) There is acceptable evidence to establish that it was received at the Government installation designated for receipt of offers and was under the Government's control prior to the time set for receipt of offers; or

     (C) If this solicitation is a request for proposals, it was the only proposal received.

48 C.F.R. § 52.212-1(f)(2)(i)(A)–(C).  Bid protest litigants commonly refer to FAR 52.212-1(f)(2)(i)(A) as the "electronic commerce" exception and FAR 52.212-1(f)(2)(i)(B) as the

---

[6] The government expressly disclaimed this argument.  ECF No. 73 at 3 ("KHI argues that the United States must be invoking (as AEG does) FAR 52.212-1(f)(2)(i)(B) for the notion that the Government's control of AEG's email definitively establishes that AEG's offer was received in a timely manner.  We are not.  Simply put, the United States does not believe that the plain language of the Government Control exception (FAR 52.212-1(f)(2)(i)(B)) applies to electronic submissions." (footnote and citation omitted)).

"government control" exception to FAR 52.212-1(f)(2)(i), which itself is referred to as the "late is late" rule. *See, e.g., eSimplicity, Inc. v. United States*, 162 Fed. Cl. 372, 377 (2022); *Fed. Acquisition Servs. Team, LLC v. United States*, 124 Fed. Cl. 690, 702–03 (2016).

AEG argues that Volume 1 of its proposal was timely under the government control exception because there is "acceptable evidence"—via government email screenshots and declarant testimony—to establish that AEG's Volume 1 was in the government's control "prior to the time specified for receipt of offers." ECF No. 65-1 at 20–21 (quoting *eSimplicity*, 162 Fed. Cl. at 386); ECF No. 74 at 10. Specifically, AEG asserts that DLA "has provided acceptable evidence showing AEG's proposal . . . was received on-time: . . . Volume 1 reached Energyfuelcards@dla.mil *at 10:00 AM*." ECF No. 65-1 at 21 (emphasis in original).

However, AEG's argument fails at the outset. As AEG noted in its MJAR—in text that was not only bolded but was also underlined and italicized, lest the Court have any doubt as to how important a point AEG was making—for the government control exception to apply, there must be "acceptable evidence to establish that . . . [the proposal] was ***under the Government's control prior to the time set for receipt of offers*** . . . ." ECF No. 74 at 9 (emphasis in original). Therefore, AEG's argument that "acceptable evidence" in the form of email time stamp screenshots showing "10:00 AM" for receipt of AEG's Volume 1, ECF No. 65-1 at 20–21 (citing Tab 260 at AR 9589), fails because a 10:00 a.m. time stamp does not show that the email was in the government's control "*prior to* the time set for receipt of offers," which was 10:00 a.m. 48 C.F.R. § 52.212-1(f)(2)(i)(B) (emphasis added). AEG attempts to sidestep this conclusion by arguing that "because all four volumes of AEG's initial proposal were received by the submission inbox on time and prior to 10:01 AM, AEG's initial proposal was timely." ECF No. 65-1 at 21. But the RFP does not establish 10:01 a.m. as the deadline for submissions—it establishes "10:00 AM Eastern Daylight Time" as the deadline. Tab 11 at AR 614. Accordingly, to fall under the government control exception, AEG's Volume 1 must have been received at 9:59:59 a.m. or earlier to have been received "prior to" 10:00 a.m., which was the "time set for receipt of offers." 48 C.F.R. § 52.212-1(f)(2)(i)(B). Because AEG argues that acceptable evidence in the form of email screenshots establishes that its Volume 1 submission was received *at* 10:00 a.m., and not *prior to* 10:00 a.m., AEG's argument fails, and its submission cannot fall under the government control exception. *See* ECF No. 65-1 at 21; FAR 52.212-1(f)(2)(i)(B).

Even if metadata could cure AEG's argument (it cannot, as AEG waived any such argument by not raising it in its motion),[7] AEG's Volume 1 submission was still late according to the metadata for purposes of the government control exception. As the parties correctly note, judges of this Court have reached differing conclusions as to whether the government control exception applies to electronic submissions. In cases in which judges of this Court have found that the government control exception applies to electronic submissions, they most often come to

---

[7] AEG does not develop this argument in briefing. Instead, AEG tried to argue this point at oral argument. *See* ECF No. 85 at 95:8–12. Although AEG waived any metadata argument because it did not make such argument in its MJAR, the Court will discuss the argument anyway, as the discussion further demonstrates the lateness of AEG's proposal. *Sarro & Assocs. v. United States*, 152 Fed. Cl. 44, 58 (2021) ("A party's failure to raise an argument in an opening or responsive brief constitutes waiver.").

this conclusion either by holding that an email server is a "Government installation" for purposes of the exception and/or by finding that inclusion of electronic submissions in the government control exception would not render the electronic commerce exception surplusage, as prohibited by the canon against surplusage.[8]  *See, e.g.*, *eSimplicity*, 162 Fed. Cl. at 384 (finding that the government control exception applies to electronic communications because "it does not appear that applying both exceptions to electronic proposals would in fact turn the electronic commerce exception into surplusage"); *Fed. Acquisition Servs. Team,* 124 Fed. Cl. at 704 ("[T]he Court holds that when an e-mailed proposal is received by the first server designated by the government to receive e-mails directed to the address contained in a solicitation, it has been 'received at the Government installation designated for receipt of offers,' for purposes of the Government Control exception." (citation omitted) (quoting 48 C.F.R. § 52.215-1(c)(3)(ii)(A)(2))); *Insight Sys. Corp. v. United States*, 110 Fed. Cl. 564, 577, 578 (2013) (holding that the "Government Control exception does not exclude from its coverage electronic communications" because "a server controlled by the government most certainly can be an 'installation' that receives electronic submissions"); *Watterson Constr. Co. v. United States*, 98 Fed. Cl. 84, 98 (2011) (finding that the government control exception applies to non–batch delivered electronic commerce because the "exception is not limited to any particular method of delivery").

Conversely, in cases in which judges of this Court have found that the government control exception does not apply to electronic submissions, those judges determined that inclusion of electronic submissions under the government control exception would make the electronic commerce exception surplusage.  *See Conscoop v. United States*, 62 Fed. Cl. 219, 239–40 (2004) ("The Court agrees with the GAO [which states:] . . . .  '[W]e think the [government control] exception necessarily applies only to the proposals delivered by other than electronic means . . . [because if] late electronically transmitted proposals could be considered for award under the second exception[,] . . . this would essentially render the first exception a nullity.'" (quoting *Sea Box, Inc.*, B-291056, 2002 WL 31445297, at *2 (Comp. Gen. Oct. 31, 2002))).

Looking first at whether including electronic submissions within the government control exception would render the electronic commerce exception surplusage, the Court concludes that such inclusion would not make the electronic commerce exception extra or unnecessary.  The Court finds Judge Schwartz's reasoning in *eSimplicity, Inc. v. United States* instructive on this point.  162 Fed. Cl. at 372.  In that case, Judge Schwartz concluded that reading the government control exception to encompass electronic submissions would not render the electronic commerce exception surplusage by examining each of the three exceptions to the "late is late" rule.  *See id.* at 386–87.  As Judge Schwartz reasoned, if the first two exceptions under FAR 52.212-1(f) are read as exclusively applying to a particular means of submitting of an offer or proposal, application of the third exception would then become problematic.  *Id.* at 386.  The third exception to the "late is late" rule provides that a proposal received after the deadline will not be considered late "[i]f th[e] solicitation is a request for proposals, [and] it was the only proposal received."  48 C.F.R. § 52.212-1(f)(2)(i)(C).  But if the electronic commerce exception

---

[8] *Advoc. Health Care Network v. Stapleton*, 581 U.S. 468, 477 (2017) ("[T]he so-called surplusage canon [is] the presumption that each word Congress uses is there for a reason.")

is the only exception that applies to electronic submissions, what would the Court do with an otherwise late electronic submission of a proposal that also happened to be the only proposal received, as contemplated by the third exception?  *See eSimplicity*, 162 Fed. Cl. at 386 ("On the government's logic, then, the third exception should be the only exception applicable to responses to requests for proposals.  But the conditions for applying the exceptions overlap: What to do with an electronic response to a request for proposals?" (emphasis omitted)).  The answer to this question, as Judge Schwartz further explained, is to not treat each exception as having an exclusive domain: "[t]reating the exceptions as exclusive within their domains, as the government contends is required by the rule that the specific displaces the general, puts them in conflict.  The way to avoid the conflict is to treat the exceptions as limited, but *not* exclusive—in which case there is no reason for the electronic commerce exception to displace the government control exception."  *Id.*

In addition, the government control exception requires satisfaction of elements that are slightly different than and beyond that which must be satisfied to invoke the electronic commerce exception.  Whereas the electronic commerce exception requires only a showing that the proposal was "received at the initial point of entry to the Government infrastructure not later than 5:00 p.m. one working day prior to the date specified for receipt of offers," 48 C.F.R. § 52.212-1(f)(2)(i)(A), to fall under the government control exception, two elements must be met.  First, there must be "acceptable evidence to establish that [the proposal] was received at the Government installation designated for the receipt of offers . . . ."  48 C.F.R. § 52.212-1(f)(2)(i)(B).  Second, the proposal must have been "under the Government's control prior to the time set for receipt of offers."  *Id.*  Given these distinctions between the two exceptions, there are scenarios in which an electronic submission could have been "received at the initial point of entry to the Government infrastructure" for electronic commerce exception purposes, yet not be "received at the Government installation designated for receipt of offers" or "under the Government's control" for government control exception purposes.  Accordingly, at least as the cannon against surplusage is concerned, reading the government control exception to apply to electronic submissions is not problematic.

A more interesting question regarding the applicability of the government control exception to electronic submissions is whether an email server is a "Government installation."  When one thinks of a government installation, one of the first things that comes to mind is a physical complex or building, especially a military base.  For instance, 32 C.F.R. § 842.64(a) defines "government installation" as "[a] United States Government facility having fixed boundaries and owned or controlled by the government."  An email server, on the other hand, is not likely the first thing one thinks of when reading the term "Government installation."  That said, at least two judges of this Court have held that an email server is a government installation for purposes of the government control exception.  *See Insight Sys. Corp.*, 110 Fed. Cl. at 577–78; *Fed. Acquisition Servs. Team*, 124 Fed. Cl. at 704.  Although the undersigned is disinclined to believe that an internet server is a "Government installation" because a natural reading suggests that a "Government installation" is a physical location, such as a building or military base, the

Court need not reach a definitive conclusion on that point here.[9]  This is because even if an email server does constitute a government installation, AEG's argument clearly fails with regard to other aspects of the government control exception.

As stated above, to fall under the government control exception, a party's proposal must satisfy two elements: (1) "[t]here is acceptable evidence to establish that [the proposal] was received at the Government installation designated for the receipt of offers," and (2) the proposal must have been "under the Government's control prior to the time set for receipt of offers."  48 C.F.R. § 52.212-1(f)(2)(i)(B).  AEG's proposal fails to satisfy either element.

First, leaving aside whether an email server is a government installation, there is not acceptable evidence to establish that AEG's proposal was "received at the Government installation designated for the receipt of offers."  AEG offers no argument or evidence that its proposal was received at the government installation designated for the receipt of offers, which would be a DLA email server, much less the server that houses the Energyfuelcards@dla.mil inbox.  Instead, AEG relies on the DISA chief technology officer's declaration to argue that its proposal was received at a "Government installation" because all four of its volume submissions "reached [DISA] servers before the proposal deadline."  ECF No. 74 at 10 (emphasis omitted) (citing ECF No. 64-1 at 2).  However, alleging receipt by DISA servers is not enough, as DLA, not DISA, is the procuring entity.

Once again, an in-person hypothetical may be instructive.  Suppose that the RFP stated that offers must be hand-delivered to the contracting officer at DLA headquarters at Fort Belvoir, in Virginia, on or before 10:00 a.m. on the due date.  Instead of delivering its proposal to DLA at Fort Belvoir, an offeror sends its courier to hand-deliver its proposal to DISA headquarters at Fort Meade in Maryland, and the courier makes delivery at 9:59 a.m. on the due date.  In this hypothetical, the offer would not have been timely received at the "Government installation designated for receipt of offers."  48 C.F.R. § 52.212-1(f)(2)(i)(B).  Instead of delivering the proposal to the designated installation, Fort Belvoir, the offeror delivered it to Fort Meade.  Although Fort Meade is certainly a "Government installation," Fort Meade is not the "Government installation designated for receipt of offers," as DLA is not headquartered at Fort Meade.  Therefore, the offeror would not have timely delivered its offer to the designated government installation.

Here, assuming *arguendo* that an email server is a government installation, the RFP established the "submission inbox" for Energyfuelcards@dla.mil as the "Government installation designated for receipt of offers."  *See* Tab 10 at AR 210.  And just as the hypothetical offeror did not timely submit its offer by hand-delivering the proposal to Fort Meade instead of Fort Belvoir, AEG did not timely submit its offer because, at best, its offer only connected with DISA's server prior to the deadline, not DLA's servers.  But to be timely, the offer must have been received by

---

[9] This is an area the FAR Council may want to consider revisiting, as the exceptions to the "late is late" rule are not a picture of clarity, including the interplay between the electronic commerce and government control exceptions, and especially with regard to whether an email server is a "Government installation."

the submission inbox of Energyfuelcards@dla.mil before the deadline, which the government's proffered screenshot proves was not the case. Tab 260 at AR 9592.

Moreover, even if AEG's proposal made it as far as a DLA server before the deadline, the proposal would still not fall under the government control exception. To extend the physical delivery hypothetical, assume the RFP established that offerors must hand-deliver their proposals to the contracting officer in Room 1A of DLA headquarters at Fort Belvoir by 10:00 a.m., and an offeror, instead of delivering its proposal in Room 1A by 10:00, is wandering around Fort Belvoir at 10:00 a.m. trying to find Room 1A. That offeror's proposal would then not have been received at the "Government installation designated for receipt of offers" because, while it was somewhere on Fort Belvoir at 10:00 a.m., it was not delivered to Room 1A. The same logic applies to AEG's electronic submission. AEG's proposal hitting a DLA server is insufficient to satisfy the first prong of the government control exception, as the "Government installation designed for receipt of offers" is the submission inbox of Energyfuelcards@dla.mil, not just any DLA server generally. In fact, AEG did not even attempt to establish that its proposal at least made it to the DLA server that hosts the inbox for Energyfuelcards@dla.mil prior to the deadline for proposal submission.

