# In the United States Court of Federal Claims

No. 24-2155
(Filed Under Seal: February 10, 2026)
Reissued: March 5, 2026[*]

```
* * * * * * * * * * * * * * * * * * * * * *
                                          *
KROPP HOLDINGS, INC.,                     *
                                          *
                 Plaintiff,               *
                                          *
        v.                                *
                                          *
THE UNITED STATES,                        *
                                          *
                 Defendant,               *
                                          *
        and                               *
                                          *
ASSOCIATED ENERGY GROUP, LLC,             *
                                          *
                 Defendant-Intervenor.    *
                                          *
                                          *
* * * * * * * * * * * * * * * * * * * * * *
```

    *Craig A. Holman*, with whom were *Kara L. Daniels*, *Thomas A. Pettit*, *Roee Talmor*, and *Nicole A. Williamson*, Arnold & Porter Kaye Scholer LLP, all of Washington, D.C., for Plaintiff.

    *John H. Roberson*, Senior Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, with whom were *Douglas K. Mickle*, Acting Deputy Director, *Patricia M. McCarthy*, Director, *Brett A. Shumate*, Acting Assistant Attorney General, all of Washington, D.C., for Defendant, and *Steven Sosko*, Senior Counsel, Defense Logistics Agency, of Fort Belvoir, VA, of counsel.

    *Todd J. Canni*, with whom were *Ariella M. Cassell* of Los Angeles, CA, and *Kevin Barnett*, *Stephen Ruscus*, *Kevin N. Dorn*, and *Kaitlyn E. Toth*, Baker & Hostetler LLP, all of Washington, D.C., for Defendant-Intervenor.

---

[*] Pursuant to the protective order entered in this case, this opinion was filed initially under seal. The parties provided proposed redactions of confidential or proprietary information, which the Court adopted in addition to making minor typographical and stylistic edits.

**<u>OPINION AND ORDER</u>**

**SOMERS**, Judge.

Associated Energy Group, LLC's ("AEG") motion for reconsideration is akin to an unsuccessful challenge by an NFL coach in football. Assume, after a wide receiver catches the football, the referee deems the pass "incomplete" for two separate reasons. First, the receiver's foot was out of bounds when he made the catch. Second, the receiver did not have sufficient control of the ball for the catch to be ruled complete. The coach challenges the play, arguing at length that the receiver did have sufficient control of the ball. The coach emphasizes that the ball was not bobbling in the receiver's hands, the receiver had two hands on the ball, the ball was tucked firmly under the receiver's arm, the ball never touched the turf, and the receiver maintained control of the ball long enough to make a football move. *See* 2025 NFL RULEBOOK, Rule 8, § 1, arts. 3–4. While these arguments, if true, may prove that the receiver did, in fact, have control of the ball, the pass is still incomplete because the coach failed to address the fact that the receiver's foot was out of bounds. *See id.*

Much like the hypothetical NFL coach's futile arguments regarding the receiver's control of the football, no matter how many new arguments AEG asserts regarding whether there was timely government control of its proposal, AEG's motion cannot prevail because—just as the coach did not address the fact that the receiver's foot was out of bounds—AEG does not address its insufficient merits argument that its proposal was received *by*,[1] and not *prior to,* the deadline for proposal submission. However, just as the Court held in its merits opinion, in order for the government control exception to the late-is-late rule to apply, the proposal must be received *prior to* the time set for receipt of offers. For this reason, and others discussed below, the Court's call stands.

Before the Court is AEG's 37-page motion for reconsideration of an issue it devoted just five paragraphs to in its motion for judgment on the administrative record ("MJAR"). *Compare* ECF No. 92-1, *with* ECF No. 65-1 at 21–22. In its motion, AEG contends that the Court should reconsider its determination that the government control exception did not apply to its otherwise late submissions. *See* ECF No. 92-1 at 1; *Kropp Holdings, Inc. v. United States*, 176 Fed. Cl. 512, 533–39 (2025). However, notwithstanding myriad arguments that AEG asserts justify reconsideration, at bottom AEG fails to address the Court's actual holdings on this issue and instead emphasizes less important portions of the Court's opinion with which it disagrees. In addition to missing the Court's holdings, AEG asserts new theories not raised in AEG's merits briefing and attempts to reassert arguments that the Court already found unpersuasive the first time around. Neither these new theories nor rehashed arguments justify reconsideration.

For the reasons that follow, the Court agrees with Plaintiff Kropp Holdings, Inc. ("KHI") and the government that reconsideration is not warranted; accordingly, the Court denies AEG's motion.

---

[1] As is explained later in this opinion, AEG's use of "by," when read in context, clearly meant "at" and not "before."

## BACKGROUND

### A.    Factual Background and Procedural History

The facts and procedural history of this case are largely set forth in the Court's original opinion in this bid protest.  *See Kropp Holdings, Inc.*, 176 Fed. Cl. at 524–26.  For the sake of brevity, the Court only recounts here the factual background and procedural history salient to AEG's motion.

KHI brought suit alleging eight reasons why the Court should overturn the Defense Logistics Agency's ("DLA") decision to award an aviation into-plane fuel contract, known as the AIR Card contract ("AIR Card"), to AEG.  *Id.* at 523–24.  The Court issued an opinion on May 9, 2025, finding that KHI was successful on four of its protest grounds.  *Id.* at 524.  Therefore, the Court permanently enjoined DLA from "continuing transition activities or obtaining performance from AEG" under the contract.  *Id.* at 564.  One of the grounds upon which KHI was successful was its argument that AEG's proposal was not timely submitted.  It is this holding that AEG challenges here.  The Court's holding on this point was two-fold.  First, the Court determined that:

> the [Request for Proposals ("RFP")] establishes 10:00 a.m. as the submission deadline and states that "timeliness of an offer will be based upon the receipt time stamp on the submission inbox."  The receipt time stamps on the Energyfuelcards@dla.mil submission inbox show that AEG's Volumes 1 and 2 were received after 10:00 a.m.  Because DLA did not timely receive AEG's proposal, AEG's proposal is late and thus "tantamount to no proposal at all."

*Id.* at 533 (citations omitted).  Second, the Court held that the government control exception to the late-is-late rule did not apply to AEG's proposal submission: "Because AEG argues that acceptable evidence in the form of email screenshots establishes that its Volume 1 submission was received at 10:00 a.m., and not prior to 10:00 a.m., AEG's argument fails, and its submission cannot fall under the government control exception."  *Id.* at 534 (citing ECF No. 65-1 at 21; FAR 52.212-1(f)(2)(i)(B)).  The Court also observed that "[e]ven if metadata could cure AEG's argument (*it cannot, as AEG waived any such argument by not raising it in its motion*), AEG's Volume 1 submission was still late according to the metadata for purposes of the government control exception."  *Id.* (emphasis added) (footnote omitted).  And, in a footnote to the preceding quotation, the Court further noted that "AEG does not develop this argument in briefing.  Instead, AEG tried to argue this point at oral argument.  Although AEG waived any metadata argument because it did not make such argument in its MJAR, the Court will discuss the argument anyway, as the discussion further demonstrates the lateness of AEG's proposal."  *Id.* at 534 n.7 (citations omitted).

Accordingly, for these two reasons, and several other reasons not relevant to AEG's motion for reconsideration, the Court issued a permanent injunction and required the agency to reconsider its decision awarding the fuel card contract to AEG.  *See id.* at 538, 564.  AEG subsequently filed its own bid protest challenging DLA's re-award of the AIR Card contract to KHI in accordance with the Court's opinion.  *See* Complaint, *Associated Energy Grp. v. United*

*States*, No. 25-917 (Fed. Cl. May 29, 2025), ECF No. 1. At a status conference held on June 4, 2025, the parties agreed that, to come to the most efficient resolution of this case, the Court should stay the new bid protest, and AEG should file a motion for reconsideration of the Court's opinion in the instant case. Accordingly, the Court stayed AEG's protest the next day. *See* Order Staying Case, *Associated Energy Grp.*, No. 25-917 (Fed. Cl. June 5, 2025), ECF No. 29.

Five days after the status conference, on June 9, 2025, AEG filed its motion for reconsideration pursuant to Rule 59(a) of the Rules of the U.S. Court of Federal Claims ("RCFC"). ECF No. 92. The government filed its response to AEG's motion on June 27, 2025. ECF No. 98. KHI filed its response to AEG's motion on July 1, 2025. ECF No. 100. AEG filed a reply in support of its motion on July 18, 2025. ECF No. 102. The motion is now ripe for adjudication.