Second, AEG fails to establish that its proposal was "under the Government's control prior to the time set for receipt of offers." 48 C.F.R. § 52.212-1(f)(2)(i)(B). AEG had to show, at the very least, that DLA servers received AEG's proposal before the deadline, and the chief technology officer's testimony on which it relies does not establish this. The chief technology officer only testified that he "observed initial contact (TLS handshake) with EEMSG at the following times[]: . . . Volume 1: . . . 09:59:50 AM EST." ECF No. 78-1 at 2. But just because servers initiated a TLS Handshake or because an email is in an EEMSG does not mean that the email is in the government's control. That is because a TLS Handshake and passage through an EEMSG take place before email messages are even transmitted.

In layman's terms, a "TLS Handshake" occurs when servers exchange messages and certificates to establish a secure connection. *TLS Handshake Protocol*, MICROSOFT WINDOWS APP DEVELOPMENT (Jan. 7, 2021).[10] Once complete, the "[c]lient and server can *now* exchange application data over the secured channel they have established." *Id.* (emphasis added); *see also An Overview of the SSL/TLS Handshake*, IBM (Jan. 30, 2025)[11] (stating that, after a TLS handshake establishes exchange of server certificates and symmetrically encrypted shared secret keys, the server and client can *then* exchange messages for the duration of the TLS session). In other words, a TLS Handshake is a precursor to the transmission of data between servers.

Similarly, an EEMSG is a security tool that acts as a firewall for email, scanning incoming and outgoing emails for malicious content, spam, and other risks before they reach users' inboxes, preventing potential threats. *See* DEPARTMENT OF DEFENSE, CLOUD COMPUTING SECURITY REQUIREMENTS GUIDE 123 (2017)[12] ("All email transfers inbound through the IAP from an external email server destined to a L4/5 email server . . . must pass through the EEMSG

---

[10] https://learn.microsoft.com/en-us/windows/win32/secauthn/tls-handshake-protocol.

[11] https://www.ibm.com/docs/en/ibm-mq/9.4.x?topic=tls-overview-ssltls-handshake.

[12] https://rmf.org/wp-content/uploads/2018/05/Cloud_Computing_SRG_v1r3.pdf.

inbound protections."). Therefore, an EEMSG is a security protocol that occurs *before* messages reach a user's inbox for firewall purposes. There is no guarantee that an email that enters the EEMSG will be delivered to the recipient's inbox, or even be retrievable by the recipient, because the vast majority of emails sent through the EEMSG are blocked for firewall purposes. *See* Thuy Che, Enterprise Email Security Gateway, DISA Cyber Security and Analytics Directorate 22 (Apr. 28, 2022)[13] ("Over 85% of Inbound email is dropped due to sender reputation."). Because the EEMSG blocks many emails from entry to government email inboxes—and such emails are, therefore, unretrievable by the recipient—the fact that they entered the EEMSG cannot, by itself, constitute government control over those emails.

All in all, the chief technology officer's testimony is not helpful to establish AEG's argument, as all he "observed" was the "initial contact (TLS Handshake) with EEMSG"—two processes that take place *before* any transmission of data from sender to recipient—at "09:59:50 AM" for AEG's Volume 1 submission. ECF No. 78-1 at 2. Put differently, the chief technology officer only testified that the precursors to delivering AEG's email containing its proposal took place one minute and ten seconds before the deadline established by the RFP passed or, as relevant to the government control exception, ten seconds prior to the deadline. Neither the government nor AEG proffered evidence or moved to supplement the administrative record with any other information indicating that DLA had control of AEG's proposal prior to the 10:00 a.m. deadline. Without more, the Court cannot conclude that the Energyfuelcards@dla.mil submission inbox, or even DLA servers for that matter, received AEG's proposal before the deadline. For these reasons, the Court concludes that AEG has not "met its burden of proof based on the evidence in the record." *See Jordan Pond Co., LLC*, 115 Fed. Cl. at 630.

Although the government control exception to the FAR's "late is late" rule may encompass electronic submissions (assuming an email server is a "Government installation"), AEG's late proposal does not fit within this exception because AEG failed to prove both that there is "acceptable evidence to establish that [its proposal] was received at the Government installation designated for receipt of offers" and that its proposal "was under the Government's control prior to the time set for receipt of offers." 48 C.F.R. § 52.212-1(f)(2)(i)(B). Therefore, the government control exception does not apply to AEG's otherwise late proposal.

### c. DLA's acceptance of AEG's late proposal prejudiced KHI.

As the Federal Circuit has conclusively stated, "a late proposal is tantamount to no proposal at all." *Labatt*, 577 F.3d at 1381. Therefore, DLA's acceptance of AEG's late proposal constitutes error because it violates the FAR's "late is late" rule. However, to succeed in a bid protest, even if a protestor demonstrates a violation of law, the protestor must also establish that the violation was prejudicial. To establish prejudice in the post-award bid protest context, a protestor "must show that there was a 'substantial chance' it would have received the contract award but for the errors" in the procurement process. *Bannum, Inc.*, 404 F.3d at 1353 (quoting *Info. Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1319 (Fed. Cir. 2003); *Alfa Laval*, 175 F.3d at 1367).

---

[13] https://events.afcea.org/afceacyber22/Custom/Handout/Speaker0_Session9376_1.pdf.

Here, if AEG effectively submitted no proposal at all because it submitted a late proposal, KHI would be the only other acceptable offeror left to which DLA could award the contract. Accordingly, DLA's acceptance of AEG's late proposal is obviously prejudicial to KHI. KHI suffered prejudice because, but for DLA's acceptance of AEG's late proposal and subsequent award of the contract to AEG, KHI would have been either selected as awardee of the contract or permitted to submit another offer during re-solicitation. *See Bannum, Inc.*, 404 F.3d at 1353. Even if there were multiple acceptable offerors, which is not the case here, the elimination of one offeror leads to much greater odds of selection of the remaining offerors. But given that KHI was the only other acceptable offeror, prejudice to KHI cannot be more apparent.

In an attempt to persuade the Court that KHI faces no prejudice by AEG's award of the contract, AEG relies on *Insight Public Sector, Inc. v. United States*, 161 Fed. Cl. 760 (2022), and *KGL Food Services, WLL v. United States*, 153 Fed. Cl. 497 (2021). ECF No. 74 at 9–16. Neither case, however, supports AEG's contentions. In *Insight Public Sector*, the protestor argued, *inter alia*, that "Dell Marketing [the awardee] should not have been eligible for the award because its initial proposal did not comply with the RFQ requirements within the time frame required by the RFQ." 161 Fed. Cl. at 804 (internal quotation marks and alterations omitted). In other words, the protestor argued that the Dell Marketing's proposal was late under *Labatt* and the "late is late" rule. Judge Roumel rejected this argument, though, and determined that "Dell Marketing submitted its initial proposal with the [agency's] requested additions by the April 7, 2021 close of business deadline." *Id.* at 805. Moreover, she determined that the "late is late" rule was not even applicable to the FAR part 8 procurement at issue in that case. *Id.* ("[T]he 'late is late' principle is inapplicable here."). Simply put, in *Insight Public Sector*, the challenged proposal was not late and the "late is late" rule did not even apply; that is not the case here. Thus, *Insight Public Sector* is easily distinguishable and does not support AEG's argument. To the extent that AEG is merely relying on a stray quote from *Computer Science Corp. v. United States*, 51 Fed. Cl. 297 (2002), used in dicta in *Insight Public Sector*, it is obvious why AEG did not quote *Computer Science Corp.* directly, as that quote—an "evaluation of [the bidder's] initial proposal is irrelevant"—has nothing whatsoever to do with the "late is late" rule. *Insight Pub. Sector, Inc.*, 161 Fed. Cl. at 804 (alteration in original) (quoting *Comp. Sci. Corp.*, 51 Fed. Cl. at 308). Rather, in *Computer Science Corp.*, Judge Futey made the unremarkable observation that the fact that an initial proposal was poorly rated does not mean that a revised final proposal should not have received favorable ratings. 51 Fed. Cl. at 308. Stated differently, that "evaluation of [the bidder's subpar] initial proposal is irrelevant" to the evaluation of a revised proposal says nothing about prejudice under the "late is late" rule. *Id.*

Similarly, AEG's reliance on *KGL Food Services* is inapposite. In that case, the agency initially set a deadline for *revised* proposal submissions of "3:00 PM Eastern Time (ET) on Friday, May 22, 2020." 153 Fed. Cl. at 501. Five of the six offerors that submitted initial proposals submitted revised proposals by that deadline. *Id.* at 505 ("The DISA's report confirmed that five of the six emails arrived before 3 p.m. on May 22, 2020, and the sixth arrived at 4:08 p.m."). The agency, however, did not receive the sixth offeror's revised proposal by the deadline. *Id.* The agency in that procurement erroneously determined that submissions could not be timely delivered to the agency due to "ongoing internal [agency] network issues," and modified the submission deadline, allowing for revisions to proposals to be submitted by a new deadline of "9:00 AM ET on Monday, June 1, 2020." *Id.* at 503. The protestor argued that the

agency erred by revising the submission deadline and that one of the offerors should be excluded from competition because its revised proposal was not received by the original deadline. *Id.* at 511. The Court determined that the protestor was correct but that the protestor was not prejudiced by the agency's error. AEG relies on *KGL Food Services* because of this prejudice determination. But there is a salient fact that makes *KGL Food Services* distinguishable and AEG's reliance upon it misplaced. While in that case one of the offeror's missed the deadline for *revised proposals*, that offeror did timely submit its *initial proposal*. Based on submission of a timely initial proposal that offeror was not necessarily excluded from competition (and thus the protestor did not demonstrate prejudice) because the agency potentially could have considered the timely initial proposal against the other offerors' timely revised proposals. But the *KGL Food Services* court determined it could not "decide this issue on the record before it" and thus the protestor had not carried its burden to establish prejudice. *Id.* at 512. Here, AEG failed to meet the initial proposal deadline and, therefore, should have been excluded from competition under the "late is late" rule. Accordingly, unlike in *KGL Food Services*, here, there is no question regarding the consequence of the late submission, and the Court is not presented with a prejudice question it cannot answer on the record before it.

In sum, DLA's acceptance of AEG's late proposal and subsequent award of the contract to AEG was contrary to law and prejudiced KHI, the only other acceptable offeror.

### 2. While DLA's Post-FPR Communications with AEG Constituted Improper Discussions, KHI Has Not Established Prejudice for this Procurement Error.

KHI next argues that AEG's failure to include a certification required under the Preliminary Evaluation Factor, and DLA's post-FPR discussions with AEG that allowed AEG to fix this mistake, constituted "yet another opportunity [for AEG] to submit a compliant FPR against the threshold gate after the common deadline," which, in KHI's view, "prejudicially violated the RFP, FAR 15.307 (and the fairness principles that underlie it)." ECF No. 47-1 at 20. The government and AEG respond by arguing that DLA's communications with AEG are "properly understood to be clarifications, and not discussions." ECF No. 78 at 28; *see also* ECF No. 65-1 at 29. In the alternative, the government argues that even if DLA's communications with AEG were discussions, such discussions were "undertaken as necessary corrective action to ensure meaningful discussions with all offerors." ECF No. 78 at 31.

As relevant here, the FAR distinguishes agency "exchanges" with offerors as either "discussions" or "clarifications."[14] 48 C.F.R. § 15.306. The FAR defines "discussions" as "negotiations [that] are conducted in a competitive acquisition . . . [that] take place after establishment of the competitive range." *Id.* § 15.306(d). Such discussions must be "tailored to each offeror's proposal[] and must be conducted by the contracting officer with *each* offeror within the competitive range." *Id.* § 15.306(d)(1) (emphasis added). Conversely, the FAR

---

[14] FAR 15.306 also includes another category of exchanges: "communications." According to the FAR "[c]ommunications are exchanges, between the Government and offerors, after receipt of proposals, leading to establishment of the competitive range." 48 C.F.R. § 15.306(b). In other words, under the FAR there are three types of "[e]xchanges with offerors after the receipt of proposals": clarifications, communications, and discussions. *Id.* § 15.306.

defines "clarifications" as "limited exchanges, between the Government and offerors, that may occur when award without discussions is contemplated." *Id.* § 15.306(a)(1).

The distinction between discussions and clarifications is salient because case law establishes different rules for agency exchanges with offerors depending on whether that exchange is a discussion or clarification. For example, material errors cannot be fixed through a clarification. *See ManTech Advanced Sys. Int'l Inc. v. United States*, 141 Fed. Cl. 493, 508 (2019) ("Material changes to proposals can only be accomplished through discussions and not through clarifications."). Any exchanges that cure, or attempt to cure, a material error are considered discussions under the FAR. *See id.* An error is material, in turn, if "the error (1) violates an express provision of the RFP and (2) the RFP provision violated serves a substantive purpose in the evaluation process." *Id.* (citing *Bus. Integra, Inc. v. United States*, 116 Fed. Cl. 328, 333 (2014)). And an RFP provision has a substantive purpose if that provision "is important to the government's evaluation, is binding on the offeror, or has more than a negligible impact on the price, quantity, or quality of the bid." *Id.*

The RFP in this procurement required, under "Preliminary Evaluation Factor—No Cost," that offerors include a certification that their proposal will be completed at no cost to the government. Tab 174 at AR 5434 (capitalization altered). Specifically, the RFP delineated that an "acceptable" offer would contain "no fee, cost, or any other charge to the Government for the proposed work" and would include a certification stating verbatim: "[t]his is an offer for a contract at no cost to the Government. The offeror certifies that the proposal does not contain any fees, costs, or charges to the Government." *Id.* The RFP also states that an "unacceptable" offer either contains "a fee, cost, or other charge to the Government for the proposed work, *or the proposal lacks the following certification*: 'This is an offer for a contract at no cost to the Government. The offeror certifies that the proposal does not contain any fees, costs, or charges to the Government.'" *Id.* (emphasis added). According to the RFP, "[i]f an offeror is rated 'Unacceptable' under the preliminary evaluation factor, the offeror will not be eligible for award," and "if such an unacceptable offer has not already been removed from the competition as of the deadline to submit final offers, the offer will not be evaluated under the Weighted Evaluation Factors and *will be eliminated from the competition*." *Id.* (emphasis added).