## DISCUSSION

### A.    Legal Standard

RCFC 59(a) provides the grounds for reconsideration. The decision whether to grant such a motion lies within the sound discretion of the Court. *Yuba Nat. Res., Inc. v. United States*, 904 F.2d 1577, 1583 (Fed. Cir. 1990). To establish that reconsideration is warranted, the moving party must make "a showing of extraordinary circumstances which justify relief." *Caldwell v. United States*, 391 F.3d 1226, 1235 (Fed. Cir. 2004) (quoting *Fru-Con Constr. Grp. v. United States*, 44 Fed. Cl. 298, 300 (1999), *aff'd*, 250 F.3d 762 (Fed. Cir. 2000)). To meet this high standard, the moving party typically must show either "an intervening change in the controlling law, newly discovered evidence, or a need to correct clear factual or legal error or prevent manifest injustice." *Biery v. United States*, 818 F.3d 704, 711 (Fed. Cir. 2016). Where a movant seeks reconsideration "on the ground of manifest injustice, it cannot prevail unless it demonstrates that any injustice is 'apparent to the point of being almost indisputable.'" *Griffin v. United States*, 96 Fed. Cl. 1, 7 (2010) (quoting *Pac. Gas & Elec. Co. v. United States*, 74 Fed. Cl. 779, 785 (2006), *rev'd on other grounds*, 536 F.3d 1282 (Fed Cir. 2008)).

Importantly, a movant for reconsideration under RCFC 59(a) will not be successful by citing to evidence that "was manifestly available at [the] time of the hearing," *Parsons ex rel. Linmar Prop. Mgmt. Tr. v. United States*, 174 F. App'x 561, 563 (Fed. Cir. 2006) (alteration in original) (quoting *Gelco Builders & Burjay Constr. Corp. v. United States*, 177 Ct. Cl. 1025, 1036 n.7 (1966)), or by merely recapitulating "cases and arguments considered by th[e] court before rendering its original decision," *Fru-Con Const. Corp.*, 44 Fed. Cl. at 301 (alteration in original) (quoting *Carteret Sav. Bank, F.A. v. Shushan*, 721 F. Supp. 705, 706 (D.N.J. 1989)). Similarly, a motion for reconsideration is an inappropriate vehicle for litigants to attempt to assert new arguments or raise legal theories not asserted or raised before the original decision. *E&I Glob. Energy Servs., Inc. v. United States*, 152 Fed. Cl. 524, 533 (2021) ("[U]nder RCFC 59(a), litigants are forbidden from asserting new arguments or raising legal theories for the first time in a motion for reconsideration.").

**B.** **Analysis**

AEG seeks reconsideration of the Court's disposition of one subpart of the Court's decision on one of seven errors KHI alleged in its MJAR.  Specifically, AEG contends that (1) the Court erred in its analysis of whether the government control exception applied to rectify AEG's otherwise late proposal submission by "reaching a conclusive ruling against control," and (2) by failing to remand this question to the agency, "the Court got out ahead of DLA and usurped its role."  ECF No. 92-1 at 3.  AEG's remand argument, however, sidesteps crucial aspects of the Court's holding, ignores what AEG actually argued on the merits, and introduces new arguments in seeking reconsideration that AEG could have raised on the merits but did not.  For these reasons and others explained below, AEG's motion for reconsideration is denied.

**1.** **The Late-is-Late Rule.**

Before turning to why AEG's motion fails, it is important to recount the Federal Acquisition Regulation's ("FAR") late-is-late rule.  As the Court observed in its merits opinion, in accordance with the FAR, the Federal Circuit has made clear that proposals for government contracts that are submitted after the deadline for proposal submission are unawardable:

> All errors are not equal.  There are inherent competitive advantages to submitting a proposal after all other parties are required to do so . . . .  To avoid this potential for abuse, submission deadlines are strictly enforced across the board.  When the rules and procedures of a bid process are applied equally to all parties, but one party submits a proposal past the deadline for doing so, the untimely submission becomes a stranger to the process, and is disqualified from the procurement.  A late proposal is tantamount to no proposal at all.  Such a party has no "substantial chance" of award, and no more standing to sue than the proverbial man on the street.

*Kropp Holdings, Inc.*, 176 Fed. Cl. at 527 (omission in original) (quoting *Labatt Food Serv., Inc. v. United States*, 577 F.3d 1375, 1381 (Fed. Cir. 2009)); *see also* 48 C.F.R. § 52.212-1(f)(2)(i) ("Any offer . . . received at the Government office designated in the solicitation after the exact time specified for receipt of offers is 'late' and will not be considered.").  "Put more succinctly, 'late is late' and late submissions are not awardable."  *Kropp Holdings, Inc.*, 176 Fed. Cl. at 527.

As also was observed in the Court's merits opinion, the FAR contemplates exceptions to the late-is-late rule that can excuse an offeror's late submission if certain criteria are met.  Under the FAR, "[a]ny offer . . . received at the Government office designated in the solicitation after the exact time specified for receipt of offers is 'late' and will not be considered" unless the offer was "received before [the] award [was] made, the Contracting Officer determines that accepting the late offer would not unduly delay the acquisition," and one of the following circumstances exists:

> (A) If it was transmitted through an electronic commerce method authorized by the solicitation, it was received at the initial point of entry to the Government infrastructure not later than 5:00 p.m. one working day prior to the date specified for receipt of offers; or

(B) There is acceptable evidence to establish that it was received at the Government installation designated for receipt of offers and was under the Government's control prior to the time set for receipt of offers; or

(C) If this solicitation is a request for proposals, it was the only proposal received.

48 C.F.R. § 52.212-1(f)(2)(i)(A)–(C).  The first exception listed above is referred to as the "electronic commerce" exception, and the second exception listed above is referred to the as the "government control" exception.  *Kropp Holdings, Inc.*, 176 Fed. Cl. at 533.

Most relevant here, as it is the exception AEG invoked to attempt to cure its otherwise late proposal, is the government control exception.  Of secondary importance is the electronic commerce exception and how that exception relates to the government control exception in the regulatory scheme.  With all this in mind, the Court can now address, in turn, what AEG argued on the merits, what the Court held on the merits, and AEG's new arguments on reconsideration.

### 2.    AEG's Merits Arguments and the Court's Actual Holding on Government Control.

While recounting the arguments that a party made on the merits is important in considering any motion for reconsideration, it is especially important here, because AEG makes new arguments in its motion for reconsideration that it did not raise in its pre-judgment merits briefing and selectively overemphasizes portions of the Court's opinion with which it disagrees. Leaving aside for now three legal arguments that AEG made in its MJAR related to the government control exception—a discussion of *Watterson Construction Company v. United States*, an undeveloped argument that the contracting officer's declaration is entitled to the presumption of regularity, and an argument that KHI was not prejudiced by AEG submitting a late proposal—the entirety of AEG's argument on the government control exception in its MJAR is as follows:

> Moreover, even in the presence of conflicting timestamps, DLA acted rationally because acceptable evidence exists showing that, in any event, the government control exception to the "late-is-late" rule applies.  Under this exception, set forth at FAR 52.212-1(f)(2)(i), DLA has the discretion to accept a proposal received if:
>
> > (1) the offer was received before award is made; (2) the CO determines that accepting the offer would not unduly delay the acquisition; and (3) there is at least acceptable evidence to establish that the offer was received at the Government's installation designated for receipt of offers and was under the Government's control prior to the time set for receipt of offers.

[*eSimplicity, Inc. v. United States*, 162 Fed. Cl. 372, 386 (2022)] (quoting FAR 52.212-1(f)(2)(i)).  All three boxes are checked in this case.

6

First, AEG's proposal was "received before award was made." In fact, by any measure, AEG's proposal was received on August 19, 2021, and the relevant award was not made until October 2024. *See* Tab 260, Screenshots of AEG Offer at AR 9589–91.

Second, the contracting officer ("CO") accepted the proposal and thus determined that accepting the proposal would not unduly delay the acquisition. *See* ECF No. 50-2, Decl. of CO at 1 ("I determined AEG's initial proposal was submitted timely based on the time stamped that showed on the emails received in Outlook, which showed all 4 required volumes were received on or before 10:00 a.m. EDT on August 19, 2021.").

Third, the offer was received at the government installation designated for receipt of offers, as shown by the submission inbox screenshots, and was under DLA's control by 10:00 a.m. *See* Tab 260, Screenshots of AEG Offer at AR 9589–91.

Finally, the Court need not conclusively resolve conflicting screenshots. The government control exception's low threshold referred to as the "acceptable evidence" standard obviates the need for further inquiry into this point. The FAR confirms that "acceptable evidence to establish the time of receipt at the Government installation includes . . . *other documentary evidence of receipt maintained by the installation, or oral testimony or statements of Government personnel.*" FAR 15.208(c). DLA has provided both—documentary screenshots showing receipt by no later than 10:00 a.m., *see* Tab 260, Screenshots of AEG Offer at AR 9589–91, and sworn statements by the contracting officer. This matter need not be debated further as the record contains "acceptable evidence" to support DLA's determination.