Despite this clear instruction, AEG did not include the certification required under the Preliminary Evaluation Factor in its proposal. Instead, AEG certified the following: "[t]here are no costs to the Government for this program. Contractor revenue is derived solely from the fees charged to the merchants and a portion of these are refunded back to DLA. The terms and conditions for design, use, fees and refunds are fully spelled out in the Solicitation which combined with this response will encapsulate the terms and conditions for the AIR Card© program." Tab 207 at AR 7178. It is undisputed that this is not the certification required under the Preliminary Evaluation Factor. In March 2024, DLA realized that AEG's certification was noncompliant. Tab 210 at AR 7642, 7641 ("AEG changed the certification language . . . . It is unclear why AEG made this change because the discussion letter sent to AEG as part of the corrective action did not address Volume 4."). DLA observed that "[a]lthough the revised language substantially meets the purpose of the certification language included in the preliminary factor and indicates that AEG will not charge costs to the Government, the preliminary factor requires offerors to provide that exact statement in their certifications." *Id.* at 7641. DLA further

determined that "it is necessary to re-open discussions with AEG for the limited purpose of raising [the certification] issue." *Id.* at AR 7642. According to DLA, these discussions would only consist of informing AEG "that the RFP requires that specific certification language under the preliminary evaluation factor and it will be given an opportunity to revise only that aspect of its Volume 4 proposal." *Id.*

KHI contends that this exchange constitutes "discussions" as defined by the FAR. *See* ECF No. 47-1 at 18. KHI argues that because "failure to provide the certification renders the proposal unacceptable and ineligible for award," DLA's communication provided AEG the opportunity to cure its certification defect and, therefore, circumvented elimination from competition. *See id.* KHI is correct. This "no cost" certification is the backbone of DLA's ability to ensure that all proposals would be at no cost to the government. The certification is an "express provision of the RFP" that serves a "substantive purpose in the evaluation process," as it ensures that an offeror has not hidden some cost to the government in what is supposed to be a no-cost procurement. *See ManTech Advanced Sys.*, 141 Fed. Cl. at 508. The fact that DLA required this certification to be included verbatim in each offeror's proposal to satisfy the Preliminary Evaluation Factor and to be considered for award underscores the importance of the certification, further demonstrating the "substantive purpose" it serves in the evaluation process. *See* Tab 174 at AR 5434. Therefore, AEG's failure to include a compliant certification constituted a material error in its proposal. Such material errors can only be cured via discussions, not clarifications. *See Dell Fed. Sys., L.P. v. United States*, 906 F.3d 982, 998 (Fed. Cir. 2018) ("Clarifications are not to be used to cure proposal deficiencies or material omissions, materially alter the technical or cost elements of the proposal, or otherwise revise the proposal." (quoting *JWK Int'l Corp. v. United States*, 52 Fed. Cl. 650, 661 (2002), *aff'd*, 56 F. App'x 474 (Fed. Cir. 2003))). For this reason, the government and AEG's clarification arguments fail, and DLA's exchange with AEG was a "discussion" under the FAR.

Furthermore, the timing of exchanges can indicate whether they are better classified as discussions or clarifications. FAR 15.306(d) authorizes agencies to conduct "discussions" with offerors once the competitive range is determined. "If the agency decides to award the contract after holding discussions, it must hold discussions with all responsible offerors within the competitive range." *Wavelink, Inc. v. United States*, 154 Fed. Cl. 245, 269 (2021) (quoting *Info. Tech.*, 315 F.3d at 1318); *see also* 48 C.F.R. § 15.306(d)(1) (setting forth that after establishing the competitive range, any discussions conducted by an agency must be "tailored to each offeror's proposal, and must be conducted by the contracting officer with *each offeror within the competitive range*" (emphasis added)). Once discussions have occurred, "each offeror still in the competitive range shall be given an opportunity to submit a final proposal revision." 48 C.F.R. § 15.307(b); *see also Omniplex World Servs. Corp. v. United States*, 105 Fed. Cl. 706, 715–20 (2012). As such, "[t]he acid test for deciding whether an agency has engaged in discussions is whether the agency has provided an opportunity for quotations or proposals to be revised or modified." *WaveLink*, 154 Fed. Cl. at 269 (quoting *Consol. Eng'g Servs., Inc. v. United States*, 64 Fed. Cl. 617, 626 (2005)).

Here, in February 2024, DLA provided both AEG and KHI the opportunity to submit FPRs as part of the corrective action it undertook in response to KHI's most recent GAO protest. Tab 205 at AR 6810 (AEG FPR invitation letter); Tab 206 at AR 6816 (KHI FPR invitation

letter).  After establishing the competitive range, any discussions DLA had must have been conducted with "each offeror within the competitive range."  48 C.F.R. § 15.306(d)(1).  It is undisputed that DLA subsequently contacted AEG on March 18, 2024, regarding its failure to include the verbatim "no cost" certification required by the RFP.  Tab 210 at AR 7641–42; Tab 211 at AR 7643–44; ECF No. 47-1 at 19; ECF No. 78 at 32; ECF No. 65-1 at 29.  DLA engaged in no similar discussions with KHI after its February 2024 letter inviting KHI to submit FPRs.  Therefore, because DLA only contacted AEG, and not KHI, after receiving FPRs, DLA's March 18, 2024, exchange with AEG constitutes post-FPR discussions that violate FAR 15.306(d)(1).

Having established that DLA's unlawful post-FPR exchanges with AEG are discussions under the FAR, the Court turns to whether such discussions prejudiced KHI.  KHI argues that "had DLA included KHI in further discussions and called for further FPRs, KHI would have improved its proposal and its price as it had done on each other occasion it received such an opportunity."  ECF No. 47-1 at 21 (citing Tab 79; Tab 194; Tab 208; Tab 91 at AR 2739; Tab 218 at AR 7790).  However, this argument alone is insufficient to establish prejudice.  While DLA did participate in unlawful post-FPR discussions, KHI fails to state what, specifically, it would have modified, had it been included in these discussions, beyond vague references to pricing changes.  KHI did not submit a declaration or any other evidence regarding how KHI would have modified its prices if it had been included in discussions.  Put differently, there is no factual support in the record for KHI's assertion that it would have changed its prices if it had been included in discussions.  Instead, KHI cites price changes in earlier versions of its proposal that were separated by nearly two years as evidence that it would have changed its pricing during the mere hours that discussions regarding correcting AEG's certification were open on March 18, 2024.  *See* ECF No. 47-1 at 21 (comparing Tab 91 at AR 2739, showing a 1.0% price-refund offered on June 3, 2022, with Tab 218 at AR 7790, showing a 1.4% price refund offered on May 8, 2024); *see also* Tab 211 at AR 7643–44 (both informing AEG of the certification issue on, and requiring AEG to provide the certification language by, March 18, 2024).

Even if KHI had offered evidence that it would have revised its price proposal if DLA had conducted discussions with all offerors, KHI's argument still fails.  DLA re-opened discussions with AEG "for the limited purpose of raising" the Preliminary Evaluation Factor certification issue.  *See* Tab 210 at AR 7642.  DLA only permitted AEG to provide a "revised Volume 4, page 6 . . . to the Government in response to the finding expressed in this letter . . . ."  Tab 211 at AR 7644.  In other words, DLA only permitted AEG to provide the verbatim certification required by the Preliminary Evaluation Factor and nothing more.  Contracting officers may, within their discretion, limit the scope of discussions.  48 C.F.R. § 15.306(d)(3) ("The scope and extent of discussions are a matter of contracting officer judgment."); *see also ENGlobal Gov't Servs., Inc. v. United States*, 159 Fed. Cl. 744, 755 (2022) ("This Court has approved, for example, of an agency's ability to limit the scope of discussions following corrective action.").  Thus, the contracting officer was within her discretion to limit the scope of these re-opened discussions only to cure AEG's noncompliant certification.  Given that any re-opened discussions were limited only to curing AEG's noncompliant certification, KHI cannot assert that it would have revised its price proposal had DLA re-opened discussions with KHI as well, because DLA did not re-open discussions for that purpose.  For this second reason, KHI's prejudice argument also fails.

The Court cannot find prejudice on the record with the lack of evidence proffered by KHI here.  *See Jordan Pond Co., LLC*, 115 Fed. Cl. at 630 (stating that judges may grant a party's MJAR if the party meets its burden of proof in showing prejudicial error).  For this reason, although DLA engaged in unlawful post-FPR discussions by only communicating with AEG to cure a material error after establishment of the competitive range, KHI fails to establish that it was prejudiced by these unlawful discussions.  Because a showing of prejudice is required to establish entitlement for relief, *see Data Gen. Corp.*, 78 F.3d at 1562, and KHI fails to make such a showing, the Court cannot grant KHI's motion on this count.

### 3.  KHI's Arguments Regarding AEG's Organizational Conflicts of Interest Fail.

KHI makes two arguments regarding AEG's Organizational Conflict of Interest ("OCI") mitigation plans.  First, KHI argues that a statute bars an awardee of this contract from having any OCIs; therefore, because AEG has OCIs that it intends to mitigate, DLA's award of the contract to AEG is not in accordance with law.  ECF No. 47-1 at 23–26.  Second, KHI asserts that AEG has unmitigable impaired objectivity OCIs; thus, DLA's award to AEG despite these OCIs was irrational.  *Id.* at 26–30.  The Court addresses these arguments in the order presented.

### a.  KHI lacks standing to challenge DLA's award under section 886.

KHI first argues that the Court need "not delve into the substance of [AEG's] OCIs" because "Congress has prohibited DLA from awarding the contract to an offeror if any OCI exists."  *Id.* at 23.  Specifically, KHI draws the Court's attention to the Servicemember Quality of Life Improvement and National Defense Authorization Act for Fiscal Year 2025, Pub. L. No. 118-159, § 886, 138 Stat. 1773, 2022–23 (2024) ("section 886").  According to KHI, section 886 requires "DLA not only to ensure no OCI exists but also to certify to Congress '<u>that no conflict of interest exists</u>'—not that a conflict was identified and mitigated, but that a conflict of interest does not exist."  ECF No. 47-1 at 24 (emphasis in original) (quoting section 886(c)).

The government responds by arguing that the plain language and legislative history of section 886 support the notion that awardees of the AIR Card contract may have OCIs, so long as they properly mitigate those OCIs.  ECF No. 78 at 34–37.  In response, AEG moved the Court under RCFC 12(b)(6) to dismiss for failure to state a claim.  *See* ECF No. 65-1 at 11–19.  AEG argues that the Court lacks jurisdiction over KHI's section 886 claim because such a claim pertains to contract administration, a topic beyond the Court's bid protest jurisdiction under the Tucker Act.  *Id.* at 15–16.  Additionally, AEG argues that KHI lacks Article III standing to bring its section 886 claims because "KHI can neither demonstrate how a potential future funding limitation would cause it any injury nor how this Court could offer KHI any relief" for violation of the statute.  *Id.* at 16.  AEG argues in the alternative that KHI's section 886 claim is not ripe for adjudication because section 886 "only gives rise to a temporal limitation on payment come June 1, 2025," and, as "June 1 is . . . months away, KHI's protest grounds based on Section 886 are not ripe and are premised on hypothetical scenarios as to what may occur in the future."  *Id.* at 19.  AEG is correct that KHI lacks standing to make its section 886 argument and is correct that, even if KHI had standing, KHI's section 886 argument is nonetheless not ripe for adjudication.

Article III standing is a prerequisite to the Court exercising subject matter jurisdiction. *Allgenesis Biotherapeutics Inc. v. Cloudbreak Therapeutics, LLC*, 85 F.4th 1377, 1380 (Fed. Cir. 2023) ("To establish a case or controversy, a party invoking federal jurisdiction must meet the 'irreducible constitutional minimum of standing.'" (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992))). In *Lujan v. Defenders of Wildlife*, the U.S. Supreme Court delineated three elements a plaintiff must prove to meet its burden to demonstrate standing. 504 U.S. at 555. First, a plaintiff must have suffered an "injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Id.* at 560 (citations, quotation marks, and footnote omitted). Second, "there must be a causal connection between the injury and the conduct complained of—the injury has to be 'fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court.'" *Id.* at 560–61 (alterations in original) (quoting *Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26, 41–42 (1976)). Third, "it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" *Id.* at 561 (quoting *Simon*, 426 U.S. at 38, 43).

KHI's section 886 argument fails because KHI has not established that it has Article III standing to bring such claim. For instance, KHI has not demonstrated how it has suffered an "injury in fact" that is "concrete and particularized" or "actual or imminent" based on an alleged violation of section 886. *See id.* at 560. Section 886 merely provides that the "Secretary of Defense shall submit to the Committees on Armed Services of the Senate and House of Representatives a written certification that no conflict of interest exists with respect to a contract for financial management services for fuel contracts of the Department of Defense." Section 886(c). Congress established a deadline of January 22, 2025, thirty days after the statute's enactment, by which the Secretary of Defense must provide that certification. *See* Tab 259 at AR 9583; *see also* section 886(b). However, any consequence for violating section 886 comes in the form of a funding freeze, effective June 1, 2025, that lasts until the end of the 2025 fiscal year. *See* section 886(d). A potential four-month freeze on funding for a contract to which KHI is not even a party cannot give rise to a particularized or concrete injury. Furthermore, regarding DLA's potential violation of section 886, KHI is not an injured party. If anything, Congress would be the injured party, as the "injury" here is DLA's failure to provide the statutorily prescribed certification to Congress. For these reasons, KHI's alleged injury does not satisfy the first prong of the *Lujan* standing analysis.

Even if KHI had alleged a sufficient injury in fact, KHI's injury would not be redressable. The remedy for any injury caused by DLA's failure to provide the required certification to Congress would be the funding freeze. In other words, Congress has already established the remedy for violations of section 886, and that remedy does not, in any way, redress KHI's alleged "injury" by any violation of section 886. If, instead, section 886 prohibited DLA from entering into a contract unless it provided Congress with the required certification, KHI would potentially have standing here—although, even then, KHI's standing would be questionable. But that is not what section 886 says. The statute only requires the Secretary of Defense to provide the required certification or be subject to a funding freeze, effective June 1, 2025. *See* section 886(d). Therefore, any "injury" potentially caused by a violation of section 886 is not redressable by this Court, and KHI accordingly fails to satisfy the third prong of the *Lujan* standing analysis.

Although KHI fails to clear the standing hurdle to bringing a challenge under section 886, even if it had standing, it would then run into another hurdle in the form of ripeness for adjudication. A claim accrues and is, therefore, ripe "when all the events have occurred which fix the liability of the Government and entitle the claimant to institute an action." *See Goodrich v. United States*, 434 F.3d 1329, 1333 (Fed. Cir. 2006) (quoting *Hopland Band of Pomo Indians v. United States*, 855 F.2d 1573, 1577 (Fed. Cir. 1998)); *see also Doe v. Va. Dep't of State Police*, 713 F.3d 745, 758 (4th Cir. 2013) ("A claim should be dismissed as unripe if the plaintiff has not yet suffered injury and any future impact 'remains wholly speculative.'" (quoting *Gasner v. Bd. of Supervisors*, 103 F.3d 351, 361 (4th Cir. 1996))).