ECF No. 65-1 at 21–22 (emphasis in original; over-emphasis removed).

The Court emphasizes the arguments raised in AEG's MJAR because what a party argues in its opening brief is what controls, and AEG's MJAR was its opening brief in the pre-judgment merits phase of this litigation. *Abbott Lab'ys v. Syntron Bioresearch, Inc.*, 334 F.3d 1343, 1355 (Fed. Cir. 2003) (explaining that failure to raise an argument in an opening brief results in that argument being waived); *Hynix Semiconductor Inc. v. Rambus Inc.*, 645 F.3d 1336, 1354 (Fed. Cir. 2011) ("To the extent [defendant] relies on other arguments in its reply brief, those arguments are waived as not presented in its opening brief."); *Walker v. Health Int'l Corp.*, 845 F.3d 1148, 1156 (Fed. Cir. 2017) ("[Plaintiff] failed to raise this argument in his opening brief, so it is waived."); *Shimano, Inc. v. Rea*, 527 F. App'x 1002, 1004 n.1 (Fed. Cir. 2013) ("In post-argument submissions, the parties have debated whether particular arguments were made . . . . Rather that [sic] address those issues, we address the arguments made in the parties' opening briefs on appeal and cross-appeal. Arguments not made in the [parties'] opening briefs are ordinarily deemed waived . . . ." (citation omitted)); *see Amhil Enters. Ltd. v. Wawa, Inc.*, 81 F.3d 1554, 1563 (Fed. Cir. 1996) ("A reply brief, which should 'reply to the brief of the appellee,' is

not the appropriate place to raise, for the first time, an issue[.]" (citation omitted)); *Corrigan v. United States*, 70 Fed. Cl. 665, 668 (2006) ("[B]y failing to raise an issue *when it is first available to be litigated*, a party waives consideration by the court of the issue on reconsideration, even when the party is pro se." (emphasis added)).  In short, what truly matters is what AEG argued in its MJAR.  And in terms of what was in dispute at the merits stage of this litigation, the Court can further boil the above five paragraphs down to one:

> Third, the offer was received at the government installation designated for receipt of offers, as shown by the submission inbox screenshots, and was under DLA's control by 10:00 a.m.  *See* Tab 260, Screenshots of AEG Offer at AR 9589–91. . . . The FAR confirms that "acceptable evidence to establish the time of receipt at the Government installation includes . . . *other documentary evidence of receipt maintained by the installation, or oral testimony or statements of Government personnel.*"  FAR 15.208(c).  DLA has provided both—documentary screenshots showing receipt by no later than 10:00 a.m., *see* Tab 260, Screenshots of AEG Offer at AR 9589–91, and sworn statements by the contracting officer.  This matter need not be debated further as the record contains "acceptable evidence" to support DLA's determination.

ECF No. 65-1 at 21–22 (emphasis in original; over-emphasis removed).  In essence, this one paragraph of argument is what AEG's 37-page motion for reconsideration is about (or at least should be about).  The Court addressed this argument in one subsection in its merits opinion but, for ease, will divide its explanation here into two subsections.

> **a.    The Court held that for the government control exception to apply, AEG's proposal needed to be received prior to 10:00 a.m.**

As can be seen from the regulatory text above, the government control exception is two-pronged.  For the exception to apply, a party must show that its offer was: (1) "received at the Government installation designated for receipt of offers"; *and* (2) "under the Government's control *prior* to the time set for receipt of offers."  48 C.F.R. § 52.212-1(f)(2)(i)(B) (emphasis added).  It is important in relation to AEG's merits arguments to note the precise language used within these two prongs.  For the first prong, it is not enough that *any* federal official or *any* federal installation received the otherwise late proposal; rather, the proposal must be received at the "Government installation designated for receipt."  And for the second prong, the proposal must be under the government's control *prior to* the deadline for submitting proposals—not *at* that deadline.

In its merits opinion, the Court plainly held that "AEG's argument that 'acceptable evidence' in the form of email time stamp screenshots showing '10:00 AM' for receipt of AEG's Volume 1 fails because a 10:00 a.m. time stamp does not show that the email was in the government's control '*prior* to the time set for receipt of offers,' which was 10:00 a.m."  *Kropp Holdings, Inc.*, 176 Fed. Cl. at 534 (emphasis in original) (citing ECF No. 65-1 at 20–21 (citing Tab 260 at AR 9589)).  Moreover, the Court noted that

[n]either the government nor AEG proffered evidence or moved to supplement the administrative record with any other information indicating that DLA had control of AEG's proposal prior to the 10:00 a.m. deadline. Without more, the Court cannot conclude that the Energyfuelcards@dla.mil submission inbox, or even DLA servers for that matter, received AEG's proposal before the deadline.

*Id.* at 538. But even more importantly, AEG *did not* even argue in its MJAR that its proposal was received and under the government's control prior to 10:00 a.m. Rather, AEG argued that its "offer was received at the government installation designated for receipt of offers, as shown by the submission inbox screenshots, and was under DLA's control *by 10:00 a.m.*" ECF No. 65-1 at 22 (emphasis added) (citing Tab 260 at AR 9589–91). Although the word "by" as used in this sentence encompasses both *prior to* 10:00 a.m. and *at* 10:00 a.m., this is because AEG's proposal was transmitted in multiple emails. The cited screenshots purportedly show Volumes 3 and 4 being received at 9:53 a.m., Volume 2 being received at 9:58 a.m., and Volume 1 being received at 10:00 a.m. *See* Tab 260 at AR 9589–91. Thus, when AEG argued its proposal was received "by 10:00 a.m."—which generally means "not later than" 10:00 a.m.—it is clear from the documents in the administrative record to which this sentence cites that AEG is arguing that Volume 1 of its proposal was received *at* 10:00 a.m. *See By*, MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY (10th ed. 1993) ("3 . . . b : not later than"). Stated differently, the only linguistically logical reading of AEG's MJAR is that AEG is arguing that the first volume of its proposal was received at 10:00 a.m., not prior to 10:00 a.m., as the cited evidence shows a 10:00 a.m. timestamp on Volume 1. Furthermore, this reading is entirely consistent with AEG's argument that, "because all four volumes of AEG's initial proposal were received by the submission inbox on time and prior to *10:01 AM*, AEG's initial proposal was timely." ECF No. 65-1 at 21 (emphasis added) (citing *Castle-Rose, Inc. v. United States*, 99 Fed. Cl. 517, 525–26 (2011)). And it is further consistent with AEG's statement, which included the time not only in italics but in bold font as well, that "Volume 1 reached Energyfuelcards@dla.mil *at 10:00 AM*." *Id.* (emphasis in original) (citing Tab 260 at AR 9589).

Therefore, the Court's holding was that, because AEG argued that the evidence showed that its proposal was received *at* 10:00 a.m., the government control exception could not apply as a matter of law because application of the government control exception would require receipt prior to 10:00 a.m. *Kropp Holdings Inc.*, 176 Fed. Cl. at 534.[2] This is all the Court had to hold. To apply, the government control exception requires submissions to be received "prior to the time set for receipt of offers." 48 C.F.R. § 52.212-1(f)(2)(i)(B). Because AEG argued that its offer was received *at* the time set for receipt of offers, AEG's government control exception

---

[2] As the Court explained, "to fall under the government control exception, AEG's Volume 1 must have been received at 9:59:59 a.m. or earlier to have been received 'prior to' 10:00 a.m., which was the 'time set for receipt of offers.'" *Id.* at 534 (quoting 48 C.F.R. § 52.212-1(f)(2)(i)(B)). But because AEG argued "that acceptable evidence in the form of email screenshots establishes that its Volume 1 submission was received at 10:00 a.m., and not prior to 10:00 a.m.," the Court found that "AEG's argument fails, and its submission cannot fall under the government control exception." *Id.* (citing ECF No. 65-1 at 21; FAR 52.212-1(f)(2)(i)(B)).

argument failed at the outset.[3]  AEG could have included in its MJAR an argument that the submission was received prior to 10:00 a.m.; proffered evidence to that effect or moved the Court to supplement, correct, or complete the administrative record with such evidence; or moved for a remand to the agency to see if acceptable evidence existed.  But AEG did none of these things.  Instead, AEG rested its argument on its legally insufficient assertion that the submission was received at 10:00 a.m.  To look at this issue slightly differently, if AEG had made this argument in a complaint instead of an MJAR, the Court would be forced to find that AEG failed to state a claim upon which relief can be granted.  This is because even if the Court read AEG's "alleged fact" of a 10:00 a.m. receipt in the light most favorable to AEG, AEG would still not be entitled to relief as a matter of law because an email received *at* 10:00 a.m. does not fall under the government control exception.