KHI's section 886 claim has not accrued because not "all the events have occurred which fix the liability of the Government" and entitle KHI to relief. *See Goodrich*, 434 F.3d at 1333. While DLA stated that it would not meet Congress's certification deadline of January 22, 2025, and it told Congress it would provide the required certification "by the end of March 2025," Tab 259A at AR 9585, the funding freeze contemplated by the statute does not come into effect until June 1, 2025. Section 886(d). It is well established that "courts must presume that a legislature says in a statute what it means and means in a statute what it says there." *Barnhart v. Sigmon Coal Co., Inc.*, 534 U.S. 438, 461–62 (2002) (quoting *Conn. Nat. Bank. v. Germain*, 503 U.S. 249, 253–54 (1992)). With this canon of statutory interpretation in mind, the Court notes that Congress did not set a potential funding freeze to commence the day after January 22, 2025, if certification did not timely occur, but instead provided that such a freeze would not start until June 1, 2025, if necessary. That June 1 is not the day after January 22 suggests that Congress contemplated some sort of process between the two dates before jumping to a funding freeze. Nevertheless, any potential funding freeze appears to be curable if DLA provides the required certification before June 1, 2025. Therefore, KHI's section 886 challenge fails because it is not yet ripe for adjudication, even if Article III standing existed.

### b. KHI fails to demonstrate that DLA irrationally evaluated AEG's OCI mitigation plan.

KHI also argues that AEG has an unmitigable impaired objectivity OCI as both a fuel merchant that supplies fuel to DLA and as the prospective administrator of the AIR Card program. ECF No. 47-1 at 26. Specifically, KHI states that AEG's plan to mitigate its OCIs—by creating a firewalled division to handle work with which AEG would have a conflict of interest—is inadequate because "organizational separation does not mitigate an impaired objectivity OCI as a matter of law." *Id.* at 28. Therefore, according to KHI, DLA erred by awarding the contract to AEG despite AEG's OCI mitigation plan. *See id.* at 26.

The government responds by reminding the Court that its task here is "limited to a determination whether DLA's acceptance of AEG's mitigation plan was reasonable." ECF No. 78 at 38. The government cites numerous cases to argue that "this Court has recognized that organizational separation involving a firewall is a means to sufficiently mitigate impaired objectivity OCI." *Id.* at 39; *see also id.* at 39–40. The government further argues that DLA reasonably determined that AEG's OCI mitigation plan sufficiently mitigated any impaired objectivity OCI. *Id.* at 41–46. AEG responds by arguing that DLA reasonably evaluated AEG's

27

OCI plan, that case law recognizes organizational separation as sufficient to mitigate impaired objectivity OCIs, and that KHI's allegations conflict with the record.  ECF No. 65-1 at 33–38.

FAR 9.504(a) provides that contracting officers "shall analyze planned acquisitions in order to- (1) Identify and evaluate potential organizational conflicts of interest as early in the acquisition process as possible; and (2) Avoid, neutralize, or mitigate significant potential conflicts before contract award."  *See also Turner Constr. Co. v. United States*, 645 F.3d 1377, 1386 (Fed. Cir. 2011).  "A significant potential conflict [of interest] is one which provides the bidding party a substantial and unfair competitive advantage during the procurement process on information or data not necessarily available to other bidders."  *PAI Corp. v. United States*, 614 F.3d 1347, 1352 (Fed. Cir. 2010).  FAR 9.504(e) further provides that "[t]he contracting officer shall award the contract to the apparent successful offeror unless a conflict of interest is determined to exist that cannot be avoided or mitigated."  Still, "the FAR recognizes that the identification of OCIs and the evaluation of mitigation proposals are fact-specific inquiries that require the exercise of considerable discretion."  *Axiom Res. Mgmt. v. United States*, 564 F.3d 1374, 1382 (Fed. Cir. 2009) (citing 48 C.F.R. § 9.505).  The Court thus evaluates an agency's determination that an offeror's mitigation plan sufficiently remedied an OCI for reasonableness.  *Paradyme Mgmt. v. United States*, 167 Fed. Cl. 180, 185–86 (2023)

"An 'impaired objectivity' OCI 'occurs when a government contractor has conflicting obligations under different government contracts,'" *Sigmatech, Inc. v. United States*, 144 Fed. Cl. 159, 181 (2019) (quoting *Axiom Res. Mgmt.*, 78 Fed. Cl. at 592 n.17), or "is tasked with 'evaluat[ing] its own offers for products or services, or those of a competitor,'" *Paradyme Mgmt.*, 167 Fed. Cl. at 186 (alteration in original) (quoting 48 C.F.R. § 9.505-3).  "The primary concern under this type of OCI is that a firm might not be able to render 'impartial advice' due to" its other contract obligations or "its relationship with the entity being evaluated."  *Turner Constr. Co.*, 94 Fed. Cl. at 569 (quoting *Aetna Gov't Health Plans, Inc.*, B-254397, 1995 WL 449806, at *9 (Comp. Gen. July 27, 1995), *aff'd*, 645 F.3d 1377 (Fed. Cir. 2011)).  To demonstrate an impaired objectivity OCI, a party must point to "facts showing that 'a government contractor's "work under one government contract could entail its evaluating itself, either through an assessment of performance under another contract or an evaluation of proposals."'"  *Sigmatech, Inc.*, 144 Fed. Cl. at 181 (quoting *Aegis Techs. Grp., Inc. v. United States*, 128 Fed. Cl. 561, 575 (2016)).

Although the parties dispute whether AEG's mitigation plan is sufficient, it is undisputed that AEG at the very least has an OCI with regard to this contract.  ECF No. 47-1 at 26; ECF No. 78 at 40; ECF No. 65-1 at 33.  AEG is both a fuel supplier to DLA, *see* Tab 207 at AR 6985 ("AEG has proudly supplied aviation fuel to the U.S. Government, including the Defense Logistics Agency (DLA), for many years . . . ."), and, after award of this contract, is the AIR Card program administrator.  There is no doubt that AEG's positions as AIR Card program administrator, tasked with monitoring fuel transactions to identify potential misuse, fraud, and abuse, conflicts with its role as a fuel provider seeking to maximize profits.

That said, the Court finds that KHI has not met its burden to demonstrate that DLA unreasonably determined that AEG's OCI mitigation plan cured its OCIs.  According to KHI, AEG's OCI plan "involves three approaches: (1) firewalling PPS from the AEG Fuel Division;

(2) AEG recusing itself 'from participating in any and all non-contract location fuel supply transactions'; and (3) using 'a firewalled, non-conflicted subcontractor.'" ECF No. 68 at 26 (quoting ECF No. 65-1 at 34). KHI asserts that each of these three approaches is insufficient, and that DLA erred in determining that each mitigated AEG's related OCI. *Id*. at 26–29. The problem for KHI, however, is that its arguments on these three points are largely conclusory and do not meet its burden of showing that the agency acted irrationally. To be clear, "KHI has never argued it is impossible for AEG to mitigate its OCIs." *Id*. at 25. Rather, KHI's issues are with how AEG proposed to mitigate its OCIs and DLA's acceptance of AEG's approaches.

With regard to AEG's plan to firewall PPS from AEG's Aviation Fuel division, KHI simply concludes, citing two GAO decisions, that "an organizational separation does not mitigate an impaired objectivity OCI as a matter of law." ECF No. 47-1 at 28. But this is not enough for KHI to meet its burden. KHI does nothing to analyze whether the walled-off subdivision here is anything like the organizational separations found to be insufficient in its two cited GAO decisions. And the Court is certainly under no obligation to do KHI's work for it. *See Daniels v. United States*, 163 Fed. Cl. 363, 382 (2022) ("It is not up to a court to devise and develop arguments for a party; it is the party's responsibility to present arguments in a cogent manner in support of a claim.").

Despite its lack of obligation to do so, the Court entertains KHI's undeveloped argument solely to note that KHI's reliance on the two GAO decisions is unpersuasive. KHI asserts that the government and AEG's reliance on cases from this Court is inapposite because the cited cases pertain to "divesting work to firewalled subcontractors," not to the question of whether "a firewall resolves an impaired objectivity OCI between separate parts of the same company." ECF No. 68 at 26. Instead, KHI contends that two GAO decisions, *Nortel Government Solutions, Inc.*, B-299522.5 et al., 2008 WL 5473616 (Comp. Gen. Dec. 30, 2008) and *Aetna Government Health Plans, Inc.*, 1995 WL 449806, establish that an internal firewall cannot mitigate an impaired objectivity OCI. ECF No. 68 at 26. This argument fails. At the outset, GAO decisions are not binding on this Court. *Caddell Constr. Co., Inc. v. United States*, 111 Fed. Cl. 49, 76 (2013) ("GAO decisions, however, are not binding on this court."). Even acknowledging that GAO decisions are considered persuasive authority before this Court, KHI's reliance on *Nortel* and *Aetna* does not support its claim that internal firewalls are "virtually irrelevant to an organizational conflict of interest involving potentially impaired objectivity." ECF No. 68 at 26 (quoting *Aetna*, 1995 WL 449806 at *10). GAO reached its decision in *Nortel* by relying on *Aetna*, *see Nortel*, 2008 WL 5473616 at *6, and as the government aptly notes, *Aetna* explicitly stated that its conclusion in that case, that an internal firewall was insufficient to mitigate an impaired objectivity OCI, was "based, not on a per se approach" because a "per se approach would be inconsistent with FAR subpart 9.5, which directs the contracting officer to develop a course of action to avoid or mitigate organizational conflicts of interest, where that is possible." *Aetna*, 1995 WL 449806 at *11. Instead, GAO concluded that the awardee's internal firewall there was insufficient to mitigate its impaired objectivity OCI because of the "largely subjective nature of the evaluation of probable health care costs in [that] procurement, where probable cost calculations turn on whether the [awardee's] evaluators have been persuaded that an offeror will succeed in managing health care as proposed." *Id.* Therefore, *Aetna* does not stand for the proposition that internal firewalls can *never* mitigate impaired objectivity OCIs, but

instead suggests that internal firewalls may be insufficient to mitigate such OCIs where the awardee retains the ability to subjectively benefit itself as it performs the contract.

Applying the actual takeaway from *Aetna* to this case, the contracting officer explicitly found no opportunities for AEG to subjectively benefit itself either in contract or non-contract locations. Regarding contract locations, the contracting officer stated "[r]egarding the processing of those transactions, because the terms of the contract are fixed and *there is no opportunity for subjective or substantive judgement or evaluation of its performance as the AIR Card® contractor*, there is no significant risk of impaired objectivity." Tab 212 at AR 7656 (emphasis added). Similarly, regarding non-contract locations, the contracting officer explained that "[t]he Government will have the capability to conduct its audits independently of AEG's assistance. As such, the Government's reliance on the AIR Card® contractor will be reduced in the new contract with the pending use of the required data mining tool and ad hoc reporting ability. Consequently, *AEG is not in a position to make any subjective judgments regarding fuel sales . . . .*" *Id.* at 7657 (emphasis added). Thus, *Aetna*—a GAO decision that is already not binding on this Court—is clearly distinguishable from the facts here, and KHI's argument fails.

Second, KHI argues that AEG's OCI mitigation plan does not resolve OCIs stemming from AEG's roles in the fuel supply market and its fuel supply market business relationships. To the extent that this second argument relates to anything other than an OCI created by AEG's fuel supply market business relationships, that argument is waived because in KHI's reply brief, KHI exclusively addresses the potential OCI created by AEG's fuel supply market business relationships. *See* ECF No. 68 at 28–29; *Sarro & Assocs., Inc. v. United States*, 152 Fed. Cl. 44, 58 (2021) ("A party's failure to raise an argument in an opening *or responsive brief* constitutes waiver." (emphasis added)). In this regard, DLA reasonably concluded that the conflict alleged by KHI here does not exist. According to DLA, there was no risk of AEG attempting to steer business toward itself or its interests "due to AEG's recusal as a supplier for non-contract purchases and the policy requiring card users to use Into-plane contracts where available." Tab 212 at AR 7659. As DLA explained, "Into-plane contracts and non-contract suppliers are not in competition with one another under the AIR Card® contract," because DLA policy requires card users "to search for and use [contracts suppliers] where available" and users "may only use non-contract merchants at locations where a[] contract [merchant] is not available." *Id.* at 7658. And with regard to any potential for AEG to steer users to its own contract locations or those of its partners, DLA concluded "[AEG] is unable to do so" because "[c]ard users determine the locations they will use based on mission needs." *Id.* at AR 7659.

Finally, KHI essentially argues that because AEG never identified the subcontractor it proposes to use for rejected contract location transactions involving AEG, DLA's acceptance of AEG's OCI mitigation in this regard is unreasonable: "AEG['s] proposal never identifies the purported unconflicted subcontractor, and DLA never evaluated whether the unnamed subcontractor suffices to mitigate the OCI, much less perform the contract." ECF No. 68 at 27. (emphasis omitted). But KHI focuses on the identity of the subcontractor, not whether using a subcontractor will solve the OCI issue. As the Court will explain below with regard to KHI's contentions regarding the TEB, AEG's failure to identify its proposed subcontractor for this task is not fatal. Consequently, KHI needed to do more than simply point to AEG's failure to identify

a subcontractor in order to show that DLA's acceptance of this aspect of AEG's OCI mitigation plan was irrational.

Moreover, apart from its arguments on these three specific areas, KHI fails to address DLA's findings that AEG's OCI mitigation plan exceeded the mitigation measures that KHI itself used during the time that KHI was both the AIR Card contractor and owned by a fuel service provider. *See* Tab 212 at AR 7654 ("The firewall techniques in AEG's mitigation plan are very similar to the firewalls which were put in place in the incumbent contract when incumbent KHI was owned by World Fuel Services, Inc., another fuel service provider."); Tab 230 at AR 9059 ("However, although the firewall techniques were similar, AEG's mitigation plan provides significantly more mitigation and avoidance than any of KHI's past plans due to its complete recusal from non-contract transactions, which are where the risk of impaired objectivity lie."). If KHI's OCI mitigation plan was sufficient when it was the AIR Card contractor and owned by a fuel service provider, and AEG's OCI plan exceeds the effectiveness of KHI's plan, then AEG's OCI mitigation plan would logically be sufficient and, without arguing anything to the contrary in its briefs, KHI has waived any argument on this point.

For these reasons, KHI fails to meet its burden in arguing that DLA unreasonably determined that AEG's OCI plan mitigated its impaired objectivity OCIs.

### 4. DLA Erred by Misleading KHI and Treating the Offerors' EAS Proposals Unequally.

KHI next argues that "DLA misled KHI regarding acceptable approaches to the EAS" because "DLA dissuaded KHI from proposing features that involved a virtual role for the card user/pilot, yet never questioned and ultimately rewarded AEG for solutions based on the same role for the user/pilot." ECF No. 47-1 at 31. The government responds by arguing that "DLA's position has remained consistent and reasonable: offers must comply with the roles and permissions listed in the RFP." ECF No. 78 at 47. According to the government, "DLA never expressed an issue with any feature offered by KHI. Rather, DLA assigned a weakness because KHI had admitted its solution would not conform with the PWS roles and permissions requirement." *Id*. By contrast, the government states, "AEG proposed to follow the authorized user roles and permissions in the PWS." *Id*. AEG did not address this argument in its cross-MJAR; therefore, AEG has waived argument regarding this topic. *See Sarro & Assocs., Inc.*, 152 Fed. Cl. at 58–59.