Turning to its merits reply brief, AEG again asserted that the agency received its submission at, and not prior to, the deadline.  AEG argued that the record on which the contracting officer relied "supports her decision to accept AEG's proposal as timely submitted, as each of the initial proposal volumes ***were received on-time according to the inbox timestamps***: Volume 1—10:00 a.m."  ECF No. 74 at 7 (emphasis in original) (citing Tab 260 at AR 9589).  Again, this argument did not properly invoke the government control exception, which requires that the proposal be received prior to, and not at, the deadline.  AEG further contended in its reply brief that the late-is-late rule "exists to prevent one offeror from gaining a competitive advantage—not to render untimely a proposal transmitted and received within the Government's control by the due date and time."  *Id.* at 9.  The Court agrees.  The problem, though, is that while AEG may have transmitted its proposal "by the due date and time" by clicking "send" before 10:00 a.m., AEG did not even argue (much less prove) that the government *received* that proposal prior to that "due date and time."  *Id.*  Regardless of when AEG transmitted its proposal, without even an argument that the government received that proposal prior to 10:00 a.m., the Court could not find that the government control exception spares AEG's otherwise late submission.

Ultimately, AEG made an argument in its MJAR that was bad for its case and, in furtherance of that argument, cited evidence of a late arrival time (for purposes of the government control exception) that further damaged its position.  The Court need not reconsider this argument.  Even assuming all facts in AEG's favor, AEG still loses in this bid protest because, in AEG's own words, "the offer was received at the government installation designated for receipt of offers, as shown by the submission inbox screenshots, and was under DLA's control by 10:00 a.m."  ECF No. 65-1 at 22 (citing Tab 260 at AR 9589 (showing a 10:00 a.m. time stamp)).  Receipt *at* 10:00 a.m. is not receipt *prior to* 10:00 a.m., as required for the government control exception to apply.

---

[3] The Court notes that AEG appears to correctly formulate, but not develop, an argument regarding the applicability of the government control exception in the introduction section of its MJAR.  *See* ECF No. 65-1 at 4–5 ("As the completed record illustrates, each volume of AEG's initial proposal was . . . at a minimum, timely received by DLA's email server prior to the time set for receipt of proposals." (emphasis omitted)).  However, that same sentence cites Tab 260 at AR 9589–91, which demonstrates that AEG's Volume 1 submission was not received prior to the 10:00 a.m. deadline.  *See* Tab 260 at AR 9589 (showing a time stamp of 10:00 a.m.).

        **b.**       **Even assuming the government control exception can apply, it could not apply here and be consistent with regulatory construction principles.**

Although by arguing that its proposal was received at 10:00 a.m. instead of prior to 10:00 a.m. AEG's merits argument that the government control exception applied to its late proposal submission necessarily failed, in its merits opinion the Court nonetheless addressed (1) whether the government control exception *can* apply to electronic submissions generally, and (2) whether, assuming the government control exception can apply, it *could* apply in this case.

AEG contends in its motion for reconsideration that the Court, in its merits opinion, agreed with AEG that the government control exception applies to electronic submissions. ECF No. 92-1 at 4–5 ("AEG did not have the burden to prove 'acceptable evidence' of control, but needed solely to establish that the exception, as a legal matter, may apply to electronic submissions, which the Court found . . . ." (emphasis omitted)). But AEG overstates the Court's holding, as the Court never held that the exception applies to electronic submissions. *See Kropp Holdings, Inc.*, 176 Fed. Cl. at 535–36. Rather, the Court stated:

> A more interesting question regarding the applicability of the government control exception to electronic submissions is whether an email server is a 'Government installation' . . . . Although the undersigned is disinclined to believe that an internet server is a 'Government installation' because a natural reading suggests that a 'Government installation' is a physical location, such as a building or military base, the Court *need not reach a definitive conclusion on that point here*.

*Id.* (emphasis added) (footnote omitted). For this reason, the Court notes that AEG's entire argument on this point misstates the Court's holding. Moreover, even if the Court had definitively found that the government control exception can apply to electronic communications, it still would not mean that it necessarily applied to the facts of this case. In attempting to show that the government control exception applied here, AEG asserted a plain language argument and a policy argument. *See* ECF No. 74 at 10–11. The Court discusses each in turn.

First, AEG's plain meaning argument—found not in its MJAR, but in its reply brief—is as follows:

> Applying the plain meaning of the government control exception, DLA properly considered AEG's timely proposal. At a minimum, AEG's initial proposal reached the Defense Information Systems Agency ("DISA") servers ***before the proposal deadline***. *See* ECF No. 64-1 ("Decl. of S. Wallace") at 2. Indeed, per the Declaration, ***under penalty of perjury***, of the government's experienced declarant, DISA's ***Chief Technology Officer***, Mr. Stephen Wallace declared: "Per the provided message headers I observed initial contact (TLS handshake) with [DOD's Enterprise Email Message Security Gateway] at the following times (UTC): Message titled "Air Card Volume 1": 8/19/2021 1:59:59 PM (Hop 9)—Translates to ***09:59:50*** AM EST; Message titled "Air Card Volume 2": 8/19/2021 1:58:31 PM

(Hop 5)—Translates to **09:58:31** AM EST".   *Id.*   Based on this "acceptable evidence," "the Court's inquiry ends."  *Tesoro*, 405 F.3d at 1346.

ECF No. 74 at 10 (alterations and emphasis in original).  Leaving aside the fact that this argument was waived because it was made for the first time in AEG's reply brief, as the Court explained in its merits opinion, this plain meaning argument is flawed because it conflates a key term used in the electronic commerce exception with a key term used in the government control exception.  *See Kropp Holdings, Inc.*, 176 Fed. Cl. at 535–36.

The electronic commerce exception covers proposals that are "received at the initial point of entry to the Government infrastructure"; whereas the government control exception covers proposals that are received at the "Government installation designated for receipt of offers."  As long as these two terms are read to have different meanings, a harmonious reading of the electronic commerce and government control exceptions, as it relates to electronic transmissions of proposals, can be accomplished.  *Id.*  However, as discussed below, AEG's conflation of these two terms would impermissibly read the electronic commerce exception out of the regulation.

As a starting point, it is important to note that the "rules of statutory interpretation apply when interpreting an agency regulation," such as the FAR.  *Roberto v. Dep't of Navy*, 440 F.3d 1341, 1350 (Fed. Cir. 2006) (citing *Wronke v. Marsh*, 787 F.2d 1569, 1574 (Fed. Cir. 1986)). Thus, like statutory construction, regulatory interpretation begins with the language of the regulation, *see Williams v. Taylor*, 529 U.S. 420, 431 (2000) (citing *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241 (1989)), and the Court derives the plain meaning of a regulation from its text and structure, *Norfolk Dredging Co. v. United States*, 375 F.3d 1106, 1110 (Fed. Cir. 2004) (citing *Alexander v. Sandoval*, 532 U.S. 275, 288 (2001)).  Additionally, it is a cardinal principle of statutory construction "to give effect, if possible, to every clause and word of a statute," *Duncan v. Walker*, 533 U.S. 167, 174 (2001) (quoting *United States v. Menasche*, 348 U.S. 528, 538–39 (1955)), and when "Congress uses different parallel words in the alternative in the same statutory provision, it is reasonable to assume that the words have different meanings," *Walton v. United States*, 551 F.3d 1367, 1370 (Fed. Cir. 2009) (citing *Bowers v. N.Y. & Albany Lighterage Co.*, 273 U.S. 346, 349–50 (1927)).  This is because "courts must presume that a legislature says in a statute what it means and means in a statute what it says there."  *Barnhart v. Sigmon Coal Co., Inc.*, 534 U.S. 438, 461–62 (2002) (quoting *Conn. Nat. Bank. v. Germain*, 503 U.S. 249, 253–54 (1992)).