"[M]isleading discussions are characterized by communications from the government that are incorrect, confusing or ambiguous." *DMS All-Star Joint Venture v. United States*, 90 Fed. Cl. 653, 670 (2010). The requirement that discussions be meaningful and not misleading means that an agency must not "misdirect[] the protestor as it revises its proposal." *Green. Contractors I/S v. United States*, 131 Fed. Cl. 216, 225 (2017) (quoting *DMS All-Star Joint Venture*, 90 Fed. Cl. at 670). "Equal treatment, however, does not require that all proposals be treated the same." *Mil-Mar Century Corp. v. United States*, 111 Fed. Cl. 508, 530 (2013) (quoting *Chenega Mgmt. v. United States*, 96 Fed. Cl. 556, 585 (2010)). As with all alleged procurement errors, "[t]o prevail on a claim for unequal treatment, a . . . protestor must show that

the instance of unequal treatment was prejudicial." *Crowley Gov't Servs. Inc. v. United States*, 158 Fed. Cl. 358, 377 (2022).

Before analyzing the offerors' proposals, the Court provides background as to the EAS requirements listed in the RFP and Attachment 3 to the RFP. The RFP delineated what DLA sought in an offeror's EAS proposal. *See* Tab 10. The RFP contemplated a "real time, user friendly internet based EAS that allows for secure Hypertext Transfer Protocol Secure (HTTPS) communication and data transfer between the customer and the Contractor." Tab 10(a) at AR 367. At its core, the EAS was supposed to "provide authorized users with the ability to electronically access program data, as specified in Attachment 3: roles and permissions." *Id.* (emphasis omitted). Specifically, the EAS was to "provide users with online access to accounts, including access to online statements, and online payment options" for fuel services. *Id.* Fuel service customer accounts were to "reside within a hierarchy/approval structure." *Id.* at AR 352. The AIR Card program "established a hierarchal account structure which consists of five levels." *Id.* The hierarchy identifies levels by "the unit, wing or squadron" and levels within the hierarchy correspond with moving "down the chain of command." *Id.* In other words, users are assigned levels that "govern their ability to maneuver (view or update) account information" within the EAS. *Id.* The levels of the hierarchy are titled "HL1" through "HL5." *See id.* The RFP labels each level of the hierarchy according to their access permissions with HL1 being the highest in the hierarchy with the most permissions, and HL5 being the lowest with the fewest permissions. *See id.* HL1 would consist of members of the DLA Energy Fuel Card Program Office and HL5 of Accountable Officials and Certifying Officers. *Id.* HL2 through HL4 would consist of officers lower in the chain of command than HL1 officers, but higher in rank than HL5 officers. *Id.* The RFP required the contractor to "setup [sic] and maintain an accurate user role management process based on the hierarchy structure defined [therein] and as detailed in Attachment 3: Roles and Permissions." *Id.* (emphasis omitted). The RFP further stated that the contractor "shall provide the ability for customer access with limited ability to cross services when requested by the PM." *Id.*

The RFP also contemplated the creation of a sixth level, HL6, for AIR Card users themselves. *Id.* The card user, when referenced by the RFP, is the "virtual" sixth level, as HL6 card users were to have virtual electronic fuel cards with which to purchase fuel. *Id.* According to Attachment 3 to the RFP, HL6-level card users were to have no permissions within the EAS in contrast with their HL1–HL5 counterparts. *See* Tab 10(b) at AR 462 (delineating permissions for HL1–HL5 users only).

The administrative record contains both offerors' EAS proposals. Beginning with KHI's EAS proposal, KHI stated that its proposal included an ███████████████████████████ ████████████████████ Tab 14 at AR 776. According to KHI, its proposed solution would provide pilots a user role ███████████████████████████████████████████ ████████████████████████████ *Id.* In other words, HL6 card users, such as individual pilots, could utilize KHI's proposed EAS to electronically complete various fueling tasks.

Turning to AEG's EAS proposal, AEG stated that it had "established a role for the 'virtual' HL6 Level (pilots) in ███████████████████████      Tab 15 at AR 1049; Tab 207 at AR 7039.  AEG also stated that it had ████████████████ for these HL6 users. Tab 15 at AR 1054.  According to AEG's proposal, AEG's EAS would provide



*Id.* at AR 1055.  In short, AEG's EAS proposal ██████████████████████████████████████████████████ Tab 207 at AR 7047.

The administrative record also contains DLA's responses to the offerors' EAS proposals. Starting with DLA's response to KHI's EAS proposal, DLA stated, KHI's "solution includes a process that is not supported in the requirements.  Reference the role/permission attachment and note there is not a card user role or permission.  Card users are not authorized access to the EAS under this requirement, so explain how this solution will work."  Tab 63 at AR 1722.  KHI replied to DLA's response, stating that "KHI is proposing new secure functionality and auditability through the OMS via secure customer access that will allow virtual approvals and arrangements of orders for the AIR Card®" and that if "cardholders are not able to log in, KHI can discuss with DLA other secure methods of verifying the cardholder placing the order post-award."  Tab 68 at AR 1934.  In response to KHI's reply, DLA reiterated that "[t]he role/permissions attachment does not contain a card user role" and, for this reason, assigned KHI's EAS proposal a weakness.  Tab 72 at AR 2078.  Moreover, DLA stated that KHI's "solution has not been tested and proven and the Government at this time does not accept this as a viable solution" and stated that "[t]he weakness remains."  *Id*. at AR 2077.

DLA's response to AEG's EAS proposal differs greatly.  With regard to AEG's EAS proposal, DLA stated that "AEG's approach to its EAS is Outstanding because it satisfied all the RFP requirements and exceeded them ████████████████ in which it received strengths."  Tab 218 at AR 7793 (emphasis omitted).  DLA made no further mention of AEG's EAS proposal.  In the subsequent SSDD, the SSA stated that "[f]or Subfactor 3, EAS, AEG offered the clearly superior solution because ██████████████████████████████████  Tab 253 at AR 9555.  As a result, the SSA concluded that "AEG's solution, which was rated as Outstanding compared to KHI's Acceptable solution, is superior and offers more value to the Government."  *Id*.  DLA then relied on these ratings, in part, to award the contract to AEG.  *See* Tab 218 at AR 7800 ("KHI and AEG received similar ratings for many of the evaluation factors, however, AEG proposed a superior technical proposal, most notably due to its Management Approach in Factor 2 and EAS in Factor 3 . . . .").

DLA's disparate responses to KHI and AEG's similar proposals misled KHI into believing its EAS solution was unacceptable, which constituted unequal treatment for two reasons.  First, DLA took issue with KHI's user role proposal, noting that "[c]ard users are not authorized access to the EAS under this requirement."  Tab 63 at AR 1722.  Heeding DLA's input

regarding user roles, KHI ultimately removed such features from its proposal.[15]  However, DLA did not mention this apprehension to AEG, which also proposed a solution with a clear user role. *See* Tab 207 at AR 7039 ███████████████████████████████████████████████ ████████████████████████  In fact, DLA did not mention AEG's similar user role proposal and instead rated AEG's EAS proposal "Outstanding" without comment, signaling clear unequal treatment of two similar proposals.  Tab 218 at AR 7788.  If DLA had treated the two offerors' proposals equally, AEG's EAS proposal should have received a weakness, like KHI's did, because AEG's proposal also included ████████████████████████████████████████████ ████████████████████████████████  Tab 72 at AR 2076.  Furthermore, DLA's assigning of a higher rating to AEG, in comparison with KHI's assigned weakness, for an EAS proposal similar to KHI's contributed to DLA's overall flawed ratings for the two offerors' proposals and to DLA's decision to award AEG the contract based on these flawed ratings.  *See* Tab 253 at AR 9555 ("For Subfactor 3, EAS, AEG offered the clearly superior solution . . . .  As a result, AEG's solution, which was rated as Outstanding compared to KHI's Acceptable solution, is superior and offers more value to the Government.").  Therefore, not only did DLA treat the two offerors' similar EAS proposals unequally, but this unequal treatment was also prejudicial to KHI because such treatment contributed to the flawed proposal ratings on which DLA relied to ultimately award AEG the contract.

Second, DLA's reasoning regarding whether the EAS solutions were tested and proven is unsound and further demonstrates unequal treatment of the two offerors' EAS proposals.  In response to KHI's EAS solution, DLA stated that KHI's "solution has not been tested and proven" and, therefore, the weakness assigned to KHI's solution would remain.  Tab 72 at AR 2077.  By contrast, after rating AEG's EAS solution "Outstanding," and at least partially relying on that rating to select AEG as the awardee, DLA justified the award by reasoning that AEG "offered new, innovative approaches that provide the Government with increased information to improve its use of the AIR Card®."  Tab 253 at AR 9555.  However, the record obviously does not reflect any documentation of "testing and proving" AEG's EAS solution, as AEG is not the incumbent AIR Card contractor and thus all its solutions, including its EAS solution, are new and unproven.  The Court also notes the logistical issues of testing and proving AEG's EAS solution, in comparison with testing and proving KHI's solution, given that KHI is the incumbent on this contract.  Any testing and proving of an offeror's EAS proposal would likely be more easily conducted when the offeror already has the infrastructure and accessibility needed for such testing because it already holds the contract and thereby already assists with running the AIR Card program.  In any event, whereas DLA assessed KHI's EAS solution a weakness because it had not been "tested and proven," DLA commended AEG's similar solution, even opining that it was "new" and "innovative," *Id.*; Tab 218 at AR 7801, without any documentation to support that AEG's solution was itself "tested and proven."  Thus, DLA's double standard when it comes to whether being "tested and proven" is a weakness is further indication of unequal treatment of KHI's and AEG's EAS solutions.  Once again, such unequal treatment was prejudicial to KHI as

---

[15] "KHI Interim Response: In recommending the OMS . . . KHI proposed a technology advanced solution that would add value to the program and ████████████████████████████ ████████████████████████████████████████████████████  However, *based on DLA's feedback in discussions,* we are re-evaluating our solution . . . ."  Tab 79 at AR 2335 (emphasis added).

DLA assessed KHI a weakness because its solution had not been "tested and proven" and relied on ratings incorporating this assessed weakness in awarding the contract to AEG. Because AEG's untested and unproven EAS solution was not also assessed a weakness and AEG ultimately won the contract due to its higher overall rating, DLA's unequal treatment of the two EAS solutions prejudiced KHI.

In sum, DLA did not treat KHI and AEG's EAS proposals equally. DLA stated that KHI's proposal was noncompliant because it included a "user role" and was not "tested and proven," ultimately assessing KHI's proposal with a weakness, which caused KHI to remove these features from its final revised proposal. On the other hand, DLA commended AEG's substantially similar EAS proposal—which also included a "user role" and, at least as evidenced by the record, was not "tested and proven." DLA subsequently relied on these flawed ratings in making its decision to award the contract to AEG. DLA treated the two offerors' EAS proposals unequally, and such unequal treatment prejudiced KHI, as DLA's inconsistent rating system simultaneously hurt KHI's and helped AEG's chances of being awarded the contract.

### 5. DLA Did Not Err in its Limited Re-evaluation of Factor 1 of AEG's Proposal.

Following GAO's sustention of KHI's 2024 protest, *see Kropp Holdings, Inc.*, 2024 WL 4330024, DLA empaneled a new TEB to reevaluate AEG's proposal under Factor 1. *See* Tab 253 at AR 9540. The TEB assessed AEG a weakness for failing to identify by name the subcontractor it intended to use as part of its OCI mitigation plan rather than deeming AEG's proposal altogether unacceptable. Tab 252 at AR 9527–28. Despite this weakness, the new TEB ultimately concurred with the pre-2024 protest TEB's conclusions, and "assess[ed] AEG as the best overall value to the government." Tab 253 at AR 9556.

In attempting to establish that DLA erred in its limited re-evaluation of Factor 1, KHI makes two arguments. First, KHI argues that DLA's use of a new TEB in its re-evaluation failed to maintain consistency and was consequently erroneous. ECF No. 47-1 at 35–37. Second, KHI asserts that DLA did not resolve the error identified by GAO by failing to require AEG to name the subcontractor that it planned to use as part of its OCI mitigation plan. *Id.* at 37–42. This, according to KHI, caused KHI prejudicial harm because DLA should have deemed AEG's proposal unacceptable and eliminated AEG from the competition for failing to identify the proposed subcontractor. *Id.* at 42.

KHI's first argument essentially asserts that, "[b]ecause the RFP and this Court's case law require consistency in evaluations, DLA should have evaluated both AEG and KHI's proposals under the same criteria, including by using the same evaluators." *Id.* at 35. The government counters by stating that "[t]he issue is not whether an agency has to reconvene the same TEB on remand; the issue is whether the TEB's evaluation on remand was reasonable under the APA . . . ." ECF No. 78 at 53. Given the "highly deferential APA standard of review" with which this Court reviews agency decisions in a bid protest, the government asserts that "the notion that a new TEB panel might, in theory, reach a different reasonable conclusion on a given issue, is not a reversible state of affairs . . . ." *Id.* AEG responds by pointing out that the SSA remained the same during both the initial evaluation and the corrective action evaluation,

effectively supplying "whatever consistency was required" and nullifying KHI's argument. ECF No. 65-1 at 42.

Although general consistency is required in TEB evaluations, KHI's proposition that the subsequent TEBs must consist of the "same evaluators" is without merit. *See* ECF No. 47-1 at 35. As AEG points out, KHI cites no authority stating that the same technical evaluators must conduct the entire technical evaluation. ECF No. 65-1 at 41. This lack of authority makes sense, as any requirement for TEBs to consist of the same evaluators would be impractical given that procurements can, and often do, span months or even years. Such a requirement would put an unrealistic burden on the agency to retain procurement officials for the entirety of a procurement. Not only is this burden too high, but also this level of consistency is not needed to ensure error-free procurements. Additionally, KHI's contention that, when switching evaluators, an agency must reassess the entire technical proposal is equally meritless. ECF No. 47-1 at 36–37. Such a requirement would also impose too great a burden on procurement officials to again sift through hundreds or thousands of procurement documents whenever switching evaluators during lengthy procurements.