In its reply brief, AEG emphasized that, because the Wallace declaration establishes that AEG's proposal made initial contact with a DISA server prior to the deadline, its proposal was within the government's control in a timely manner.  ECF No. 74 at 10.  The Court rejected this argument, stating that contact with a DISA server is akin to contact with the "initial point of entry to the Government infrastructure" under the electronic commerce exception than receipt at "the Government installation designated for receipt of offers" under the government control exception.  *Kropp Holdings, Inc.*, 176 Fed. Cl. at 536–37.  This is because the Energyfuelcards@dla.mil email inbox, which was designated as the government installation[4] for

---

[4] This assumes, *arguendo*, that the government control exception applies to electronic submissions and that an inbox can serve as a "government installation" under that exception.

receipt of offers for this procurement, *see* Tab 10 at AR 210, is housed in a DLA server which itself is housed in a DISA server, *see Kropp Holdings, Inc.*, 176 Fed. Cl. at 536.  Therefore, because an email would first have to pass through a DISA server before reaching the designated email inbox on a DLA's server, evidence that an email reached a DISA server prior to the deadline for proposal submissions may be sufficient to show that the email reached the "initial point of entry to the Government infrastructure" for electronic commerce exception purposes. However, such evidence would be legally insufficient to show that the email reached the "Government installation designated for receipt of offers," and would thus fall short of establishing the applicability of the government control exception.  *See Kropp Holdings, Inc.*, 176 Fed. Cl. at 536 ("AEG relies on the DISA chief technology officer's declaration to argue that its proposal was received at a 'Government installation' because all four of its volume submissions 'reached [DISA] servers before the proposal deadline.'  However, alleging receipt by DISA servers is not enough, as DLA, not DISA, is the procuring entity." (alterations in original) (citations omitted)).

This is a necessary distinction because, if evidence that a proposal "made initial contact" with a DISA server could suffice for government control exception purposes, the government control exception would swallow the electronic commerce exception.  Under AEG's interpretation, for electronic submissions, all that would have to be shown to establish government control is that an offeror clicked "send" and a government server (in this case, a DISA server) initiated contact with the sent email file.  But under the plain meaning of FAR 52.212-1(f)(2)(i), this is not enough for the government control exception to apply.

Instead, the FAR provision at issue already contemplates such a rule for electronic submissions: the electronic commerce exception.  48 C.F.R. § 52.212-1(f)(2)(i)(A).  Under that exception, evidence that an offeror clicked "send" and that a DISA server initiated contact with the email file would satisfy the exception as long as "it was received at the initial point of entry to the Government infrastructure not later than 5:00 p.m. one working day prior to the date specified for receipt of offers."  *Id.*  But if clicking "send" and making initial contact with a government server was sufficient to meet the requirements of both the electronic commerce and the government control exceptions, the electronic commerce exception would be rendered superfluous and thereby violate the canon against surplusage: there would be no reason to invoke an exception that required initial contact at 5:00 p.m. the day before the deadline if an offeror could simply rely on an exception that permitted initial contact up to one second prior to the deadline.  *Frank v. United States*, 171 Fed. Cl. 392, 413 (2024) ("The canon against surplusage instructs that 'statutes should be read to avoid superfluity.'" (quoting *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 392 (2013) (Sotomayor, J., dissenting))); *see Marx*, 568 U.S. at 386 ("[T]he canon against surplusage is strongest when an interpretation would render superfluous another part of the same statutory scheme." (citing *United States v. Jicarilla Apache Nation*, 564 U.S. 162, 185 (2011))).

13

Here, AEG essentially argues that, because its proposal was sent to the designated email inbox and reached[5] a DISA server prior to the deadline, it was within the government's control. But this cannot be without rendering the electronic commerce exception "inoperative or superfluous, void or insignificant . . . ." *Hibbs v. Winn*, 542 U.S. 88, 101 (2004). DLA did not designate "a DISA server" as the government installation for receipt of offers; it designated the Energyfuelcards@dla.mil email address for that purpose. *See* Tab 10 at AR 210. As in the physical world, where merely dropping off a bid for a DLA procurement at DISA headquarters just before the deadline is insufficient to establish government control, merely initiating contact with a DISA server seconds before the deadline cannot, without more, establish government control in the electronic world.

Second, AEG's policy argument, also found only in its reply brief, similarly missed the mark. AEG contended that "[b]eyond meeting the plain language of the exception, accepting AEG's proposal as timely is also consistent with the late-is-late rule's stated purpose—ensuring no offeror obtains extra time after the due date and time and creating a competitive advantage." ECF No. 74 at 11 (citing *Geo-Seis Helicopters v. United States*, 77 Fed. Cl. 633 (2007)).[6] AEG continued, stating that it "gained no unfair competitive advantage because AEG submitted its proposal before the deadline—and thus had no more time than the amount allotted to work on its proposal." *Id.*

AEG's argument is simply incorrect. In procurements involving sensitive technologies, like the AIR Card contract at issue here, it should come as no surprise to experienced military contractors that their electronic proposals would undergo security screening to protect DLA information technology systems from viruses or other risks. Indeed, the RFP explicitly warned prospective offerors that the "closing time . . . is intentionally set to avoid any potential receipt issues due to electronic transmission delays such as fire walls" and encouraged offerors "to submit proposals as early as possible to the closing time to ensure a timely proposal and to allow system transmission time." Tab 10 at AR 208. Knowing that this was the case, it behooved offerors to set aside additional time within their proposal preparation window to ensure that their proposals had ample time to be electronically transmitted to DLA prior to the deadline. Whether an offeror set aside a whole day or just an hour is of no moment. The point is, when other offerors set aside time to ensure a seamless transmission before the deadline, and thereby forego using that time to modify their proposals, those offerors are prejudiced if the agency selects a competitor's bid that was sent on time but received late because that competitor failed to ensure a seamless transmission and sent its proposal minutes or seconds before the deadline. That competitor would enjoy the very "inherent competitive advantages" warned of in *Labatt Food Services*: the ability to access news and market information that "could result in last minute changes to the proposal" not available to the contractor who already submitted its bid. *See* 577

---

[5] The Court again notes that the Wallace declaration, on which AEG relies to argue that its submission "reached" a DISA server, only states that the precursor to any transmission of information—a "TLS Handshake with EEMSG"—occurred ten seconds before the deadline. *See Kropp Holdings, Inc.*, 176 Fed. Cl. at 537 (citation modified) (citing ECF No. 78-1 at 2).

[6] The Court surmises that the citation to "*Geo-Seis*, 77 Fed. Cl. at 64," is in error, as the opinion does not appear on page 64 of the reporter.

F.3d at 1381 (citation omitted).  For these reasons, AEG's policy argument was also unpersuasive.

The remaining arguments in AEG's MJAR on the government control exception did nothing to revive its above-discussed failure to make an argument that would make the government control exception applicable.  Despite this failure, the Court outlines the remainder of AEG's argument in its MJAR on this point.  First, AEG argued that, under *Watterson Construction Company v. United States*, 98 Fed. Cl. 84 (2011), "timeliness is determined by when the submission reaches the agency's servers regardless of when it arrives to the end destination inbox."  ECF No. 65-1 at 22–23.  But AEG's invocation of that case misses the mark, as *Watterson* does not address the particular requirement that submissions must arrive "prior to the time set for receipt of offers" but rather more generally discusses whether the government control exception can apply to proposals sent by email and at what point in the transmission chain timeliness is determined.  *See* 98 Fed. Cl. at 93–97.  Unlike here, however, in *Waterson*, the protestor argued its proposal was received prior to the deadline, not at the deadline.  *Id.* at 97 ("It is particularly appropriate that the 'Government Control' exception be available to offerors where there is 'acceptable evidence' to establish that the offeror's e-mail proposal 'was received at the Government installation designated for receipt of offers and was under the Government's control *prior to* the time set for receipt of offers,' as was the case here." (emphasis added)).  Because AEG argued that its proposal was received at 10:00 a.m., *Watterson* offers AEG no help on this crucial point.[7]

AEG next very briefly asserts that the contracting officer's "sworn statement is entitled to the presumption of regularity and KHI has failed to provide 'clear and convincing evidence' to overcome that presumption."  ECF No. 65-1 at 24.  This argument is completely undeveloped in AEG's MJAR and amounts to nothing more than a legal conclusion.  *See Rodriguez v. Dep't of Veterans Affs.*, 8 F.4th 1290, 1305 (Fed. Cir. 2021) ("An issue that is merely alluded to and not developed as an argument in a party's brief is deemed waived." (citing cases)).

Finally, AEG argued that, because KHI "is not prejudiced by the finding that AEG's proposal was timely submitted or within the government's control," the Court cannot find in KHI's favor on this point.  ECF No. 65-1 at 24–25.  This argument is also off-base.  It is beyond peradventure that KHI would have a substantial chance of receiving the AIR Card contract if AEG's proposal was disqualified for being submitted late.  Indeed, KHI was the only other offeror to submit a technically acceptable proposal.  *See* Tab 91 at AR 2739–42.  Accordingly, this prejudice argument cannot revive AEG's fatal argument that its submission was received by, and not prior to, the deadline.

---

[7] Additionally, the analysis of the government control exception in *Watterson* is at odds with the above analysis of how to harmonize the electronic commerce and government control exceptions, because *Watterson* improperly conflates "the Government installation designated for receipt of offers" and "the initial point of entry to the Government infrastructure."  *See* 98 Fed. Cl. at 97.