To be sure, technical evaluations must generally be conducted in a consistent manner. Here, as AEG notes, the SSA remained the same during both the initial and corrective action evaluations. ECF No. 65-1 at 42; *compare* Tab 218 at AR 7082 (showing the SSA for the initial evaluation was Jamaal R. Rose) *with* Tab 253 at AR 9556 (showing that the SSA for the corrective action evaluation was Jamaal R. Rose). The fact that the same SSA made the same determinations in the subsequent evaluation as he did in the first evaluation cures any inconsistency alleged by KHI.

Second, KHI argues that DLA did not require AEG to identify its OCI mitigation subcontractor; therefore, DLA did not resolve the subcontractor error identified by GAO. ECF No. 47-1 at 37–42. For this reason, KHI asserts that the TEB was required to rate AEG's proposal as unacceptable and remove AEG from the competition. *Id.* at 42. The government responds by contending that "KHI's arguments fail because they ignore the deference owed to agency officials' technical expertise." ECF No. 78 at 54. The government asserts that, because the "subcontractor [at issue] is only going to be rarely employed," DLA was "within the realm of reason to downgrade AEG for the lack of subcontractor information . . . to a weakness but not find AEG's offer altogether unacceptable." *Id.* at 56.

"Procurement officials have substantial discretion to determine which proposal represents the best value for the government." *E.W. Bliss Co. v. United States*, 77 F.3d 445, 449 (Fed. Cir. 1996). For that reason, the Court "should not second guess challenges to 'such matters as technical ratings . . . which involve discretionary determinations of procurement officials.'" *Akal Sec., Inc. v. United States*, 103 Fed. Cl. 310, 329 (2011) (quoting *E.W. Bliss Co.*, 77 F.3d at 449).

DLA determined that AEG's failure to identify a proposed subcontractor was a weakness and rated AEG's proposal accordingly. Tab 252 at AR 9527 ("AEG did not provide or 'explain the relationships, duties and responsibilities of each subcontractor' under Volume 2 . . . which was evaluated as a 'weakness'"). Despite this weakness, DLA noted that "AEG did explicitly state the use of subcontractors teaming under Volume 1." *Id.* at AR 9527–28. Simply put, AEG

sought to use a non-conflicted subcontractor to cure any potential OCIs related to rejected AIR Card transactions. Specifically, AEG proposed using such a subcontractor to "perform[] transaction processing support[] on the small number of AEG's rejected transactions that require AIR Card® contractor involvement" to establish a firewall thereby preventing AEG from obtaining "knowledge of [subcontractor] activities . . . which may influence the subcontractor impartiality and other OCI mitigation procedures." *Id.* at AR 9528. While failure to identify a subcontractor for this role was "still a flaw in AEG's proposal," DLA determined that, "[g]iven the fact that the subcontractor has a limited role handling a very small portion of transactions," AEG's omission of this subcontractor's identity had a "minimal impact on the performance risk" and was not material. *Id.*

Despite the fact that the Court is not to "second guess challenges to 'such matters as technical ratings,'" *Akal Sec., Inc.*, 103 Fed. Cl. at 329 (quoting *E.W. Bliss Co.*, 77 F.3d at 449), KHI essentially asks the court to do just that. As the above demonstrates, DLA considered AEG's failure to identify its subcontractor a weakness, yet it still determined that AEG's proposal provided the best value to the government. DLA's justification further underscores the reasonableness of this decision. As the TEB correctly notes, the RFP provides "no explicit requirement for offerors to provide the names of their subcontractors." Tab 252 at AR 9528. The TEB further stated that AEG only "proposed one subcontractor, for a very limited role, in processing AEG's rejected transactions" and determined that "AEG would most likely establish a subcontractor teaming relationship, responsibilities, duties, and firewall parameters during the transition phase." *Id.*; *see* Tab 207 at AR 6994 ("Contract location transaction volumes were 253,586 for fiscal year-end September 30, 2019, and 186,958 for fiscal year-end September 30, 2020; AEG's transaction volumes for the same periods were ███████████ and ███████████ respectively. Accordingly, the percentage of estimated tasks to be subcontracted is a relatively small amount of the total work to be performed under the contract."). Given that there was no explicit requirement to identify subcontractors and that AEG sufficiently explained the role subcontractors would play in executing the AIR Card program, *see* Tab 207 at AR 6991–94, DLA's decision to assess only a weakness for failure to identify the proposed subcontractor in its OCI mitigation plan is rational. If, instead, AEG did not explain the role the subcontractor would play or otherwise violated the RFP's requirements for subcontractors, KHI's argument would be stronger, but that is not the case here.

To the extent KHI argues that identification of subcontractors is imperative to ensure a subcontractor even exists to do the work, the Court notes that AEG's proposed use of a subcontractor to mitigate this potential OCI does not call for the use of a particularly specialized subcontractor. This particular subcontractor would only be responsible for accounting services in reviewing the occasionally rejected transaction. Such accounting services appear straightforward and do not require any highly specialized knowledge or technology to complete. It appears beyond peradventure that many potential subcontractors with the capability to complete the required simple accounting tasks exist. In other words, there does not appear to be a question of whether any subcontractor exists that could complete the work such that identification of a particular subcontractor in AEG's proposal was of paramount importance. Accordingly, KHI's subcontractor argument fails. DLA's assessing AEG a weakness for failing to identify a subcontractor while still finding that AEG's proposal provides the best value for the government was rational.

**6. DLA Erred by Attributing AEG's Corporate Experience and Past Performance to AEG's Walled-off Subdivision.**

Recall that AEG assured DLA in its FPR that its OCI mitigation plan mitigates any potential OCIs. To achieve this goal, AEG stated that it would "establish[] a separate operating division, called the 'Performance Payment Solutions' (PPS) division, which, if AEG [were] awarded the contract, [would] be separate from its 'Aviation Fuel' division." Tab 207 at AR 6989. The PPS division would operate "separately and distinctly from AEG" by being "housed in a separate secure building from the Aviation Fuel division with its own access controls with security access limited to PPS division employees only." *Id.* Furthermore, AEG stated that PPS division information systems would be "secure stand-alone systems" inaccessible to Aviation Fuel division employees, who would also "not be permitted to enter the PPS division offices." *Id.* at AR 6989–90. At the center of its OCI mitigation plan, AEG's proposal provides that "AEG's leadership will not be within the [PPS division] firewall, and will only have access to financial information required for financial reporting and controls." *Id.* at AR 6990.

KHI argues that DLA "cannot simultaneously credit AEG's decision to wall off PPS from AEG and at the same time credit PPS with AEG's experience and past performance." ECF No. 47-1 at 5. The government responds by arguing that "AEG's offer relied upon AEG's experience and past performance as the offeror for PPS's corporate experience and past performance" and that DLA properly relied on AEG's corporate experience and past performance because "as a matter of first principle under the RFP's terms, AEG is the offeror." ECF No. 78 at 58 (emphasis omitted). In response, AEG asserts that "KHI's position is misguided, as PPS is a mere division of AEG, not a separate legal entity" and, therefore, "there was nothing inappropriate about DLA crediting [PPS] with [AEG's] past performance and corporate experience." ECF No. 65-1 at 46.

The solicitation provides that offerors must meet certain requirements under Subfactor 1(d), titled "corporate experience," and Factor 5, titled "past performance." Tab 174 at AR 5427, 5428–29. Subfactor 1(d) requires offerors to provide a "narrative response . . . [that] demonstrates a clear understanding of and/or ability to accomplish the totality of the Government's requirements." *Id.* at AR 5427. Specifically, Subfactor 1(d) directs offerors to address their "experience providing internet logistics programs including best practices," "[c]orporate and/or government experience with logistics, data management, and system development," and their history of "successful, completed, or ongoing projects related to AIR Card® PWS," among other things. *Id.* Factor 5 requires offerors to provide information about any history of past performance and to include at least three recent client references that DLA could contact for more information. *Id.* at AR 5428–29.

In its proposal, AEG provided information solely about AEG's, and not PPS's, corporate experience. Regarding corporate experience, AEG included a section in its proposal titled "About AEG" in which AEG boasts its experience with aviation fuel services and developing a mobile app for fuel cards in a previous contract. Tab 207 at AR 7060–63. Nowhere in this section does AEG mention PPS, its relevant corporate experience, or whether the employees and resources behind this AEG experience would be part of PPS. That is to say, AEG does not explain in its proposal what, if any, of the relevant resources and experience that AEG possesses

are going to be transferred to the new walled-off subdivision such that AEG's corporate experience and past performance are relevant to the walled-off PPS subdivision.

Similarly, regarding past performance, AEG highlighted its past and current relationships with commercial airlines, military/government aviation departments, and business aviation services, specifically listing its past global endeavors. *Id.* at AR 7118; *see also id.* (regarding a bulk fuel services contract in the ███████████); *id.* at AR 7119 (regarding a plane refueling contract with the ███████████); *id.* at AR 7120–21 (regarding a global into-plane refueling and fuel card contract with NATO). Again, what is missing from the description of AEG's past performance is any discussion of whether the employees and resources behind AEG's relevant past performance would be transferred from AEG to its walled-off subdivision, PPS.

The Court struggles to understand how AEG's corporate experience and past performance are relevant, given that PPS would be handling the administration of the AIR Card program under this contract. Per AEG's own assurances, AEG would be completely barred from any PPS operations and thus would not be involved with the work PPS is to complete under the contract. *See* Tab 207 at AR 6989–90. As a consequence, DLA's acceptance of AEG's corporate experience under Subfactor 1(d) and AEG's past performance under Factor 5 was not rational. How could PPS claim AEG's vast corporate experience or past performance when AEG is completely walled-off from any work PPS is to complete? AEG's corporate experience and past performance could have rationally been attributed to PPS if somewhere in its proposal AEG described how it would transfer the resources and employees associated with the relevant corporate experience and past performance to PPS. But neither AEG nor the government pointed the Court to anything in the administrative record containing such a description.[16]

AEG's referral to its own vast corporate experience and past performance on behalf of PPS is equivalent to referring to the 1998–99 Chicago Bulls at the start of the season as a "championship team," despite the fact that the stars of the Bulls' championship run—including Michael Jordan, Scottie Pippen, and Dennis Rodman, not to mention head coach Phil Jackson— left the team after the 1997–98 season. *See, e.g.*, Brian Carney, *Chicago's Temperature is Minus 23*, WASH. POST (Feb. 19, 1999).[17] Randy Brown and Tim Floyd does not a championship team make. Just as a championship team loses its status without its champions in the world of basketball, an aviation fuel service division loses the corporate experience and past performance of its parent company when the division loses access to its parent. KHI's argument is

---

[16] The closest AEG came was arguing for the first time at oral argument that a few of the key personnel listed in AEG's proposal had worked on similar contracts for AEG in the past. This argument should have been raised in AEG's cross-motion. *Sarro & Assocs., Inc.*, 152 Fed. Cl. at 58–59 ("A party's failure to raise an argument in an opening or responsive brief constitutes waiver."). However, even had it been raised, the fact that three out of the six listed key personnel previously worked for AEG in allegedly relevant task areas does not in and of itself mean that AEG transferred all of the corporate experience and past performance history to PPS that the agency relied on in scoring corporate experience and past performance for PPS.

[17] https://www.washingtonpost.com/archive/sports/1999/02/19/chicagos-temperature-is-minus-23/65942118-be43-4c0d-af07-d3f64b8de51c/.

accordingly a slam dunk: because DLA credited PPS with the corporate experience and past performance of AEG, DLA's ratings of PPS for corporate experience and past performance, on which DLA relied to award the contract to AEG, are flawed and constitute error.

Attempting to rebound, the government and AEG airball three arguments in response. First, the government asserts that, "because KHI's dispute is grounded on the fact that the RFP does not require a separate corporate experience or past performance submissions that pertains to a division of an offeror, KHI has waived any argument concerning the absence of such a requirement" under *Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308, 1314–15 (Fed. Cir. 2007) (emphasis omitted). ECF No. 78 at 59. Put differently, according to the government, because KHI did not challenge the RFP's requirements for corporate experience or past performance before the contract was awarded, KHI waived such arguments. In support of this contention, the government states that the "Federal Circuit extended [*Blue & Gold*'s] waiver doctrine 'to apply to all pre-award situations where the protesting party had the opportunity to challenge aspects of a solicitation before the award but failed to do so.'" *Id.* (quoting *Couture Hotel Corp. v. United States*, 138 Fed. Cl. 333, 340 (2018)). But the government's argument overlooks the very language it cites, as the *Blue & Gold* waiver rule only applies where the protesting party "had the *opportunity* to challenge aspects of a solicitation before the award but failed to do so." *Couture Hotel Corp.*, 138 Fed. Cl. at 340 (emphasis added). In other words, a protesting party only waives arguments under *Blue & Gold* in situations in which that party, "exercising reasonable and customary care[,] would have been on notice of the now-alleged defect in the solicitation long before awards were made." *WaveLink, Inc.*, 154 Fed. Cl. at 266 (quoting *Inserso Corp. v. United States*, 961 F.3d 1343, 1352 (Fed. Cir. 2020)).

But KHI had no opportunity to challenge the solicitation for this purpose before award of the contract, even "exercising reasonable and customary care," because KHI did not have access to AEG's proposal. To know that AEG proposed creating a firewalled division as part of its OCI mitigation plan, KHI would have had to have seen AEG's proposal, which was non-public and submitted confidentially to DLA. Such information was not available to KHI, even utilizing "reasonable and customary care." Furthermore, the details of AEG's proposal—such as the degree of autonomy PPS would enjoy or what AEG listed in its proposal regarding corporate experience and past performance—were not available to KHI pre-award. KHI only learned of the details of AEG's proposal once it had access to the administrative record, which the government produced post-award in connection with these proceedings. Without any way to know the details of AEG's proposal pre-award, KHI could not have waived argument regarding those details. Therefore, the government's *Blue & Gold* argument fails.

Second, the government cited in its briefs and at oral argument *American Auto Logistics, LP v. United States*, 117 Fed. Cl. 137 (2014), for the proposition that DLA may credit AEG's past performance and corporate experience to PPS, because "PPS is a mere division of AEG, not a separate legal entity." *See* ECF No. 78 at 27; *see also* ECF No. 85 at 249:22–253:25. However, *American Auto Logistics* does not help the government's argument. In that case, Judge Horn determined that the procuring agency could credit a subcontractor's past performance to an offeror because the offeror provided "sufficient information in its proposal and later responses" to allow the agency to "reasonably conclude" that the offeror would be working with the subcontractor to perform the contract if the contract were to be awarded to the offeror. *Am. Auto*

40

*Logistics*, 117 Fed. Cl. at 189. Moreover, Judge Horn found that the agency's decision to credit the offeror with the subcontractor's past performance was reasonable because the subcontractor would "have 'meaningful involvement' in [the offeror's] proposed contract performance." *Id.* (quoting *Linc Gov't Servs., LLC v. United States*, 96 Fed. Cl. 672, 772 (2010)).