3.      **AEG's Post-Judgment Reconsideration Arguments Are Unavailing.**

As established above, the Court held that the government control exception did not excuse AEG's late proposal because AEG argued that its proposal was received at, and not prior to, the time set for receipt of offers.  *See* ECF No. 65-1 at 21; *Kropp Holdings, Inc.*, 176 Fed. Cl. at 533.  Despite this holding, AEG expends much effort and many pages in its motion for reconsideration challenging the Court's discussion of how a reading of the government control exception that does not render the electronic commerce exception surplusage also means that the government control exception cannot apply here.  *See* ECF No. 92-1 at 2, 14–23, 27–30.  But this effort is futile, as AEG never addresses in its motion for reconsideration the fatal deficiency in its original argument.  For this reason, the Court finds that reconsideration is not warranted in this case.  Nonetheless, the Court will briefly discuss the arguments raised in AEG's motion for reconsideration, all of which are unavailing.

In its motion, AEG asserts four reasons why the Court should reconsider its decision.  First, AEG contends that DLA did not have the opportunity to determine whether the government control exception spared AEG's late proposal; therefore, contrary to what AEG argued on the merits, AEG now for the first time maintains that the Court should have remanded this question to the agency for resolution.  ECF No. 92-1 at 12–17.  Second, AEG asserts that the Court created a "heightened standard" for "acceptable evidence" of government control by finding that DISA servers were insufficient for control purposes, not accepting DLA's "reasonable" interpretation of the Wallace declaration, making use of "extrinsic information" for definitions, and finding no government control despite there being "time left on the clock" to establish such control.  *Id.* at 17–27.  Third, AEG argues that the Court made a mistake of fact in finding that AEG's proposal did not timely enter DLA servers because, according to AEG's reading of the ███████ declaration (which it only now cites for the first time on reconsideration), such entrance was timely made.  *Id.* at 27–30.  Finally, AEG argues that it did not waive any arguments related to metadata, requests for agency remand, or the insufficiency of the record to establish the applicability of the government control exception.  *Id.* at 31–37.  The Court discusses each argument in turn.

a.      **AEG explicitly argued in its prejudgment merits briefing that the Court should not remand.**

AEG essentially contends that reconsideration is warranted because once the Court "found that the [government control] exception 'may' apply, but that the evidence was inadequate due to its identified inadequacies, it should have remanded the issue to DLA decision-makers and not conclusively ruled out government control."  *Id.* at 16.  Because the Court did not remand to the agency, AEG maintains that the "Court inserted itself into DLA's shoes" by evaluating "the very limited information before it on control."  *Id.*  After all, according to AEG, due to its role in this case as a defendant-intervenor, AEG did not have "the 'burden' to demonstrate that the [government control exception] applied to AEG's initial Volumes 1 and 2."  *See id.* at 12.

It is axiomatic that a party, in furtherance of a motion for reconsideration, may not "reassert the same arguments [ ] made in earlier proceedings" or "raise new arguments that could

have been made earlier." *Lee v. United States*, 130 Fed. Cl. 243, 252 (2017), *aff'd*, 895 F.3d 1363 (Fed. Cir. 2018) (citing *Freeman v. United States*, No. 01–39L, 2016 WL 943859, at *2 (Fed. Cl. Mar. 1, 2016); *Stueve Bros. Farms, LLC v. United States*, 107 Fed. Cl. 469, 475 (2012)). In other words, "[m]otions for reconsideration are not a vehicle for parties to present arguments that they should have made during the regular briefing." *Seldovia Native Ass'n, Inc. v. United States*, 36 Fed. Cl. 593, 598 (1996) (citing *Gen. Elec. v. United States*, 189 Ct. Cl. 116, 117–18 (1969) (per curiam)).

In its motion for reconsideration, AEG advances an argument regarding remand that it did not raise on the merits and that directly contradicts its merits' position. AEG's reconsideration argument that the Court should have remanded the question of whether the government control exception applies is particularly misplaced considering that AEG emphasized in its MJAR that "acceptable evidence" existed for the Court to determine whether the exception applied without need for a remand. *See* ECF No. 65-1 at 20 ("In sum, the record contains acceptable evidence that AEG's initial proposal was timely received by DLA and within DLA's control."); *id.* at 21 ("[E]ven in the presence of conflicting timestamps, DLA acted rationally because acceptable evidence exists showing that, in any event, the government control exception to the 'late-is-late' rule applies."); *id.* at 22 ("The government control exception's low threshold referred to as the 'acceptable evidence' standard obviates the need for further inquiry into this point . . . . This matter need not be debated further as the record contains 'acceptable evidence' to support DLA's determination.").

> AEG continued this argument in its merits reply brief as well.
>
> At a minimum, AEG's initial proposal reached [DISA] servers before the proposal deadline. Indeed, per the [Wallace] Declaration . . . Mr. Stephen Wallace declared: "Per the provided message headers I observed initial contact (TLS handshake) with [DOD's Enterprise Email Message Security Gateway] at the following times (UTC): Message titled 'Air Card Volume 1': 8/19/2021 1:59:59 PM (Hop 9) – Translates to 09:59:50 AM EST; Message titled 'Air Card Volume 2': 8/19/2021 1:58:31 PM (Hop 5) – Translates to 09:58:31 AM EST." *Based on this "acceptable evidence," "the Court's inquiry ends*."

ECF No. 74 at 10 (citation modified) (first quoting ECF No. 64-1 at 2, then quoting *Tesoro*, 405 F.3d at 1346) (emphasis added). Nowhere in its merits briefing did AEG even hint that it thought remand was necessary. Indeed, as KHI points out in its brief in response to AEG's motion for reconsideration, the word "remand" appears "forty-four times in AEG's [motion for reconsideration], yet the word does not appear in AEG's MJAR or its Reply." ECF No. 100 at 2 (citing ECF Nos. 65-1, 74).

The Court conducted a trial (on the paper record), throughout which AEG urged that acceptable evidence existed for the Court to conclusively determine that the government control exception applied. *See, e.g.,* ECF No. 65-1 at 2, 5, 20–22. The sole reason that the Court even engaged in depth with AEG's merits arguments on this point was because AEG adamantly insisted that the record was sufficient for the Court to make a ruling on government control. As discussed in the preceding section, because AEG only argued that its complete proposal was

received at (and not prior to) 10:00 a.m., the Court did not need to engage in the discussion for which AEG now seeks reconsideration. But the Court engaged in this discussion nonetheless, observing that "[a]lthough AEG waived any metadata argument because it did not make such argument in its MJAR, the Court will discuss the argument anyway, as the discussion further demonstrates the lateness of AEG's proposal." *Kropp Holdings*, 176 Fed. Cl. at 534 n.7.

Now, on reconsideration, only after the Court decided against AEG on an issue that AEG urged the Court to decide in its merits reply brief, AEG argues that the Court erred by deciding the question rather than remanding this question to the agency. This is an unacceptable basis on which to argue for reconsideration. *See Lee*, 130 Fed. Cl. at 252 (finding that a plaintiff may not "raise new arguments that could have been made earlier" (citing cases)). If AEG wanted the Court to remand the question for agency determination, AEG should have argued that before the Court's ruling on the merits. *See Seldovia Native Ass'n, Inc.*, 36 Fed. Cl. at 598 ("The purpose of a motion for reconsideration is not to reargue the case." (citing *Roche v. District of Columbia*, 18 Ct. Cl. 289, 290 (1883))). AEG's attempt to do so now cannot succeed, not only because it was nonessential to the Court's ruling but also because it contradicts AEG's merits argument.

Prejudgment hearings are not to be treated by litigants as some sort of experimental laboratory in which they can test their original hypotheses and, after learning that the Court disagrees with those hypotheses in its ruling on the merits, come afresh with new theories to prove its point on reconsideration or appeal. Litigation is not a science experiment. Unlike how a scientist engages in multiple trial runs to test his or her theories over time, litigants have one opportunity to develop and assert their arguments to convince the Court to rule in their favor. And once the Court rules, the time to assert new arguments has long passed.

Moreover, to the extent AEG asserts that its post-judgment remand argument will uncover new evidence of government control under RCFC 59(a), the Court agrees with the government's contention that AEG has the standard backwards. *See* ECF No. 98 at 6. Newly discovered evidence is the predicate that warrants reconsideration—not the other way around. *See id.* Therefore, to the extent that AEG asserts that a remand *may* uncover new evidence proving the applicability of the government control exception to its late proposal, AEG has the standard wrong.

Because AEG argued in its merits briefing that remand was not warranted, the Court is not convinced by AEG's about-face argument in its motion for reconsideration that the Court should have remanded to the agency.