Here, in stark contrast with the offeror's assurances in *American Auto Logistics*, AEG clearly states in its OCI mitigation plan that PPS would operate "separately and distinctly from AEG" by operating in a separate building to which AEG employees would not have access. Tab 207 AR at 6989. Furthermore, according to its OCI mitigation plan, "AEG's leadership will not be within the [PPS division] firewall, and will only have access to financial information required for financial reporting and controls." *Id.* at AR 6990. Whereas in *American Auto Logistics* the agency reasonably attributed the past performance of a subcontractor to the offeror because the subcontractor would be working with the offeror to complete contract performance, 117 Fed. Cl. at 189, here, DLA irrationally attributed AEG's corporate experience and past performance to PPS because AEG expressly stated that it would not have any involvement with PPS's performance of contractual duties. Because *American Auto Logistics* supports KHI's argument, the government's reliance on that case is unpersuasive.

Third, at oral argument, the government and AEG asserted that DLA could credit PPS with AEG's past performance because three AEG employees were transferring from AEG to PPS to help PPS perform its duties. *See* ECF No. 78 at 243:6–18, 256:11–257:3. Specifically, AEG points to the transfer of three former AEG personnel—███████████████████████████ ████████████████—as sufficient for DLA to credit PPS with AEG's past performance. *Id.* at 256:24–258:20. Leaving aside for a moment the fact that this argument is not mentioned in either parties' brief or by the agency in the administrative record, transferring three experienced employees to an entirely new division cannot, by itself, confer the past performance of the employees' former employer on the new division.

Returning to the basketball hypothetical may be illustrative. If, after the 1997–98 season, Michael Jordan, Scottie Pippen, and Dennis Rodman all left the Chicago Bulls and joined the New York Knicks, one could not rationally posit that the Knicks were then a championship team. Even if those three former champions are the new stars of the Knicks, the 1998–99 Knicks would not be a championship team solely because of its acquisition of three former championship players. (And that is even assuming that ████████████████████████ are the equivalent of Jordan, Pippen, and Rodman and not Scott Burrell, Jud Buechler, and Joe Klein.) Just as the Knicks would not be a championship team because three former champions are now on its roster, PPS cannot adopt AEG's past performance solely because three former AEG employees are now on its payroll. Without more, the fact that PPS would retain three former AEG employees is not enough to rationally attribute AEG's past performance to PPS. For this reason, DLA's crediting of PPS with AEG's past performance was not reasonable.

In sum, DLA credited PPS, a completely walled-off subdivision with no corporate experience or past performance regarding aviation fuel services, with AEG's vast corporate experience and past performance in that industry even though AEG stated that it would not be involved with PPS's performance of contractual duties. Simply put, DLA's decision to credit PPS with AEG's corporate experience and past performance is not reasonable. Because DLA

41

credited PPS with AEG's corporate experience and past performance and relied on those flawed ratings to award the contract, DLA erred in its award of the contract to AEG and such error prejudiced KHI.  Tab 253 at AR 9556 ("Regarding Factor 5, Past Performance, although KHI has more relevant experience than AEG, KHI's past performance record includes some recent performance issues.  As a result, both received ratings of Satisfactory Confidence and I find AEG and KHI relatively equal for Factor 5 . . . .  In summary, based on my integrated assessment of the three offerors proposals, and *in accordance with the evaluation criteria for the AIR Card® program*, it is my decision that the proposal submitted by [AEG] represents the best overall value to the Government.  I hereby reaffirm contract award . . . to [AEG]." (emphasis added)).

### 7.  KHI Waived Argument Regarding "Business Lines" Because KHI Failed to Make Any Such Challenge Pre-award.

Next, KHI argues that AEG's proposal was nonresponsive because it violated a provision of the RFP prohibiting offerors from creating new "business lines" as part of their proposals. ECF No. 47-1 at 44.  Specifically, KHI asserts that AEG violated the RFP business line provision by "establishing PPS as a separate division—i.e., a new business line—specifically for the purpose of performing the solicited work" because "[a]lthough the RFP does not expressly define the term 'business line,' the RFP read as a whole leaves no doubt that the term encompasses new corporate divisions."  *Id.* at 45.

The government and AEG assert two arguments in response.[18]  First, according to the government and AEG, the term "business lines" in the RFP refers to a product and not a business entity.  ECF No. 78 at 60; ECF No. 65-1 at 47–49.  Second, to any extent that "business lines" does not refer to a product, the government and AEG argue that the fact that "business lines" could constitute either a business entity or a product demonstrates that the term is patently ambiguous.  *See* ECF No. 78 at 60; ECF No. 65-1 at 46.  For this reason, AEG contends that KHI was required to bring this definitional challenge pre-award, and, because it failed to do so, KHI waived this argument under *Blue & Gold*.  ECF No. 65-1 at 46–47.  KHI replies to this argument by asserting that the term "business lines" constitutes at best a latent ambiguity and should thus be interpreted against DLA as the contract drafter.  *See* ECF No. 68 at 36.

In instances in which an agency solicitation contains a "patent ambiguity," an offeror has a "duty to seek clarification from the government, and its failure to do so precludes acceptance of its interpretation" of an ambiguity "in a subsequent action against the government."  *Blue & Gold*, 492 F.3d at 1313 (first quoting *Stratos Mobile Networks USA, LLC v. United States*, 213 F.3d 1375, 1381 (Fed. Cir. 2000)).  A "patent ambiguity" is one that is "obvious, gross, [and] glaring, so that [the] plaintiff contractor had a duty to inquire about it at the start."  *H&M Moving, Inc. v. United States*, 204 Ct. Cl. 696, 716 (1974).  Thus, a patent ambiguity encompasses "an obvious omission, inconsistency, or discrepancy of significance," *Beacon Constr. Co. of Mass. v. United States*, 161 Ct. Cl. 1, 7 (1963), or an "obvious error in drafting, a gross discrepancy, or an inadvertent but glaring gap," *WPC Enters., Inc. v. United States*, 163 Ct. Cl. 1, 6 (1963).  A patent ambiguity also exists "where there is a facial inconsistency between the

---

[18] The Court only relies on the portion of the government's argument on this point that appears on page 60 of its cross-motion.

provisions or terms within the contract." *Travelers Cas. & Sur. Co. of Am. v. United States*, 75 Fed. Cl. 696, 711 (2007). Thus, a patent ambiguity "should be, to the reasonable contractor, apparent on the face of the contract." *Id.*; *see also P.R. Burke Corp. v. United States*, 277 F.3d 1346, 1355 (Fed. Cir. 2002).

In contrast, "[a] latent ambiguity is a hidden or concealed defect which is not apparent on the face of the document, could not be discovered by reasonable and customary care, and is not so 'patent and glaring as to impose an affirmative duty on [a] plaintiff to seek clarification.'" *Diggins Equip. Corp. v. United States*, 17 Cl. Ct. 358, 360 (1989) (quoting *Avedon Corp. v. United States*, 15 Cl. Ct. 771, 777 (1988)). The "general rule of *contra proferentem* controls" with regard to latent ambiguities. *Burchick Constr. Co., Inc. v. United States*, 83 Fed. Cl. 12, 20 (2008). Accordingly, any latent ambiguity will be construed against the procuring agency as the drafter of the contract. *See id.* at 19.

According to the parties' briefing, the RFP mentions "business lines" in three provisions. First, RFP Amendment 14 provides in a stand-alone provision: "ADDITIONAL BUSINESS LINE: The Contractor may not offer any new business lines." Tab 174 at AR 5423. Second, RFP Amendment 16 states: "[t]he contractor shall provide documents annually by December 15th acknowledging that the organization, business line, entity, third parties and procedures that process, store, and transmit payment card data are PCI compliant. The Contractor shall also provide documents acknowledging that the organization, business line, entity, third parties and procedures that manage the EAS are PCI compliant." Tab 201 at AR 6343. Third, Amendment 14 notes that "[i]f an Offeror is relying on a subcontractor or team member to provide products and services for an entire business line, past performance information for the subcontractor or team member must be provided." Tab 174 at AR 5429.

With regard to the free-floating clause included in Amendment 14—"[t]he Contractor may not offer any new business lines"—this clause is, in and of itself, patently ambiguous. At first glance or after close inspection, such an open-ended phrase, standing alone with no clarifying context, is "obvious, gross, [and] glaring." *Id.* at AR 5423; *see H&M Moving, Inc.*, 204 Ct. Cl. at 716. The term "business lines" is neither a commonly used term nor defined anywhere in the RFP. Additionally, this statement—"[t]he Contractor may not offer any new business lines"—is not built upon or used in any other way whatsoever throughout the rest of the RFP. It stands alone and appears as though it could essentially be a typo or an accidentally included clause. It seems to have no use or explanation. For this reason alone, the free-floating clause renders the RFP's "business lines" restriction patently ambiguous.

The other two clauses that use the term "business lines" also demonstrate the patent ambiguity of the term in this RFP. The RFP mandates that contractors provide documents acknowledging business lines that "process, store and transmit card data are PCI compliant," Tab 174 at 5494, and that business lines that "manage the EAS are PCI compliant," Tab 201 at 6343. Additionally, the RFP provides, "[i]f an Offeror is relying on a subcontractor or team member to provide products and services for an entire business line, past performance information for the subcontractor or team member must be provided." Tab 174 at AR 5429. The parties' arguments demonstrate that these mandates are patently ambiguous regarding business lines. For example, KHI focuses on the clauses regarding processing, storing, and transmitting card data and

managing the EAS.  KHI argues that "[a]s used with the terms 'organization . . . entity [and] third parties'" in these provisions, "all of which refer to an organizational framework, the only way that 'business line' fits within this category is by interpreting it as an intra-company division or department."  ECF No. 47-1 at 45 (alterations in original).  While this definition is plausible, the government and AEG—based on the clause regarding providing products and services for an entire business line—offer their own definition: "[the] use of the phrase 'business lines' references a product and not an entity" because "[i]t would make no sense to interpret the phrase 'entire business line' here to mean an entity; instead entities are themselves set forth *in relation* to the 'entire business line;' i.e., a product to be provided *by* an entity, either a subcontractor or team member."  ECF No. 78 at 60 (emphasis in original); *see also* ECF No. 65-1 at 48.  In short, whereas KHI argues "business lines" means a business entity, the government and AEG argue that "business lines" means a product or procedure.

KHI's definition of "business lines" makes more sense for the clause in Amendment 16, *see* Tab 201 at AR 6343, whereas the government and AEG's definition makes more sense for the clauses in Amendment 14, *see* Tab 174 at AR 5423, 5429.  Conversely, KHI's definition makes little to no sense for the clauses in Amendment 14, Tab 174 at AR 5423, 5429, and the government and AEG's definition makes little to no sense for the clause in Amendment 16, Tab 201 at AR 6343.  This is a patent ambiguity as neither definition of business lines makes sense in all the clauses in which the term "business lines" is used.

In short, the ability of the term "business lines" to mean either a product or a business entity demonstrates a "facial inconsistency between the provisions or terms within the contract"; therefore, the ambiguity here is patent.  *See Travelers*, 75 Fed. Cl. at 711.  The ambiguity cannot be characterized as latent because it is neither a hidden nor concealed defect; instead, it is apparent on the face of the document as the term contains ambiguity in both instances in which it is mentioned in the RFP.  *Diggins*, 17 Cl. Ct. at 360.  Had KHI exercised reasonable and customary care, KHI would have discovered the ambiguity.  Therefore, KHI had an "affirmative duty . . . to seek clarification" of this ambiguous term.  *See id.* (quoting *Avedon*, 15 Cl. Ct. at 777).  Having failed to exercise its duty to seek clarification pre-award, KHI accordingly waived this argument in its post-award protest.  *See Blue & Gold*, 492 F.3d at 1313.

## 8.  DLA Erred by Relying on a Flawed Best Value Determination to Award AEG the Contract.

KHI argues that "DLA's best value decision lacks reason because it relies on a fatally flawed underlying evaluation."  ECF No. 47-1 at 45.  AEG did not address KHI's best value determination argument and, therefore, waived any response.[19]  As the Court discusses in greater detail below, the government waived this argument as well, due to a Court-imposed sanction for submitting a brief beyond the page limit allowed by the Court.

---

[19] Although AEG did address KHI's best value determination argument in its reply brief, ECF No. 74 at 29, AEG failed to address this argument in its MJAR.  "A party's failure to raise an argument in an opening *or* responsive brief constitutes waiver."  *Sarro & Assocs., Inc.*, 152 Fed. Cl. at 58–59 (emphasis added).  Therefore, because AEG failed to address this argument in its opening brief, *i.e.*, its MJAR, AEG waived this argument.

However, even if AEG or the government had properly responded to this argument, their responses would be immaterial because the best value determination was a cumulative determination built upon individual ratings, which, as discussed above, contained errors. As the Court established above, DLA committed various errors in this procurement, most of which prejudiced KHI, including DLA's acceptance of AEG's late proposal, DLA's prejudicially misleading discussions and unequal treatment of the offerors' EAS proposals, and DLA's prejudicial crediting of PPS with AEG's corporate experience and past performance despite the fact that AEG would play no role in PPS's performance of the contract. Because the best value determination was a cumulative determination that relied on flawed ratings, the best value determination was itself flawed. In other words, DLA arrived at its best value determination in an irrational manner because it relied on irrational individual ratings in doing so. Therefore, the Court sets aside DLA's arbitrary and capricious best value determination.

### 9. The Court Imposes Sanctions on the Government for Violating the Court's Order and Rules By Submitting a Brief Beyond the Page Limit.

On February 24, 2025, the government filed a consent motion for leave to exceed the page limit for its cross-MJAR by ten pages. ECF No. 52. The Court granted this request, ECF No. 53, and the government filed that brief, ECF No. 64, on February 28, 2025. By the Court's order, the government was permitted to file a cross-MJAR of up-to sixty pages, instead of the usual fifty pages. *See* RCFC 5.4(b)(1) ("Except by leave of the court on motion, a party's initial brief or memorandum must not exceed 40 pages (50 pages for a cross-movant) . . . ."). While the Court's order permitted the government to exceed the normal page length for a cross-motion, the order did not displace RCFC 5.5(c)(2), which requires that "[t]he type size for text and footnotes must be no smaller than 12 point." Yet, the government needed to use a font smaller than the minimum twelve-point font in order to keep its brief within the sixty-page limit.