### b.     The Court did not create a heightened standard for "acceptable evidence" of government control.

AEG next asserts that the Court created a "heightened standard" for "acceptable evidence" of government control by finding DISA servers insufficient for control purposes, rejecting DLA's "reasonable" interpretation of the Wallace declaration, making use of "extrinsic information" for definitions, and finding no government control despite there being time left on the clock to establish such control. ECF No. 92-1 at 17–27.

18

Taking these arguments one at a time, the Court did not create a heightened standard as AEG alleges. Specifically, AEG contends that the FAR "defines 'acceptable evidence,' and makes clear that the [government control exception] does not require 'conclusive' evidence or evidence beyond a reasonable doubt." *Id.* at 17 (citing 48 C.F.R. § 52.212-1(f)(3)). However, as the Court did not require either conclusive evidence or evidence beyond a reasonable doubt, AEG's arguments are inapposite.

Under the FAR, "acceptable evidence to establish the time of receipt at the government installation includes the time/date stamp of that installation on the offer wrapper, other documentary evidence of receipt maintained by the installation, or oral testimony or statements of Government personnel." 48 C.F.R. § 52.212-1(f)(3). AEG stresses that the Wallace declaration, which is a "statement of Government personnel," is acceptable evidence that the government control exception applies. *See* ECF No. 92-1 at 18–19. The Court agrees that the declaration fits the bill for "acceptable evidence" in that it is indeed a "statement of Government personnel." However, just because an agency proffers a declaration containing a "statement of Government personnel," it does not automatically mean that the statement's content establishes or even addresses the relevant question for application of the government control exception. Rather, the substance of that statement may or may not provide sufficient information for the Court to conclude that such exception applies.

Here, the Court concluded that the substance of Mr. Wallace's statements did not confirm whether the government control exception applied to AEG's submission for two reasons. First, Mr. Wallace only testified that he "observed initial contact" of AEG's Volume 1 submission with DISA servers ten seconds prior to the deadline. *See* ECF No. 78-1 at 2. The Court's conclusion that testimony recounting an observation of the "precursor to the transmission of data between servers" is insufficient to establish government control does not by any means create a "heightened standard" for acceptable evidence. *See Kropp Holdings, Inc.*, 176 Fed. Cl. at 537. To the contrary, the Court merely found that the information that the declaration provided did not establish government control because the contact discussed in the Wallace declaration was insufficient to "establish that it was received at the *Government installation designated for receipt of offers* and was under the Government's control prior to the time set for receipt of offers." 48 C.F.R. § 52.212-1(f)(2)(i)(B) (emphasis added). Recall that the FAR lists the "time/date stamp of that installation on the offer wrapper" as a form of acceptable evidence. 48 C.F.R § 52.212-1(f)(3). If the Court had rejected a time/date stamp as establishing receipt at the relevant government installation or government control because the stamp was from the wrong installation or because the timestamp was after the deadline for receipt of proposals, the Court would not be creating a "heightened standard" for acceptable evidence. It would simply be pointing out that the stamp does not, in fact, establish that the requirements of the government control exception are met. That is exactly what the Court did here regarding the Wallace declaration. The Court need not reconsider this conclusion.

Second, far from requiring "conclusive evidence" or evidence "beyond a reasonable doubt," the Court applied basic principles of regulatory interpretation to determine that the declaration did not provide acceptable evidence to establish government control. While cautious to not entirely belabor the point discussed in detail above, the Court recognized that "the initial point of entry to the Government infrastructure" under the electronic commerce exception and

19

the "Government installation designated for receipt of offers" under the government control exception must have two different definitions. If they did not, the two exceptions would cover the same field, and the electronic commerce exception would be rendered superfluous in contravention of the canon against surplusage. *See Frank*, 171 Fed. Cl. at 413 ("The canon against surplusage instructs that statutes should be read to avoid superfluity." (citations omitted)); *see also Kropp Holdings, Inc.*, 176 Fed. Cl. at 535. Thus, under the plain meaning of the FAR language at issue, a DISA server, through which emails must first pass before reaching DLA servers or the Energyfuelcards@dla.mil email address, is best read to be the "initial point of entry to the Government infrastructure" as used in the electronic commerce exception. 48 C.F.R. § 52.212-1(f)(2)(i)(A). Having established this, a DISA server cannot also be the "Government installation designated for receipt of offers" because such a reading would render the two phrases synonymous and, therefore, the electronic commerce exception superfluous. For this reason, Mr. Wallace's declaration that he only observed contact with AEG's proposal and a DISA server, without more, cannot establish government control of AEG's proposal prior to the deadline.

Turning to its next argument, AEG contends that "the Court endeavored to find extrinsic evidence—outside the record and not presented to any party—to aid in its efforts to discredit the Wallace Declaration further." ECF No. 92-1 at 24. Specifically, AEG asserts that the Court "became hyper-focused on the technical jargon used by Mr. Wallace, including the 'TLS Handshake' and 'EEMSG' terms, and went on to utilize third-party, extra-record evidence to define the terms rather than remand the issue to DLA for additional information." *Id.* In other words, AEG is arguing that the Court's use of what are essentially dictionaries to define a few technical terms was impermissible. Were it correct, this argument would come as quite a shock to judges throughout the country.

Consulting a dictionary for the definition of a technical term is not considered an impermissible resort to extrinsic evidence, especially when the judge, as here, is simply using a dictionary for its intended purpose: to define a word. As the undersigned's Legal Research & Writing professor has explained, courts regularly use dictionaries for definitions "when the Court simply does not know (or believes that the reader may not know) the accurate definition of a word that it is using; these are typically technical terms or foreign terms. Needless to say, [use of a dictionary] is completely appropriate when 'definition' is the Court's sole objective." Craig Hoffman, *Parse the Sentence First: Curbing the Urge to Resort to the Dictionary When Interpreting Legal Texts*, 6 N.Y.U.J. LEGIS. & PUB. POL'Y 401, 415 (2002) (footnotes omitted); *see also Travelers Cas. & Sur. Co. of Am. v. United States*, 75 Fed. Cl. 696, 708–09 (Fed. Cl. 2007) ("[U]se of dictionaries as interpretive aids (e.g., 'lexicography') is not considered 'extrinsic' aids the use of which violates the plain meaning doctrine." (citations omitted)).

Moreover, any contention that the Court erred by using dictionaries to define certain terms used in the declaration instead of remanding the issue to the agency to define the terms is undermined by AEG's repeated assertion that the Court could rule on the applicability of the government control exception based on the complete record before it. *See* ECF No. 65-1 at 20–22; ECF No. 74 at 10. AEG insisted that "acceptable evidence" existed and that the record was sufficiently supplied for the Court to make its ruling. As explained above, AEG cannot now reverse course and claim that the Court should have remanded to the agency to define technical terms. *See* ECF No. 92-1 at 25.

20

Last under this section, AEG argues that, if the Court "found the Wallace Declaration inadequate, unclear, ambiguous, or confusing," it should have remanded to the agency because the Wallace declaration "makes clear that, even if the Court chose not to interpret it as stating that AEG's initial Volumes 1 and 2 were received by DOD prior to the deadline, there was still time prior to deadline where control could occur, if it had not already." *Id.* at 25–26 (emphasis omitted). AEG's reference to the "time left on the clock" for the Energyfuelcards@dla.mil email address to receive AEG's submitted proposal, *see* ECF No. 92-1 at 25–26, further reinforces the Court's conclusion that, "[w]ithout more, the Court cannot conclude that the Energyfuelcards@dla.mil submission inbox, or even DLA servers for that matter, received AEG's proposal before the deadline," *Kropp Holdings, Inc.*, 176 Fed. Cl. at 538. The Court explained that the Wallace declaration only established that "the precursors to delivering AEG's email containing its proposal took place . . . as relevant to the government control exception, ten seconds prior to the deadline" and that "[n]either the government nor AEG proffered evidence or moved to supplement the administrative record with any other information indicating that DLA had control of AEG's proposal prior to the 10:00 a.m. deadline." *Id.* Had AEG made its ten-seconds-left-on-the-clock argument before the Court's ruling, it may have been appropriate for the Court to remand to the agency for a determination on this point. But again, that is not what AEG argued. Instead, AEG insisted that the record was fully developed and contained "acceptable evidence" for the Court to rule, including that its proposal was received at 10:00 a.m.; therefore, AEG cannot now argue the opposite in its present motion. *See* ECF No. 65-1 at 20–22; ECF No. 74 at 10.

      c.      **The Court did not make a mistake of fact regarding the** ███████ **declaration.**

AEG next argues that the Court made a mistake of fact in finding that AEG's proposal did not timely enter DLA servers because, according to the ███████ declaration, such entrance was timely made. *See* ECF No. 92-1 at 27–28. AEG recounts ███████ statement that "AEG's email containing its Volume 2 proposal displayed as received on August 19, 2021[,] at 9:58 AM EDT because it was received by the *first DLA Server* at 9:58:20 AM EDT." *Id.* at 27 (quoting ECF No. 50-1 ¶ 3 (emphasis in original)). Furthermore, "AEG's email containing its Volume 1 proposal displayed as received on August 19, 2021 at 10:00 AM EDT because it was received by the *first DLA Server* at 9:59:38 AM EDT." *Id.* For this reason, AEG contends that acceptable evidence existed to show that its proposal was received by DLA servers prior to the deadline and that the Court's conclusion to the contrary was clearly erroneous. *See* ECF No. 92-1 at 27–28.