The Court noticed this font manipulation almost immediately when it began reading the government's cross-MJAR. As Judge Kozinski has observed, "if you don't read briefs for a living, one page of type looks pretty much like another, but you'd be surprised how sensitive you become to small variations in spacing or type size when you read 3,500 pages of briefs a month." Alex Kozinski, *The Wrong Stuff*, 1992 B.Y.U. L. REV. 325, 327. In total, when reviewing the government's brief, the Court noticed that large sections of that brief—eighteen of sixty pages— were written in a font size smaller than twelve point. Because sections of the brief were written in an impermissibly small font, the government's brief appeared to be exactly at the extended page limit of sixty pages; however, in actuality, it was sixty-three pages long. For this violation of the Court's rules,[20] the Court struck the impermissibly long brief, issued an order requiring government counsel to show cause as to why the government should not be sanctioned, and required the government to resubmit its brief in a font no smaller than twelve point with no other alterations. ECF No. 77.

---

[20] The Court also notes that the government's submission violated RCFC Appendix E, which provides that "[u]nless otherwise ordered by the court, if a document, including exhibits and attachments, exceeds 50 pages when printed, the Filing User must supply chambers with a courtesy copy of the document in paper form in accordance with RCFC 5.5(c)." *Id.* part V ¶ 12.

After refiling its brief to be compliant with the Court's rules, ECF No. 78, the government responded to the Court's show cause order explaining that the government should not be sanctioned because government counsel "was unaware that the fact and procedural history sections of the United States' Cross-Motion for Judgment on the Administrative Record were set forth in 11 point font and only became aware of that fact upon reading the Court's March 21, 2025 Order." ECF No. 79 at 1. The government further explained that government counsel "relied on other attorneys to provide the fact and procedural history sections, which he received in a single Microsoft (MS) Word file (which was set at a 12-point font), and which he pasted into the brief he was preparing using MS Word" but that the pasted text "embedded an 11-point font," which government counsel did not notice. *Id.* at 2. Put simply, government counsel did not sufficiently proofread his brief before filing it with the Court.

Although such oversight may seem minor, the Court already afforded the government ten extra pages to make its arguments in its cross-MJAR, *see* ECF No. 53, and regardless of this page limit extension, there is no place for gamesmanship to meet page limits. While the error may have been unintentional, as the government suggests, that assertion is questionable given that the government used every page within the extended page limit (with its signature block spilling on to page sixty-one of the brief). In other words, this bare compliance with the sixty-page limit would not have been possible without use of an impermissibly small font size.

Even assuming the use of the impermissibly small font size was, in fact, a mistake, the Court nonetheless expects attorneys arguing before it to thoroughly proofread their briefs. The Court takes the time to carefully read and, in almost all cases, reread each brief (sometimes more than once) and thus expects counsel to have taken the time to proofread the briefs they submit to the Court. The government submitted what was an otherwise solid brief that it tainted by an error that, if unintentional, could have easily been eliminated with due diligence.

Under RCFC 16(f)(1)(c), the Court may sanction a party for failure "to obey a scheduling or other pretrial order." The Court may also sanction parties under its contempt statute for failure to comply with its orders. 28 U.S.C. § 2521(b) (providing the Court with statutory contempt authority). While acknowledging the government's justification for the error, the Court nonetheless finds it appropriate to sanction the government by declining to read beyond page sixty of the brief. *See Christian v. Mattel, Inc.*, 286 F.3d 1118, 1129 (9th Cir. 2002) ("The district court has considerable latitude in managing the parties' motion practice and enforcing local rules that place parameters on briefing."); *see also Galea v. Wells Fargo Bank, NA*, 388 F. Supp. 3d 1212, 1218 (E.D. Cal. 2019) ("The Order limits . . . reply memoranda in support of motions to dismiss to five pages. The Order also states . . . that the Court will not consider any arguments made past the page limit. Equifax's reply memorandum exceeds the page limit by five pages. The Court has not considered any arguments made after page five of the reply brief." (citation omitted)). For this reason, arguments beyond page sixty of the government's resubmitted compliant brief—including those regarding DLA's best value determination and why injunctive relief is not appropriate—are hereby waived.[21] Although this sanction is not very harsh in this

---

[21] The Court notes that waiver of these arguments is not prejudicial to the government, as the best value determination argument is already rendered essentially moot given that the best

case—as the government's best value response would necessarily fail even if the Court read it because of agency errors elsewhere in the procurement, and as the government essentially did not respond to KHI's request for injunctive relief in any event—this sanction nevertheless should serve as a word to the wise that manipulating font sizes to cram in extra arguments is not a winning strategy and will do more harm than good to a litigant's case.

### 10. DLA's Various Procurement Errors Entitle KHI to Injunctive Relief

KHI seeks an order from the Court enjoining DLA's award of the AIR Card contract to AEG. *See* ECF No. 47-1 at 48. As discussed above, the government waived response to this argument both because it failed to develop this argument beyond conclusory statements and because such arguments are included on pages that exceed the page limit afforded by the Court. AEG argues in response that, because KHI "cannot succeed on the merits," the Court must deny KHI injunctive relief. ECF No. 65-1 at 50. AEG further argues that injunctive relief is not warranted because KHI failed to establish "that it will suffer irreparable harm," that KHI cannot establish that the "balancing of the harms supports injunctive relief," and that national security concerns weigh against issuing an injunction in this case. *Id.* at 50, 51, 52–53.

To determine whether a permanent injunction should issue, the Court considers: "(1) whether, as it must, the plaintiff has succeeded on the merits of the case; (2) whether the plaintiff will suffer irreparable harm if the court withholds injunctive relief; (3) whether the balance of hardships to the respective parties favors the grant of injunctive relief; and (4) whether it is in the public interest to grant injunctive relief." *PGBA*, 389 F.3d at 1228–29. "No one factor, taken individually, is necessarily dispositive. If a[n] . . . injunction is granted by the trial court, the weakness of the showing regarding one factor may be overborne by the strength of the others." *FMC Corp. v. United States*, 3 F.3d 424, 427 (Fed. Cir. 1993). The Court addresses these factors in turn.

As the Court established above, KHI succeeded on the merits of this case and thus satisfies the first prong of the injunctive relief test. DLA committed four prejudicial errors in this procurement. DLA erred by accepting AEG's late proposal, by treating unequally and misleadingly discussing the parties' EAS proposals, by crediting PPS with AEG's corporate experience and past performance despite the fact that AEG will be in no way involved with PPS's performance of the contract, and by relying on these erroneous findings in making its best

---

value determination is based on the erroneous evaluations of individual procurement requirements and that the government already waived argument regarding injunctive relief by failing to develop this argument beyond conclusory statements. *Rodriguez v. Dep't of Veterans Affs.*, 8 F.4th 1290, 1305 (Fed. Cir. 2021) ("An issue that is merely alluded to and not developed as an argument in a party's brief is deemed waived."); *Halliburton Energy Servs., Inc. v. M-I LLC*, 514 F.3d 1244, 1250 n.2 (Fed. Cir. 2008) ("A skeletal 'argument,' really nothing more than an assertion, does not preserve a claim . . . ." (quoting *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991))); *Bauer v. United States*, No. 24-287L, 2025 WL 1064205, at *4 (Fed. Cl. Apr. 9, 2025) ("When an argument is not fully developed in briefing, this Court—absent unusual circumstances—ordinarily finds a forfeiture . . . .").

value determination. For these reasons, KHI succeeds on the merits and satisfies this prong of the injunctive relief analysis.

Under the second prong, KHI argues that it "will suffer irreparable harm absent a permanent injunction because without such a remedy KHI will lose the opportunity to be considered for the award, along with its corresponding loss of potential profits." ECF No. 47-1 at 46. AEG argues in response that KHI will not suffer irreparable harm because DLA's award of the contract to AEG was not unreasonable and that "KHI's claim of harm stems from the natural end of its performance as the AIR Card® contractor—nothing more." ECF No. 65-1 at 50 (emphasis omitted). AEG's response fails. As the Court established above, DLA's award of the contract to AEG was irrational for the four reasons stated. Furthermore, the fact that KHI, as the incumbent on the contract, contemplated the possibility that its contractual relationship with DLA may be coming to an end as its current contract would soon expire does not preclude KHI from suffering irreparable harm from lost profits due to DLA's irrational award of the contract to AEG. Had KHI's contract naturally expired or had DLA reasonably awarded the contract to AEG, KHI could not claim irreparable harm. But that is not the case here. Instead, DLA's irrational award to AEG irreparably harmed KHI, which unjustly lost out on potential profits due to DLA's errors in the procurement process. For this reason, KHI establishes that it would suffer irreparable harm absent injunctive relief and satisfies the second prong of the analysis.

Regarding the third prong, KHI argues that injunctive relief would not tip the balance of hardships to the agency's favor because "the parties agreed to litigate this matter according to an aggressive schedule that will allow [DLA] to either exclude AEG and award the contract to KHI (as should occur) or, alternatively should the matter require further competition, extend the existing contract under which KHI successfully performs the work today without risk to the warfighter or the public." ECF No. 47-1 at 47. AEG responds by arguing that AEG would suffer worse harm than KHI, as AEG "made a significant financial investment of approximately ██ ███████████████ . . . to be selected as the AIR Card® awardee." ECF No. 65-1 at 51 (emphasis omitted). AEG's argument again falls short. Government procurement is an expensive process and offerors know the risks and expense involved in bidding for government contracts. The fact that AEG went through great expense to prepare its offer cannot alone tip the balance of hardships in its favor because KHI undoubtedly also invested great time and effort into its bid to win the contract in a competition that was supposed to be conducted in a rational manner. Although re-soliciting a government contract can be burdensome for all involved, the Court finds that KHI's interest in reversing an irrational award to AEG outweighs any financial expense suffered by AEG. Furthermore, as KHI noted, the parties agreed to an expedited resolution of this case to avoid scheduling setbacks, given its relation to ongoing military operations.[22] Given that the parties contemplated the possibility of injunctive relief at the outset

---

[22] *See* ECF No. 14 at 2 ("DLA has asserted that the requested decision date of May 1, 2025, and the transition-related activities required by the contract are necessary to ensure that, should the Court deny the protest, AEG can deliver the fuel sale transactional services commencing at the end of the transition period through the contract term or, if the Court sustains the protest, afford DLA time to take appropriate corrective action before the current bridge contract ends. [The government] and [AEG] will not argue that the foregoing transition steps provide a basis to limit the relief available in this matter.").

of this case, and that AEG only cites to its own expenses as a reason to preclude injunctive relief, KHI has established that the balance of the hardships to the parties favors injunctive relief and therefore satisfies the third prong of the analysis. *See Cardinal Maint. Serv., Inc. v. United States*, 63 Fed. Cl. 98, 111 (2004) ("The harm which will allegedly befall [the Intervenor-awardee] due to an injunction is discounted in the calculation of harms. [Intervenor] was the beneficiary of a CICA violation and, as such, suffers no harm when the violation is corrected."); *Al Ghanim Combined Grp. Co. Gen. Trad. & Cont. WLL v. United States*, 56 Fed. Cl. 502, 520 (2003) ("As to the third issue, the court is required to balance the harm to plaintiff vis-à-vis the harm to the Government and [the awardee]. No harm would be visited on [the awardee], as the award process was flawed.").

Lastly, under the fourth prong, KHI argues that the public interest favors injunctive relief because "the public has an 'interest in preserving the integrity of the procurement system'" and ensuring that executive branch agencies comply with federal law. ECF No. 47-1 at 47 (quoting *Caddell Constr. Co.*, 111 Fed. Cl. at 117). AEG responds by arguing that injunctive relief "is not appropriate due to national security concerns." ECF No. 65-1 at 51. According to AEG, the U.S. military "relies on the DLA Energy AIR Card® Program to supply its aircraft in critical regions with the fuel required to execute the combatant commands' mission"; therefore, "[a]ny disruption in the availability of the AIR Card® Program would hinder flight operations and limit the prepositioning capabilities of the U.S. military, causing severe risk to national security." *Id.* at 52. While the Court is mindful of mitigating judicial interference in national security operations, AEG's proffered justification is insufficient. Not only did the parties agree to an expedited schedule for the express purpose of mitigating disruptions to the military's reliance on the AIR Card program, but also AEG offers no evidentiary support for its claims, such as affidavits from national security or military personnel detailing the exact harm the military would face if the Court enjoined award to AEG. Moreover, the government itself did not raise any national security concerns with the Court granting injunctive relief. AEG, a private company and competitor for the contract, cannot espouse national security concerns on behalf of the United States, especially with no evidentiary backing. The Court further notes that KHI is the incumbent on this contract, meaning that it has both the capability and clearance to provide uninterrupted fuel services to the military both during re-solicitation and/or ultimate award of the contract to KHI down the road. For these reasons, the Court is unpersuaded by AEG's vague invocation of the national security as a reason to avoid injunctive relief and finds that the public's interest in ensuring the integrity of the procurement system prevails. Thus, the public interest favors injunctive relief, and KHI has satisfied the final prong of the injunctive relief standard.

Having established all four prongs of the injunctive relief analysis, the Court finds that injunctive relief is appropriate in this case. Accordingly, the Court will issue an injunction permanently enjoining award of the contract to AEG without re-solicitation in accordance with the FAR and this opinion.

## CONCLUSION

For the reasons set forth above, as ordered by the Court on April 30, 2025, *see* ECF No. 86, DLA's award of the contract at issue in this protest to AEG is held to be **UNLAWFUL**, is **SET ASIDE**, and the Court orders as follows:

1.    The cross-motions for judgment on the administrative record filed by the government and AEG are **DENIED**.

2.    KHI's motion for judgment on the administrative record is **GRANTED**, and its request for injunctive relief is **GRANTED**.

3.    The United States, by and through the Department of Defense, its officers, agents, and employees, and all other persons acting in concert and participating with them respecting the procurement under RFP No. SPE608-21-R-0203, is hereby **PERMANENTLY RESTRAINED AND ENJOINED** from continuing transition activities or obtaining performance from AEG under the contract that is at issue in this protest.

4.    The United States, by and through the Department of Defense, its officers, agents, and employees, and all other persons acting in concert and participating with them respecting the procurement under RFP No. SPE608-21-R-0203, is hereby **PERMANENTLY RESTRAINED AND ENJOINED** from re-awarding a contract for the services requested under RFP No. SPE608-21-R-0203 or allowing any contractor to perform under RFP No. SPE608-21-R-0203 in a manner that is inconsistent with this opinion.

5.    The parties shall confer to determine agreed-to proposed redactions to this opinion.  On or before May 21, 2025, the parties **SHALL** file a joint status report indicating their agreement on proposed redactions, attaching a copy of those pages of the Court's opinion that contain proposed redactions, with all proposed redactions clearly indicated.

6.    The Clerk shall enter **JUDGMENT** accordingly.

**IT IS SO ORDERED**.


                                        s/ Zachary N. Somers
                                        ZACHARY N. SOMERS
                                        Judge