AEG's argument fails for two reasons. First, AEG did not cite the ███████ declaration even once in its merits briefing. *See* ECF No. 65-1; *see also* ECF No. 74. This declaration was readily available to AEG before it filed either brief, as the government filed that declaration on February 19, 2025, *see* ECF No. 50-1, and AEG filed its MJAR over a week later, on February 28, 2025, *see* ECF No. 65, and its reply brief nearly a month later, on March 18, 2025, *see* ECF No. 74. AEG also did not mention the declaration at oral argument on March 26, 2025. *See* ECF No. 85. Because this declaration "was manifestly available" to AEG before the Court's ruling, and AEG did not cite to this declaration or mention it at oral argument, AEG cannot do so now in furtherance of its argument for reconsideration. *See Parsons*, 174 Fed. App'x at 563. Nor can

AEG attempt to assert new arguments not raised before the Court's ruling based on this evidence. *See E&I Glob. Energy Servs.*, 152 Fed. Cl. at 533.

Second, to the extent the Court mentioned the ▮▮▮ declaration in its opinion, it did so in a separate subsection of the opinion from the portion of the opinion AEG is challenging on reconsideration. Moreover, the Court probably should not have cited to the ▮▮▮ declaration at all because it is clear that the credibility of that declaration is undermined by the declarant's erroneous mixing of time stamps in coming to the conclusion AEG points to here. For example, ▮▮▮ concluded that the email containing AEG's Volume 1 submission "was received by the first DLA server at 9:59:38 AM EDT." ECF No. 50-1 ¶ 3. But this conclusion directly conflicts with Mr. Wallace's testimony, which states that the "first contact with DOD systems was the TLS handshake" and that he "observed initial contact (TLS handshake with EEMSG)" at "9:59:50 AM" for AEG's Volume 1 submission. ECF No. 78-1 at 2. An email obviously could not reach a DLA server at 9:59:38 a.m. when that server exists within DISA servers that did not even make first contact with that email until 9:59:50 a.m.

Furthermore, the metadata provided to the Court reinforces Wallace's conclusion and undermines ▮▮▮ statement. When looking to the metadata provided, not only does ▮▮▮ conclusion that DLA servers received AEG's Volume 1 submission at 9:59:38 a.m. correspond exactly with the time AEG sent that submission, but the time stamp that "supports" ▮▮▮ conclusion matches metadata showing that 9:59:38 a.m. was the time Microsoft Outlook servers received the transmission of the email from other Outlook servers, not when DOD servers made such receipt. *See* ECF No. 56-1 at 2. In contrast, Mr. Wallace's statement that a TLS Handshake first occurred with the EEMSG at 9:59:50 a.m. finds support in the metadata. *See id.* at 1. The Court additionally notes that Mr. Wallace's position as "Chief Technology Officer for the Defense Information Systems Agency," ECF No. 78-1 at 2, lends further credibility to his conclusions over the conflicting statements of ▮▮▮ who is a "Legal Administrative Specialist (e-Discovery)" for DLA, ECF No. 50-1 ¶ 1. For these reasons, the Court views the ▮▮▮ declaration through a skeptical lens as the conclusions in that declaration appear erroneous and certainly conflict with the verifiable testimony of a more senior IT officer.

But even leaving all of this aside, the ▮▮▮ declaration still does not undermine the basic point that what the government control exception is concerned with is receipt and government control at the "Government installation designated for receipt of offers." Unlike the electronic commerce exception, entry to servers at points along the way to the designated government installation is not a concern of the government control exception.

In sum, AEG never as much as mentioned the ▮▮▮ declaration in its merits briefing and, consequently, cannot do so now. Moreover, the credibility of that declaration is doubtful when considering that it conflicts with other verifiable testimony and appears to misconstrue the metadata evidence. Furthermore, the ▮▮▮ declaration does not undermine the basic point that AEG's proposal did not make it to the "Government installation designated for receipt of offers" until after the 10:00 a.m. deadline. For these reasons, AEG's reconsideration arguments regarding the ▮▮▮ declaration are unavailing.

**d.**     **AEG has waived any arguments related to metadata, requests for remand, and the insufficiency of the record to establish applicability of the government control exception.**

Despite AEG's efforts to recharacterize its arguments before the Court's merits ruling by stating in its motion for reconsideration that it "relied upon the very limited information before the Court," *see* ECF No. 92-1 at 32, in actuality, AEG repeatedly urged on the merits that the record was complete and that "acceptable evidence" of government control existed for the Court to make a ruling regarding applicability of the exception, *see* ECF No. 65-1 at 20–22; ECF No. 74 at 10.  Perhaps AEG made that argument because it was originally selected for the AIR Card contract and wanted to go full steam ahead to preserve its contract without the delay of an agency remand or additional proceedings before this Court.  Regardless of AEG's motivation to make such an argument, as the Court has thoroughly explained above, AEG cannot now ask the Court to go back in time, ignore the arguments AEG made on the merits, and order remand for issues AEG either did not address on the merits or previously argued were ripe for resolution. *See Fru-Con Const. Corp.*, 44 Fed. Cl. at 301 ("Put simply, the rulings of a court are not 'mere first drafts, subject to revision and reconsideration at a litigant's pleasure.'" (quoting *Quaker Alloy Casting Co. v. Gulfco Indus.*, Inc., 123 F.R.D. 282, 288 (N.D. Ill. 1988))).

Although GAO decisions are not binding on this Court, the Court notes the similarity of the protestor's situation in *In re ALJUCAR, LLC* to AEG's predicament here.  *See* B-401148, 2009 WL 1588827 (Comp. Gen. June 8, 2009).  That case involved an untimely delivery of a hard-copy proposal to a physical government installation.  *Id.* at *2.  The protester there argued that the "sole cause" of its untimely proposal was "delay caused by the guard at the security checkpoint" who erroneously failed to "allow the [protestor's] representative who lacked adequate identification to either wait at the checkpoint or leave the checkpoint, unescorted, to exit the base." *Id.* at *3.  The GAO stated that, even if the guard's actions were in error, it could not conclude that such actions were "the sole or paramount cause of the proposal being received late," since the protestor, who "had the primary responsibility for delivering its proposal on time[,] significantly contributed to the lateness of the proposal." *Id.*  This is because, as the GAO explained, "[d]espite numerous RFP instructions emphasizing [an] offeror's responsibility for timely submission, including that [an] offeror should anticipate it taking up to an hour to complete the required security screening for proposal submissions, the [protestor] arrived on the base only 8 minutes before closing." *Id.*  All in all, the GAO, in concluding that the protestor's proposal was late, remarked that the protestor "simply did not allow sufficient time to fulfill its responsibility to deliver its proposal by the proper time." *Id.*

Here, AEG similarly waited until the last minute to submit its proposal for the AIR Card contract.  Determining whether its strategy in doing so was to make last-minute improvements to its proposal or for other reasons is beyond the scope of this Court's review.  Nonetheless, the Court must observe that, like the protestor in *ALJUCAR*, AEG took a gamble by waiting until the last minute to submit its proposal, especially in light of the clear warnings given in the RFP for offerors to submit their proposals as early as possible to prevent this exact situation.  *See* Tab 10 at AR 208.  AEG's counsel even conceded the riskiness of his client's gamble in submitting its proposal so close to the deadline.  *See* ECF No. 85 at 93:3–8.  Unfortunately, his gamble did not pay off, and the Court must deny AEG's motion for reconsideration.

**CONCLUSION**

Although the Court acknowledges that it may seem unfortunate that AEG was eliminated from competition due to the untimeliness of its proposal, the law is clear that the government control exception to the late-is-late rule is inapplicable to spare AEG's otherwise untimely submission.  For the foregoing reasons, the Court hereby **DENIES** AEG's motion for reconsideration.

**IT IS SO ORDERED**.


s/ Zachary N. Somers
Zachary N. Somers
Judge